## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DRIVEN BRANDS HOLDINGS INC., JONATHAN G. FITZPATRICK, and TIFFANY L. MASON, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Genesee County Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon the investigation of its counsel, which included review and analysis of: (i) regulatory filings made by Driven Brands Holdings Inc. ("Driven" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Driven; and (iv) other public information regarding the Company.

## INTRODUCTION

1. This securities class action is brought on behalf of all purchasers of Driven common stock between October 27, 2021, and August 1, 2023, inclusive (the "Class Period"). The claims asserted herein are alleged against Driven and certain of the Company's current and former senior

executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.　　Driven is the largest automotive services company in North America, providing customers with a range of automotive needs, including paint, collision, glass, oil change, maintenance, and car wash.  Driven is the holding company of a portfolio of brands that compete across the automotive services industry.  Those brands include Take 5 Oil Change®, Take 5 Car Wash®, Meineke Car Care Centers®, MAACO®, CARSTAR ®, and 1-800-Radiator & A/C ®, and Auto Glass Now®, among others.  The Company conducts its operations through four reportable segments: Maintenance; Car Wash; Paint, Collision and Glass; and Platform Services. On January 14, 2021, Driven conducted an initial public offering ("IPO") and became a publicly traded company.

3.　　Driven's acquisition of existing businesses in the automotive services industry, and its integration of those businesses, has been a core component of the Company's growth strategy. Over the last several years, Driven expanded its operations to provide car washes and extended its geographical presence in the auto glass repair services market.

4.　　In August 2020, Driven acquired International Car Wash Group ("ICWG"), the world's largest car wash company by location count.  In late December 2021, Driven acquired Auto Glass Now ("AGN"), through which Driven expanded its auto glass repair services business into the U.S. market.  The Company's growth strategy was to build an auto glass repair platform through a significant number of acquisitions in a short amount of time.  Through a series of subsequent acquisitions, Driven quickly became the second-largest auto glass repair business in North America.

5.     The claims against Defendants arise from their misrepresentations and omissions that fall into two categories: (i) statements concerning Driven's ability to efficiently and effectively integrate a high volume of acquired businesses, including statements related to the status of integrating its U.S. auto glass businesses; and (ii) statements concerning the performance and competitive position of Driven's car wash business segment.

6.     Throughout the Class Period, Driven repeatedly touted its ability to execute and integrate acquisitions as a "core strength," and assured investors that it had made "significant progress" integrating the auto glass businesses it had acquired.  The Company also represented that the large scale of its car wash business served as a "competitive moat" that would preserve Driven's competitive position.  While Driven acknowledged some "softness" in customer demand for its car wash business segment, the Company downplayed that issue and pointed investors to the growth of its car wash subscriptions, which Driven labeled as the "Holy Grail" in the car wash business.  Significantly, Driven provided assurances to investors that "nothing whatsoever concerns us" regarding its car wash business.

7.     These and similar statements made throughout the Class Period were false.  In truth, Driven was "several quarters" behind on integrating its auto glass businesses, and the Company's car wash business was faltering and more exposed to a decline in demand from retail customers than it represented to investors.  As a result, the Company's statements concerning its business and prospects, including its fiscal year 2023 financial guidance, lacked a reasonable basis.  As a result of Defendants' misrepresentations, shares of Driven common stock traded at artificially inflated prices during the Class Period.

8.     The truth began to emerge on May 8, 2023, when Driven announced that, on May 4, 2023, the Company's former Chief Financial Officer ("CFO"), Defendant Tiffany L. Mason

("Mason"), abruptly and inexplicably left the Company, just one day after Driven reported its financial results for the first quarter of 2023 and Defendant Mason participated in the Company's corresponding earnings call. In the wake of Defendant Mason's abrupt departure, Driven reaffirmed its financial guidance for fiscal 2023.

9. Then, on August 2, 2023, Driven reported earnings for the second quarter of 2023 that missed expectations, including disappointing results for both its Paint, Collision and Glass and Car Wash business segments. The Company also slashed its earnings guidance for fiscal 2023. Driven attributed its earnings miss and guidance cut to delays in the integration of its acquired auto glass businesses and increased exposure to "intensified competitive intrusion" in its Car Wash segment, which negatively impacted consumer demand and the Company's margins. These disclosures caused the price of Driven common stock to decline by $10.63 per share, or 41%.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Driven common stock, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Driven maintains its headquarters in Charlotte, North Carolina, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading

information, occurred in and/or were issued from this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff Genesee County Employees' Retirement System is a multi-employer defined benefit plan that provides retirement and survivor benefits for employees of Genesee County, Michigan. As indicated in the certification submitted herewith, Plaintiff purchased shares of Driven common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

14.     Defendant Driven is an automotive services company, and maintains its headquarters at 440 South Church Street, Suite 700, Charlotte, North Carolina. Driven common stock trades on NASDAQ under the ticker symbol "DRVN." As of November 6, 2023, Driven had over 163 million shares of common stock outstanding, owned by hundreds or thousands of investors.

15.     Defendant Jonathan G. Fitzpatrick ("Fitzpatrick") is, and was at all relevant times, President and Chief Executive Officer ("CEO") of Driven and a member of the Company's board of directors.

16.     Defendant Mason served as Executive Vice President and CFO of Driven from March 2020 to May 4, 2023.

17.     Defendants Fitzpatrick and Mason are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with Driven, possessed the power and authority to control the contents of the Company's reports to the SEC,

5

press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

18. Driven, through its portfolio of brands, provides a range of automotive services. Those brands include, among others: Take 5 Oil Change®, Take 5 Car Wash®, Meineke Car Care Centers®, MAACO®, CARSTAR ®, and 1-800-Radiator & A/C ®, and Auto Glass Now®. Driven is the largest automotive services company in North America, with approximately 5,000 franchised, independently-operated, and Company-operated locations across 49 U.S. states and 13 other countries. The Company operates through four reportable business segments: Maintenance; Car Wash; Paint, Collision and Glass; and Platform Services.

19. A core component of Driven's growth strategy has been to acquire businesses that compete in the automotive services industry and then integrate those businesses into its own brands. In the last several years, Driven expanded its operations to provide car wash services and extended its reach in the auto glass repair market by entering the U.S. market. In August 2020, shortly before the Company's January 2021 IPO, Driven acquired ICWG, the largest car wash company in the world by location count. The Company claimed that the size and scale of its car wash business provided Driven with a sustainable competitive advantage. In late December 2021,

Driven acquired AGN and began providing auto glass repair services to customers in the U.S. Before the AGN acquisition, Driven provided auto glass services only in Canada. The Company claimed that it could leverage the "playbook" it had applied to acquiring and integrating other businesses to its acquisition of the auto glass businesses.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

20. The Class Period begins on October 27, 2021, when Driven held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2021 third quarter ended September 25, 2021. During the call, Defendant Fitzpatrick touted M&A as "a core strength at Driven" and led investors to believe that Driven was poised to continue successfully integrating the businesses it acquired. Defendant Fitzpatrick also described the large number of car washes the Company operated and the way in which it operated them in the context of a "competitive moat" that would preserve and enhance its competitive position. Also, during the call, in response to an analyst's question about a "slowdown" in same-store sales in the Company's Car Wash segment, Defendant Fitzgerald provided assurances that "the business is in great shape" and "nothing whatsoever concerns us."[1]

21. On January 4, 2022, the Company issued a press release announcing that it had acquired AGN on December 30, 2021, which Driven would report in its Paint, Collision, and Glass segment. In the press release, Driven presented the AGN acquisition as "another exciting opportunity to leverage our proven playbook of consistent and repeatable growth to continue capturing market share."

---

[1] Same-store sales is a financial metric that reflects the change in sales year-over-year for the same-store base, which Driven defines to include all franchised, independently-operated, and Company-operated stores open for comparable weeks during a given fiscal period in both the current and prior year. According to the Company, this metric highlights the performance of existing stores by excluding the impact of new store openings and closures and acquisitions and divestitures.

22.     On February 16, 2022, Driven held an earnings call with analysts and investors to discuss the Company's financial results for its fourth quarter and fiscal year ended December 25, 2021. During the call, Defendant Fitzpatrick emphasized that since the Company had completed its acquisition of AGN, Driven would apply "the same proven playbook to [its] most recent growth acquisition." Defendant Fitzpatrick claimed that Driven was poised to "leverage [its] growth blueprint and significantly accelerate [its] presence in this segment" through the Company's efficient and effective integration of its acquired auto glass businesses, reassuring investors that "M&A is a core strength at Driven."

23.     On March 18, 2022, Driven filed its annual report on Form 10-K with the SEC for the fiscal year ended December 25, 2021. In the 10-K, the Company labeled the "execution of successful mergers and acquisitions" as a "core competency" of Driven, and emphasized its investment in "processes to systematically source, perform due diligence on, acquire and integrate locations." In the 10-K, Driven also claimed that it was "optimally positioned to continue our long and successful track record of acquisitions" and poised "to capitalize on the highly fragmented nature of the automotive services industry by continuing to execute on accretive acquisitions using our proven acquisition strategy and playbook." Further, in the 10-K, Driven stated that "[t]he large number and variety of market participants creates intense competition," and purported to warn investors of the ostensible risk that "increased competition could have a material adverse effect on our business, financial condition and operating results." In addition, Driven purported to warn that "we may not be able to successfully integrate acquired businesses and may incur significant costs to integrate and support acquired companies," which "could adversely affect our financial results."

24.     On April 27, 2022, Driven held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2022 first quarter ended March 26, 2022.

During the call, Defendant Fitzpatrick discussed the Company's auto glass business, which was one of Driven's "primary growth levers," and provided an update on the acquisition it had made. Specifically, Defendant Fitzpatrick represented that "I'm very pleased with our progress" and told investors that the Company had "integrated the AGN acquisition into the Driven platform." Defendant Fitzpatrick further explained that Driven was "getting faster at executing" its growth-by-acquisition "playbook," and led investors to believe that the Company would "have even more rapid progress in our glass business." In addition, "despite multiple inflationary challenges" that could otherwise negatively impact consumer demand for the Company's automotive services, including car washes, Defendant Fitzpatrick sought to reassure investors that Driven "continues to grow and take [market] share" and "[w]e remain as confident as ever in our ability to deliver on our short-, medium- and long-term goals."

25.     On July 27, 2022, Driven held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2022 second quarter ended June 25, 2022. During the call, Defendant Mason represented that Driven's "proven M&A playbook is delivering across [its] car wash and glass businesses." Mason further represented that Driven's "diverse and need-based" services enabled the Company "to better withstand any volatility that comes with a weakening economic environment" and emphasized that Driven is "navigating the inflationary environment and supply chain challenges better than most in auto aftermarket, given our scale and sophistication."

26.     On September 7, 2022, Defendants Fitzpatrick and Mason participated in the Goldman Sachs Global Retailing Conference on behalf of Driven. During the conference, in discussing the Company's "priority growth levers," including Driven's auto glass business, Defendant Fitzpatrick touted the Company's "M&A machine," emphasizing that Driven's more

than 100 M&A transactions over the previous eight years provided it with "the ability to buy small chains and independents and larger businesses and then consolidate them into the overall Driven platform."

27. On October 26, 2022, Driven held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2022 third quarter ended September 24, 2022. During the call, despite Driven experiencing some headwinds in its Car Wash segment related to "softening retail volume as the result of the macro environment," Defendant Fitzpatrick downplayed that issue, stating that those headwinds were "partially offset by strong execution from the team implementing price increases, shifting mix towards premium offerings, and converting customers to stickier recurring revenue with our car wash club program." Similarly, Defendant Mason pointed investors to Driven's continued growth in its car wash subscription program and stated that the program is "not only a great recurring revenue stream that provides a level of predictability to this business, but it is also proving to be a sticky customer." Further, in response to an analyst's question regarding Driven's increase in promotions to drive customer growth in its Car Wash segment, Defendant Fitzpatrick downplayed concerns that those promotions signaled issues with the business. Fitzpatrick assured investors that promotional activity is "something we do across all of our businesses" and "[t]his is not a reaction to a short-term reaction," referring to softness in the Car Wash segment.

28. On December 5, 2022, Driven issued a press releasing announcing that the Company would migrate its glass servicing business to Driven's Auto Glass Now brand beginning in 2023. In the press release, Driven touted the rapid growth of its U.S. glass business primarily through its acquisitions, stating that "[s]ince entering the U.S. glass business less than a year ago, Driven Brands has grown to approximately 175 locations and over 700 mobile units through a

series of acquisitions and a growing pipeline of greenfield openings and ten acquisitions, including the acquisition of Discount Auto Glass that closed today."

29.     On December 6, 2022, Defendant Fitzpatrick participated in the Morgan Stanley Global Consumer and Retail Conference on behalf of Driven. During the conference, an analyst asked about the weaker than expected performance in Driven's Car Wash segment and whether that weakness was related to increased competition. In response, Defendant Fitzpatrick emphasized that the "subscription side of the business continues to grow . . . very nicely," and referred to increased competition as only "a small piece" of the softness in the Car Wash segment.

30.     On February 22, 2023, Driven issued a press release announcing its financial results for its fourth quarter and fiscal year ended December 31, 2022. The press release, which was also filed with the SEC on Form 8-K, quotes Defendant Fitzpatrick as stating that "2022 was a year of record performance and significant strategic progress for Driven Brands" and "[w]e deepened our competitive moat as our differentiated offering resonated with our customers." Fitzpatrick further stated that Driven "entered the first quarter of 2023 with momentum, excellent visibility into our expense base and a robust development pipeline that provides us with a strong line of sight to multi-year growth." In the press release, Driven also provided guidance for fiscal 2023, telling investors to expect revenue of approximately $2.35 billion, adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") of approximately $590 million, and adjusted earnings per share of approximately $1.21.

31.     That same day, Driven held a conference call with analysts and investors to discuss the Company's financial results for its fourth quarter and fiscal year ended December 31, 2022. During the call, Defendant Fitzpatrick discussed the ten percent decline in same-store sales in the Company's Car Wash segment during the fourth quarter. While Fitzpatrick acknowledged that

Driven experienced headwinds related to "foreign exchange and softer retail volume, as a result of the macroeconomic environment," Fitzpatrick assured investors that the Company's "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants." Defendant Mason stated that, despite the softness in retail customer volume in the Company's car washes, Driven "continued to drive mix shifts to higher dollar washes and grow our subscription program," which is "not only a great recurring revenue stream that provides a level of predictability to this business, but it's also proving to be a sticky customer." In addition, regarding the growth of Driven's auto glass business through the Company's acquisitions, Defendant Fitzpatrick stated that "we did a phenomenal job in 2022 building out that platform from zero to becoming the second largest player in the United States."

32.     On March 1, 2023, Driven filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2022. In the 10-K, the Company claimed that it was "optimally positioned to continue our long and successful track record of acquisitions." Further, in the 10-K, Driven stated that "[t]he large number and variety of market participants creates intense competition," and purported to warn investors of the ostensible risk that "increased competitive pressures could have a material adverse effect on our business, financial condition, and operating results." In addition, Driven purported to warn that "we may not be able to successfully integrate acquired businesses and may incur significant costs to integrate and support acquired companies," which "could adversely affect our financial results."

33.     On March 15, 2023, Defendant Mason participated in the UBS Global Consumer and Retail Conference on behalf of Driven. During the conference, in response to an analyst's question regarding the "competitive dynamic" in Driven's Car Wash segment, Defendant Mason downplayed the competitive pressures Driven faced. Indeed, Mason explained that, given the

number of car washes Driven operated, "there might be some interesting opportunities for us to gain some additional share from players that just weren't able to make it." Moreover, in response to an analyst's comment that the Company's Car Wash segment was the "most economically sensitive" to macroeconomic conditions, Mason downplayed that concern, and pointed investors to Driven's continued growth in its car wash subscription program. Mason stated that the Company's car wash subscription program "gives a nice sort of shield or limits the volatility in the segment over various seasons or economic times" and referred to that program as the "Holy Grail" in the Car Wash segment.

34.     On May 3, 2023, Driven held a conference call with analysts and investors to discuss the Company's financial results for its fiscal year 2023 first quarter ended April 1, 2023. During the call, Defendant Fitzpatrick discussed the Company's integration of its auto glass business acquisitions, and represented that Driven had made "significant progress integrating our 10 acquisitions to create a US glass platform" and boasted that "the team is doing great work" with those integrations.

35.     During the call, Defendant Mason also provided commentary on the performance of Driven's Car Wash segment, for which the Company reported an 11% decline in same-store sales year-over-year. While Defendant Fitzpatrick acknowledged "softer retail volume" in the Car Was segment "as a result of the macro environment," Defendant Mason downplayed that issue, and instead again emphasized the Company's continued growth in its car wash subscription program. Defendant Fitzpatrick also downplayed the competitive pressures in Driven faced in its Car Wash segment, assuring investors that "[o]ur scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants." In response to an analyst's question about whether pressures in the

Company's Car Wash and Paint, Collision, and Glass segments had "peaked," Defendant Mason pointed to the fact that Driven reaffirmed its guidance for fiscal 2023 and assured investors that this "should give you confidence that we're seeing the right behavior in the business."

36.     The statements set forth above in ¶¶ 20-35 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Driven was at least "several quarters" behind on integrating the auto glass businesses it had acquired, and the Company's car wash business was more exposed to the negative impacts from a decline in demand from retail customers than it represented to investors.  As a result, Defendants' positive statements concerning its business and prospects, including its fiscal year 2023 financial guidance, were materially misleading and/or lacked a reasonable basis.  In addition, to the extent the Company purported to warn of risks regarding the negative impacts from increased competition and issues integrating acquired businesses, Defendants omitted that such risks had already begun to materialize.

## THE TRUTH EMERGES

37.     Investors began to learn the truth on May 8, 2023, when Driven revealed that, on May 4, 2023, the Company's former CFO, Defendant Mason, immediately left the Company, under unusual circumstances.  Mason's abrupt and unexpected exit came just one day after Driven reported its financial results for the first quarter of 2023, including her participation in the Company's corresponding earnings call, and two weeks before Driven's inaugural Investor Day conference.  While Driven did not provide any explanation or details regarding the circumstances of Mason's departure, some analysts expressed concerns.  For example, one analyst from

Canaccord Genuity observed that "the timing is odd to say the least." Despite Mason's sudden exit, the Company reaffirmed its guidance for fiscal year 2023.

38. In the wake of Mason's unusually timed departure, on May 18, 2023, Driven postposed its first Investor Day conference as a public company, previously scheduled for May 23, 2023, until September 2023, "due to the Company's recent CFO transition." Despite Driven's four-month postponement of its Investor Day conference, the Company again reaffirmed its financial guidance for fiscal year 2023.

39. Then on August 2, 2023, Driven announced disappointing financial results for the second quarter of 2023 for both its auto glass and car wash business segments and slashed its full-year guidance for fiscal 2023. With respect to its auto glass business, the Company admitted that it was at least "several quarters" behind on its integration of the businesses it had acquired. Due to the integration issues, Driven reported a year-over-year decline of 3.5% in adjusted EBITDA margin in its Paint, Collision, and Glass segment and conceded that its integration delays "contribut[ed] to our updated guidance for fiscal 2023." Driven further acknowledged that "[w]e made a conscious decision to go fast" in acquiring the U.S. auto glass businesses and "knew that there was potential sort of complexity of integration."

40. In its Car Wash business segment, Driven reported a year-over-year decline in the volume of retail customers due to heightened competition at several of the Company's U.S. locations. Indeed, the Company revealed that its increased exposure to "intensified competitive intrusion" negatively affected Driven's retail (*i.e.*, non-subscription based) car wash customers, which are the Company's "highest margin customer."

41. As a result of delays in Driven's integration of its acquired auto glass businesses and the faltering performance of its car wash business, the Company slashed its full-year earnings

guidance for fiscal 2023, reducing its projected revenue by $50 million, its adjusted EBITDA by $55 million, and its adjusted earnings per share by $0.29 per share, or 24%, despite having reaffirmed that guidance a little over two months earlier. As a result of these disclosures, the price of Driven common stock declined by $10.63 per share, or 41%.

42. On September 20, 2023, after the end of the Class Period, during the Company's Investor Day conference, Defendant Fitzpatrick discussed Driven's issues with integrating the U.S. auto glass businesses it had acquired. Fitzpatrick explained that Driven "went fast intentionally to create a platform and create a moat around others following suit" and "took on a lot of integration," but admitted that "in hindsight . . . we should have gone slower."

## LOSS CAUSATION

43. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Driven common stock and operated as a fraud or deceit on the Class (defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Driven common stock declined significantly as the prior artificial inflation came out of the price over time. As a result of their purchases of Driven shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Driven common stock during the Class Period

(the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Driven and their families and affiliates.

46.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of November 6, 2023, Driven had over 163 million shares of common stock outstanding, owned by hundreds or thousands of investors.

47.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)    Whether Defendants' conduct impacted the price of Driven common stock;

(g)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)    The extent of damages sustained by Class members and the appropriate measure of damages.

48. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

49. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

50. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51. To the extent that any of the alleged false statements described in this Complaint were forward-looking, Driven's "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

52. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Driven who knew the statement was false or misleading. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or statements of future economic performance made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

53.     At all relevant times, the market for Driven common stock was an efficient market for the following reasons, among others:

(a)     Driven common stock met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Driven filed periodic public reports with the SEC and NASDAQ;

(c)     Driven regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Driven was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Driven common stock promptly digested current information regarding Driven from all publicly available sources and reflected such information in the price of Driven common stock.  Under these circumstances, all purchasers of Driven common stock during the Class Period suffered similar injury through their purchases of Driven common stock at artificially inflated prices and the presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action

involves a failure to disclose material adverse information regarding Driven's business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Driven's ability to integrate its auto glass acquisitions and the performance of its car wash business to the Company's growth, that requirement is satisfied here.

## CLAIMS FOR RELIEF

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

56.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

57.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Driven common stock at artificially inflated prices.

58.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Driven common stock in an effort to maintain artificially high market prices for Driven common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

59.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

60. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Driven's true condition from the investing public and to support the artificially inflated prices of Driven common stock.

62. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Driven common stock. Plaintiff and the Class would not have purchased Driven common stock at the prices they paid, or at all, had they been aware that the market prices for Driven common stock had been artificially inflated by Defendants' fraudulent course of conduct.

63. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Driven common stock during the Class Period.

64. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

65.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Driven within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Driven, the Individual Defendants had the power and ability to control the actions of Driven and its employees.  By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: December 22, 2023

Respectfully submitted,

*/s/ William R. Terpening*
William R. Terpening
**TERPENING LAW PLLC**
221 West 11th Street
Charlotte, North Carolina 28202
Telephone: (980) 265-1700
Facsimile: (980) 265-1729
terpening@terpeninglaw.com

*Liaison Counsel for Plaintiff Genesee County Employees' Retirement System*

Hannah Ross
Avi Josefson
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Genesee County Employees' Retirement System*

Thomas C. Michaud
Francis E. Judd
**VANOVERBEKE MICHAUD**
   **& TIMMONY, P.C.**
79 Alfred Street
Detroit, Michigan
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Plaintiff Genesee County*
*Employees' Retirement System*

# CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Tracy Khan, on behalf of Genesee County Employees' Retirement System ("Genesee County Employees"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Vice Chairperson of Genesee County Employees and I am authorized to sign this certification on its behalf. I have reviewed the complaint and authorize its filing by counsel.

2. Genesee County Employees did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Genesee County Employees is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Genesee County Employees' transactions in the Driven Brands Holdings Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Genesee County Employees has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Kornit Digital Ltd. Securities Litigation*, No. 23-cv-888 (D.N.J.)

6. Genesee County Employees has sought to serve as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Genesee County Employees' Retirement System v. FirstCash Holdings, Inc.*,
   No. 22-cv-33 (N.D. Tex.)

7. Genesee County Employees will not accept any payment for serving as a representative party on behalf of the Class beyond Genesee County Employees' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this___day of December, 2023.

_Tracy Khan_

Tracy Khan, Vice Chairperson
*Genesee County Employees' Retirement System*

**Genesee County Employees' Retirement System**
**Transactions in Driven Brands Holdings Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/6/2021 | 12,800 | 32.2959 |
| Purchase | 12/7/2021 | 9,610 | 33.0501 |
| Purchase | 4/7/2022 | 850 | 26.3927 |
| Purchase | 4/8/2022 | 890 | 26.8637 |
| Purchase | 10/13/2022 | 670 | 30.6489 |
| Purchase | 10/14/2022 | 290 | 30.4146 |
| Purchase | 3/7/2023 | 890 | 28.4509 |
| Purchase | 3/8/2023 | 300 | 28.6401 |
| | | | |
| Sale | 7/6/2023 | (600) | 26.6825 |
| Sale | 7/7/2023 | (2,140) | 26.7116 |
| Sale | 7/10/2023 | (1,360) | 27.0710 |