## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, on behalf of itself
and all others similarly situated,

                Plaintiffs,

      v.

DRIVEN BRANDS HOLDINGS INC.,
JONATHAN G. FITZPATRICK, and
TIFFANY L. MASON,

                Defendants.

Case No. 3:23-cv-00895-MOC-DCK

<u>CLASS ACTION</u>

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

<u>JURY TRIAL DEMANDED</u>

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  JURISDICTION AND VENUE ...................................................................... 8

III. PARTIES .......................................................................................................... 9

   A.   Plaintiffs ................................................................................................ 9

   B.   Defendants ............................................................................................ 9

IV.  SUMMARY OF THE FRAUD ...................................................................... 10

   A.   Investors Were Intensely Focused On Driven's Ability To Successfully
        Execute On Its Acquisition And Growth-Focused Business Model.................... 10

   B.   Driven's Auto Glass And Car Wash Businesses Were Critical Elements Of
        The Company's Promise To Deliver Dramatic Growth During The Class
        Period ......................................................................................................... 14

   C.   Throughout The Class Period, Defendants Assured Investors That Driven
        Was Executing On Its Plans To Drive Rapid Growth, Successfully
        Integrating Its Auto Glass Network, And Delivering On Operational
        Performance In Its Car Wash Business .................................................... 17

   D.   In Truth, Serious Flaws In Driven's Glass Platform Stalled Integration,
        While The Company's Car Wash Business Was Hemorrhaging Customers
        Because Of Driven's Failure To Invest In Service And Maintenance.................. 21

        1.   Unbeknownst To Investors, Driven's Auto-Glass Acquisition
             Campaign Stalled, As The Company Encountered Significant And
             Fundamental Integration Problems That More Than Doubled
             Driven's Timelines.................................................................. 22

        2.   Also Unbeknownst To Investors, Defendants Failed To Invest In
             Car Wash Service And Maintenance, Allowing Car Washes To
             Fall Into Disrepair And Severely Hampering Operational Capacity ........ 26

   E.   The Truth Emerges ................................................................................ 30

        1.   On October 26, 2022, Defendants Announce Delays In Driven's
             Glass Business And Poor Car Wash Results ............................................ 30

        2.   Defendant Mason Is Abruptly Terminated And Driven Cancels Its
             Inaugural Investor Day Conference ........................................................ 33

3.      On August 2, 2023, Driven Discloses Significant Delays In Glass Integration And Continuing Declines In Car Wash Same-Store Sales ............................................................................................ 34

V.      POST CLASS-PERIOD EVENTS .................................................................. 36

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 38

VII.    FALSE AND MISLEADING STATEMENTS .............................................. 44

    A.  Materially False And Misleading Statements About Driven's Car Wash Business ..................................................................................... 45

        1.  Defendants' Materially False And Misleading Statements During The Fourth Quarter Of 2021 ..................................... 45

        2.  Defendants' Materially False And Misleading Statements During The First Quarter Of 2022 ......................................... 46

        3.  Defendants' Materially False And Misleading Statements During The Second Quarter Of 2022 ................................... 47

        4.  Defendants' Materially False And Misleading Statements During The Third Quarter Of 2022 ........................................ 47

        5.  Defendants' Materially False And Misleading Statements During The Fourth Quarter Of 2022 ..................................... 48

        6.  Defendants' Materially False And Misleading Statements During The First Quarter Of 2023 ......................................... 50

        7.  Defendants' Materially False And Misleading Statements During The Second Quarter Of 2023 ................................... 51

    B.  Materially False And Misleading Statements About Driven's Auto Glass Acquisition Campaign ............................................................... 52

        1.  Defendants' Materially False And Misleading Statements During The Second Quarter Of 2022 ................................... 52

        2.  Defendants' Materially False And Misleading Statements During The Third Quarter Of 2022 ........................................ 53

        3.  Defendants' Materially False And Misleading Statements During The Fourth Quarter Of 2022 ..................................... 54

        4.  Defendants' Materially False And Misleading Statements During The First Quarter Of 2023 ......................................... 55

ii

      5.     Defendants' Materially False And Misleading Statements During The Second Quarter Of 2023 ................................................................. 57

VIII.   LOSS CAUSATION ................................................................................................. 58

IX.     PRESUMPTION OF RELIANCE ......................................................................... 60

X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 61

XI.    CLASS ACTION ALLEGATIONS ........................................................................ 62

XII.   CLAIMS FOR RELIEF ......................................................................................... 63

       COUNT I ................................................................................................................ 63

       COUNT II ............................................................................................................... 65

XIII.  PRAYER FOR RELIEF ......................................................................................... 65

XIV.  JURY DEMAND ................................................................................................... 66

Plaintiffs Genesee County Employees' Retirement System, Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association (collectively, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon the investigation of its counsel, which included review and analysis of: (i) regulatory filings made by Driven Brands Holdings Inc. ("Driven" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Driven; (iv) interviews with former Driven employees who worked at the Company during the Class Period (October 27, 2021 through August 1, 2023); and (v) other public information regarding the Company.

## I.      PRELIMINARY STATEMENT

1.      Defendant Driven is the country's largest automotive care provider. This case arises out of false and misleading statements and omissions that Driven and its senior executives made to investors concerning the Company's two most important growth initiatives during the Class Period: (1) the creation of a nationwide auto-glass business by rapidly acquiring and integrating smaller companies into a single "platform"; and (2) operational execution and customer retention in the Company's critical car wash business.

2.      Throughout the Class Period, Defendants repeatedly assured investors that the Company was executing on both of these key growth strategies and, as such, reaffirmed highly positive earnings growth projections. With respect to Driven's auto-glass acquisition campaign, Defendants told investors that Driven had already successfully completed construction of its critical auto-glass platform and that the Company was making "significant progress" integrating acquired auto-glass businesses into that platform. Likewise, Defendants repeatedly touted the

quality and consistency of the service provided to Driven's car wash customers, including that that the "experience for the customer is significantly better" once a car wash is integrated into the Driven network and that the Company performed "any deferred maintenance" on acquired car washes "so the equipment is working beautifully." Moreover, Defendants told investors that the operational initiatives implemented in the car wash segment were generating significant customer loyalty, resulting in "stickiness" of car wash revenue. And when Driven reported declines in "same store" car wash sales, Defendants reassured investors and attributed those declines to short-term headwinds and "macroeconomic" factors.

3. These statements were materially false and misleading. In truth, Defendants never built a functional auto-glass platform and, even by the end of the Class Period, failed to integrate the vast majority of Driven's auto-glass acquisitions into that platform. Instead, Defendants quickly discovered fundamental and severe problems in the auto-glass platform that—as the Company has ***now admitted***—stalled the "progress" of integration, putting the Company "several quarters behind" its timeline to complete the acquisition campaign. In addition, and contrary to Defendants' statements touting the Company's car wash operational depth and execution, Driven's car wash business was beset by failing equipment, poor service, and inadequate maintenance. Indeed, multiple senior car wash executives reported that more than half of Driven's car washes needed major mechanical overhauls and experienced routine and significant losses of service equipment and operating capacity—issues that were reflected in presentations delivered directly to Defendant Fitzpatrick. Contrary to Defendants' statements touting car wash's "sticky revenue," these issues led to massive customer attrition and competitive intrusion and were responsible for the declining same-store sales Defendants misleadingly blamed on other factors.

4.     Ultimately, Driven was forced to disclose the truth following the sudden and unexpected termination of Defendant Mason, Driven's longtime CFO, on May 4, 2023—just a day after she presented the Company's quarterly results to investors. ***In less than two months***, Mason's successor—Driven's new CFO, Gary Ferrara—discovered that Defendants' Class-Period statements were untrue. Accordingly, on August 2, 2023, Driven was forced to slash its guidance by an astonishing 24% and admit that, far from making "significant progress" in integrating its auto-glass network, the Company's integration was actually "***several quarters behind***" and, as a result, the Company would have to shrink the scope of its auto-glass network by a third. In addition, Driven finally disclosed substantially declining same store car wash sales driven by "significant competitive . . . growth." Indeed, just a few weeks later, Driven would write-down its car wash segment by nearly ***$1 billion***, equal to more than ***10% of Driven's entire asset value*** as of the end of 2022.

5.     In response to these disclosures, the price of Driven stock plummeted by 41%, causing massive losses for investors. But not for Defendant Mason. Following her termination, Mason—clearly cognizant that the full truth concerning Driven's growth drivers had yet to emerge—***dumped 68% of her Driven stock holdings in a single transaction, her first-ever sale, just one week before the August 2, 2023 disclosure***, reaping millions in ill-gotten gains.

6.     As background, Driven was created, sponsored, and helmed by executives at Roark Capital, a private equity firm, and, unsurprisingly, Driven operates on a private equity "playbook." Specifically, Driven bills itself as an exceedingly effective "consolidator" in the highly fragmented automative care industry. For the most part, Driven does not build businesses from scratch. It acquires smaller regional providers in various automotive segments—car wash, auto-glass, collision, paint, etc.—and integrates them into a single "platform" in order reap the benefits of

scale, synergies, and efficiencies. Driven's central value proposition to investors was to deliver strong revenue and earnings growth through this process of acquisition, consolidation, and integration.

7.     At the start of the Class Period, Driven announced a plan to deliver dramatic revenue growth and more than ***double*** earnings through two major initiatives. The first was to grow revenue by rapidly acquiring a network of auto-glass businesses across the country. To do this, Driven would initially acquire and build a "platform" business, called Auto Glass Now ("AGN"), and would quickly "bolt-on" additional acquisitions, seamlessly integrating them into the platform business.

8.     Driven's second major initiative was to grow earnings by driving sales and customer retention in the Company's supposedly stable car wash business, which accounted for more than 10% of all Company-wide revenue and more than 30% of the Company's earnings at the start of the Class Period. Driven would deliver on that earnings growth by building on its extensive network of car washes and, crucially, focus on initiatives that would engender customer loyalty and generate "sticky"—recurring, predictable, stable—revenue by ensuring consistent service quality across locations and offering subscription-based car wash membership programs.

9.     Throughout the Class Period, Defendants assured investors that Driven was executing on its twin engines of rapid growth: effectively integrating its auto-glass network and successfully generating customer loyalty in its car wash business through solid and consistent operational performance. With respect to its auto-glass acquisition campaign, Defendants told investors that Driven had completed the construction of a functional auto-glass platform, AGN, and "integrated the AGN acquisition into the Driven platform." And Defendants repeatedly

assured investors that Driven was making "significant progress" integrating its subsequent auto-glass acquisitions into AGN.

10.     With respect to Driven's car wash business, Defendants issued numerous statements to investors touting the operational scope and size of the car wash business and the consistently high-quality service provided to customers through the Company's consolidated car wash platform. For instance, Defendants Fitzpatrick told investors that "the experience for the customer is significantly better" once a car wash is integrated into the Driven network and that, as Driven was rebranding acquired car washes to its platform brand, it was performing "any deferred maintenance that was there is done, so the equipment is working beautifully"; touted "strong customer satisfaction"; and told investors that this operational execution was "creat[ing] stickiness with the consumer, stickiness with the cash flows, [and] predictability." Further, when Driven reported declines in same-store car wash sales during the Class Period, Defendants repeatedly reassured investors that any "softness" in revenue was attributable to short-term "macroeconomic conditions."

11.     Unfortunately for investors, Defendants' statements were untrue. First, by no later than May 2022, the Company discovered serious, fundamental issues with its critical auto glass platform, AGN, that Driven executives widely understood entailed significant delays to the Company's all-important integration timeline. In particular, the Driven team overseeing the auto-glass integration campaign quickly discovered that the AGN platform's POS system, the nerve-center tying together all of the financial and logistical inputs across the auto-glass network, was nowhere near adequately functional, could not effectively serve core groups of customers, including insurers, and would need to be rebuilt from the ground up—making clear that Driven would fall behind its integration timeline by a significant margin. Far from making "significant

progress" in integration, Driven fell so far behind that, even by December 2022, Driven's deadline to complete integration of the glass network, the integration process was well under 50% complete. Indeed, even by the end of the Class Period, integration was so incomplete that huge swaths of the Company's glass network could not communicate *at all* with the AGN platform and Driven was still unable to service an entire, and highly significant, segment of the business' customers, namely, insurers. Driven's integration progress was carefully documented inside the Company and was regularly reported to Driven's most senior executives.

12.     Likewise, multiple former senior Driven executives confirmed that, contrary to Defendants' statements touting the operation capacity and performance of Driven's car wash segment, poor service, major equipment failure, and non-existent maintenance plagued this segment, causing massive customer attrition throughout the Class Period. Indeed, former senior Driven executives confirmed that *more than half* of Driven's car washes required complete mechanical rebuilds of core equipment, and that, in December 2021, Fitzpatrick received—and did not dispute—a report reflecting this very information. That report provided that it would take at least $40 million to address even just these mechanical issues, but Driven failed to make the necessary investments to remediate them. These operational and service failures led to significant competitive intrusion, eroding Driven's same-store car wash sales. These issues were so severe that, within months of Mr. Ferrara's succession to the CFO position, Driven recognized that it would have to write-down its car wash segment by nearly *$1 billion*, equal to more than *10% of Driven's entire asset value* as of the end of 2022.

13.     The truth about Driven's glass integration delays and car wash troubles began to be revealed in October 2022, when Driven announced delays in its auto-glass acquisition campaign, specifically in the Company's addition of insurance customers (who, unbeknownst to investors,

could not even be serviced through Driven's dysfunctional platform), as well as severe declines in same-store sales in Driven's car wash business. Driven's stock price declined by over 7% in response, and analysts connected the decline to the glass and car wash disclosures. But rather than reveal the true causes for the bad news, Driven instead downplayed them, issuing during the call and after a host of reassuring statements to the market continuing to tout its progress in its glass and car wash strategies.

14. Within months, in May 2023, Defendant Mason was fired. No reason was given, and the termination forced Driven to postpone its investor day conference, its first as a public company, showing that Mason's departure was anything but part of an orderly succession. While analysts reacted with concern, Driven assuaged fears by reiterating its guidance, and investors were comforted. Meanwhile, in July 2023, just one week before the truth would be revealed, while Defendants' fraud was still inflating Driven's stock price, Defendant Mason liquidated approximately **$4.5 million** in stock—a sale of approximately **68%** of her holdings—in her only sale as a reporting executive of Driven.

15. Finally, On August 2, 2023, the full truth was finally disclosed. That day, Driven admitted—contrary to its drumbeat of assurances during the Class Period that its glass strategy was on track and making "significant progress"—that it was actually "several quarters behind" on its glass integrations. Driven also disclosed for the first time that its declining same-store car wash were driven in substantial part by "competitive intrusion," which had been occurring in that segment for at least the past two years. As a result of these issues, Driven announced that it would be forced to slow the pace of growth in the glass business; pause investment into, and conduct a "thorough review" of, the car wash business; and slash the 2023 guidance it had reiterated

throughout the Class Period, including just three months earlier, just after Defendant Mason's termination.

16. The market reacted with shock at the news, and Driven's stock price declined ***more that 40%*** in response to the disclosures, erasing billions in shareholder value. Analysts confirmed that the news about Driven's glass and car wash businesses caused this massive stock price decline and called into question Driven's ability to reach the 2026 goals it had characterized to the market as "conservative" just the year before.

17. Events after the Class Period further confirm that Defendants misled investors. Within months, Driven admitted that it continued to face severe delays in the glass business and was only ***just*** rolling out its POS system. Additionally, Driven announced that it was writing down its car wash business by approximately ***$850 million*** and was closing dozens of car washes.

18. Driven's stock price has never recovered, and it is currently trading at less than half of its Class Period high. This action seeks to recover for the enormous losses investors suffered due to Driven's fraud.

## II.     JURISDICTION AND VENUE

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Driven maintains its headquarters in Charlotte, North Carolina, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged

in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

21. Plaintiff Genesee County Employees' Retirement System ("Genesee") is a multi-employer defined benefit plan that provides retirement and survivor benefits for employees of Genesee County, Michigan. As indicated in its previously submitted certification, Genesee purchased shares of Driven common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

22. Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Associations (collectively, "Oakland County") provide retirement benefits to employees of Oakland County, Michigan and their beneficiaries. As indicated in its previously submitted certification, Oakland County purchased shares of Driven common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Defendants

23. Defendant Driven is an automotive services company, and maintains its headquarters at 440 South Church Street, Suite 700, Charlotte, North Carolina. Driven common stock trades on NASDAQ under the ticker symbol "DRVN." As of November 6, 2023, Driven had over 163 million shares of common stock outstanding.

24. Defendant Jonathan G. Fitzpatrick ("Fitzpatrick") is, and was at all relevant times, President and Chief Executive Officer ("CEO") of Driven and a member of the Company's board

of directors. Fitzpatrick joined Driven in 2012; prior to that, he was a senior executive at Burger King prior to and after its acquisition by private equity firm 3G Capital.

25. Defendant Tiffany L. Mason ("Mason") served as Executive Vice President and CFO of Driven from March 2020, when she was hired to help lead Driven' IPO process, until her sudden and unexpected termination from the Company on May 4, 2023.

26. Defendants Fitzpatrick and Mason are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with Driven, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with or had access to copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. SUMMARY OF THE FRAUD

### A. Investors Were Intensely Focused On Driven's Ability To Successfully Execute On Its Acquisition And Growth-Focused Business Model

27. According to its SEC filings, Driven is "the largest automotive services company in North America with a growing and highly-franchised base of approximately 5,000 locations across 49 U.S. states and 13 other countries." Since its January 2021 IPO and throughout the Class Period, Driven billed itself to investors as a powerful growth engine in the "the large, recession-resistant and highly-fragmented automotive care industry."

28.     As Defendants repeatedly told investors, Driven operated on an acquisition model: its success depended on its ability to acquire smaller, local and regional businesses in the "highly-fragmented automotive care industry" and seamlessly integrate them into Driven's operating structure in order reap the benefits of scale, synergies, and efficiencies. Driven's central value proposition was to deliver dramatic revenue and earnings growth through this process of acquisition, consolidation, and integration. As Driven explained in the IPO prospectus it filed with the SEC:

> [W]e have a proven track record of executing tuck-in acquisitions of independent market participants that are highly value accretive when integrated into our platform based on our ability to drive performance improvement post-acquisition through upfront cost synergies as well as incremental revenue growth opportunities from Driven's platform and economies of scale.

29.     Moreover, Driven told investors that folding these businesses into a single "highly-recognized" brand would encourage customer loyalty by providing a consistent level of service quality, enhancing revenue quality by getting the same customers to patronize outlets operated by Driven time and time again. For instance, Driven told investors that consolidating smaller auto-care companies under its aegis allowed the Company to provide "exceptional in-store execution," "generat[ing] . . . strong brand loyalty from our customers," and to "driv[e] consistent same store sales growth."

30.     From the time of its IPO and through the Class Period, Driven told investors that it had the tools and experience to execute on the acquisition-focused model at the heart of its success. For instance, in Driven's prospectus, the Company stated that "***M&A is a core competency of the Driven Brands platform***. We have invested in and built out a dedicated team and supporting infrastructure and processes to systematically source, diligence, acquire and integrate acquisitions." Defendants further trumpeted Driven's "continued ability to pursue and execute upon scalable and highly strategic M&A as well as integrating large businesses into the Driven

11

Brands platform," the Company's "proven track record" of successfully acquiring and integrating small, independent automotive service providers, and its "ability to pursue and execute upon scalable and highly strategic M&A." Moreover, Defendants explained that M&A would continue to be key to Driven's success: "Our track-record of highly-accretive M&A, with acquired companies benefiting from rapid growth and immediate synergies, will continue to be a significant part of the growth story for Driven Brands[.]"

31. Driven emphasized to investors the dramatic growth its M&A strategy achieved. For instance, in its IPO prospectus, Driven trumpeted its "historical success in driving revenue and profit growth," including "twelve consecutive years of positive same store sales growth through 2019, including growth through the Great Recession."

32. Driven told investors that it was so successful at acquiring and integrating these smaller, regional companies because it employed a powerful, reproducible, and proven "bolt-on" and "tuck-in" M&A strategy. This "bolt-on" approach was the key ingredient in Driven's M&A success. Pursuant to this strategy, Driven would purchase a "base" or "platform" business in an automotive segment—like car wash or auto glass—and then "bolt-on" smaller businesses, absorbing them into this developed platform. The "platform" would operate as the central nervous system of the Company's particular business segment, allowing operational control and services to flow seamlessly to—and revenue to flow seamlessly from—the many limbs comprising the individually acquired businesses. Throughout, and prior to, the Class Period, Defendants repeatedly trumpeted Driven's "bolt-on acquisition machine" as "a consistent and repeatable M&A strategy, having completed more than 40 acquisitions since 2015." And as Defendants explained, the bolt-on strategy gave Driven a competitive advantage in successfully integrating acquired companies seamlessly into the Driven platform:

Once a company has been acquired, we leverage our shared services to enable the acquired business to benefit from our powerful procurement programs, data analytics capabilities, and training services. Every acquisition has been integrated into Driven Brands on plan and has demonstrated improved performance by being a part of our platform rather than operating as an independent company.

33. Importantly, Driven explained that a ***key*** advantage of its bolt-on/tuck-in strategy was speed: the Company could quickly acquire and integrate businesses, standardize and control their operations, and rapidly grow revenue. As Defendant Fitzpatrick explained, Driven's strategy supposedly allowed the Company to "***immediately*** . . . absorb[] [acquired businesses] into our base business."

34. Analysts and investors understood that delivering rapid growth by acquiring smaller regional and local auto service providers, integrating them to Driven's platform, and driving operational excellence, was a core element of Driven's business model and they credited Defendants' statements touting the Company's experience, resources, and expertise in executing on this operating plan. For example, Goldman Sachs reported that Driven had "a lot of experience in integrating acquisitions," which "lower[ed] the risk associated with M&A and integration," and highlighted the Company's apparent success at delivering growth through that model, echoing Defendants' statements that same-store sales at Driven-acquired companies had been "positive for the last 12 years." Barclays also hailed "the consistency of [Driven's] model," which it explained had been "proven through comps, EBITDA growth, and M&A execution against a wide range of economic/macro backdrops," and reported that "M&A . . . should drive upside" for the Company. These analysts highlighted that Driven had "sticky customers which drives consistency" and a "long history of achieving positive same-store sales growth, even in difficult macroeconomic environments."

35. Similarly, Piper Sandler analysts highlighted Driven's "recurring revenue model," "12 consecutive years of positive same-store sales growth," and "successful track record" of M&A,

noting the Company's "dedicated" M&A team and that it was "skilled at integrating acquisitions." And analysts at William Blair highlighted Driven's history of "highly accretive" M&A and that M&A was "embedded in the muscle of the company."

**B.** **Driven's Auto Glass And Car Wash Businesses Were Critical Elements Of The Company's Promise To Deliver Dramatic Growth During The Class Period**

36. In October 2021, just prior to the start of the Class Period, Driven announced a plan to generate rapid and significant revenue and earnings growth, more than ***doubling*** EBITDA by 2026—growing it from just over $350 million to at least $850 million. Driven told investors that two of the three most important pillars of this growth plan were to: (1) grow revenue by rapidly acquiring a network of auto-glass businesses across the country; and (2) grow earnings by driving sales and customer retention in the Company's supposedly stable car wash business. These two key elements of Driven's plan to generate dramatic growth played into the core of the Company's investment thesis as an industry consolidator: expanding opportunistically into fragmented markets on the one hand and delivering cash generation through a fully integrated platform on the other. Investors and analysts saw Driven's plan as a key rationale for investing in the Company. William Blair, for example, told investors to "expect adjusted EBITDA to more than double over the next five years."

37. In January 2022, Driven announced the keystone of its plan to drive the Company's revenue and earnings by expanding into the U.S. auto glass market, which the Company stated was worth "approximately ***$5 billion and growing***," a market opportunity equal to the Company's ***entire*** 2021 revenue. As the first step in implementing its "bolt-on" M&A strategy, the Company announced that it had completed the acquisition and assimilation of the "base" for its auto-glass network, a sizeable provider called Auto Glass Now. With the base for its auto-glass takeover in place, Defendants told investors that Driven would "leverage our growth blueprint" quickly to

acquire "a robust pipeline" of smaller auto-glass providers across the country, plugging them seamlessly into Driven's AGN "base" in order to "significantly accelerate our presence in this segment."

38.     Again, Defendants emphasized to investors that Driven's expansion into auto glass would not only significantly boost the Company's financial performance, but would do so quickly. For instance, at a February 2022 investor conference, Fitzpatrick explained that the auto-glass acquisition campaign would rapidly boost revenues because the acquisitions were "simple" and the Company was successfully "leveraging" its vast acquisition-related resources and expertise. Fitzgerald explained that the auto glass acquisitions in the Company's pipeline have "a simple and differentiated operating model, a simple menu, simple building and strong unit level economics." Similarly, during an April 2022 earnings call, Fitzpatrick stated that "our team is getting faster at executing the Driven Brands' playbook, and we think we'll have even more rapid progress in our glass business," adding that Driven would "leverage our growth blueprint" to "significantly accelerate our presence in this segment."

39.     Analysts and investors viewed Driven's auto-glass acquisition strategy as key to quickly accelerating the Company's revenue and earnings performance and characterized that strategy as a core element of their investment thesis. For instance, Morgan Stanley analysts trumpeted Driven's auto glass campaign as "a key growth driver in an attractive, fragmented $5bn industry," with the potential to quadruple the Company's segment-wide earnings in the near-term. Likewise, in a January 2022 report, William Blair analysts raised their estimates of Driven's 2022 earnings following the Company's announcement of the AGN acquisition, stating that "[t]he highly fragmented nature of the auto glass segment provides Driven with significant opportunities for additional market share gains through both M&A and organic growth." Piper Sandler analysts

15

likewise raised their 2022 earnings estimates for Driven in a February 2022 report, explaining that the Company "is finding strong growth opportunities with . . . its recent Glass acquisition." In another February 2022 report, William Blair analysts explained that Driven's auto glass acquisition strategy is "expected to greatly enhance Driven's presence in the U.S. auto glass market, providing an additional growth level." And, in another February 2022 report, Barclays analysts characterized Driven's auto glass acquisition campaign as among "What Matters to Us Most" about the Company.

40.     At the same time, investors were closely focused on the performance of Driven's supposedly stable car wash business in contributing steady growth as part Driven's plan to rapidly and dramatically accelerate earnings. Indeed, Driven's car wash segment was a significant component of the Company's performance, accounting for more than 10% of all Company-wide revenue and ***more than 30%*** of the Company's earnings at the start of the Class Period.

41.     Prior to, and during, the Class Period, Defendants attributed the resilience of Driven's car wash business to two things. First, the Company touted its extensive and growing network of car wash locations, calling the car wash segment "the world's largest car wash company by location count with more than 900 locations across 14 countries," including approximately 300 in the U.S. at the start of the Class Period. Defendants publicly celebrated the growth of the U.S. car wash business during the Class Period, regularly issuing press releases during the Class Period to announce the addition of new outlets.

42.     Second, Driven touted its success in engendering customer loyalty by ensuring consistent service quality across locations and providing a subscription-based car wash program to its customers that would provide unlimited washes in exchange for a membership fee. In Driven's IPO prospectus, for example, the Company labeled its car wash store count as a "key

performance indicator" and explained that its subscription initiatives "foster[ed] strong customer loyalty to our stores"—thus helping to ward off competition—and "generate[d] predictable and recurring revenue."

43. Analysts focused on Driven's ability to leverage its stable, recurring car wash revenue to grow earnings. Goldman Sachs analysts stated that Driven's "Subscription-based Car Wash model drives recurring revenue," and, crediting Defendants' growth strategy, noted that subscriptions currently "constitute[d] 41% of sales, and the company believes that it can add members to increase penetration to 60%." Likewise, Barclays analysts also reported that Driven's car wash subscriber base and the increase in subscribers in 2020 "speak[] to the resiliency of the segment." Credit Suisse likewise identified the "Recurring Revenue Stream" as one of the "Key Drivers" for the car wash segment.

**C. Throughout The Class Period, Defendants Assured Investors That Driven Was Executing On Its Plans To Drive Rapid Growth, Successfully Integrating Its Auto Glass Network, And Delivering On Operational Performance In Its Car Wash Business**

44. Throughout the Class Period, Defendants made a host of statements assuring investors that the Company was executing on the twin pillars of its strategy to rapidly drive dramatic growth. First, Defendants told investors that its auto-glass acquisition campaign was proceeding successfully and as planned: that the Company had already completed the integration of its base AGN platform and that it was effectively integrating "bolt-on" acquisitions. Second, Defendants repeatedly touted the operational performance of its car wash business, its consistent service levels and operational depth, and assured investors that these business initiatives were continuing to deliver customer loyalty and revenue "stickiness." Crediting these statements, securities analysts continued to reaffirm the Company's massive earnings growth projections and, as a result, Driven's stock price soared.

17

45. ***First***, Defendants repeatedly told investors that Driven's auto-glass acquisition campaign was proceeding as planned; that Driven had successfully completed the integration of its critical auto-glass "platform," AGN, the nerve-center for its auto-glass network; and that Driven was effectively integrating its further "bolt-on" auto-glass acquisitions into the AGN platform. For instance:

- On Driven's April 2022 earnings call, Defendant Fitzpatrick assured investors that Driven's auto glass acquisitions were proceeding as planned, stating that Driven had already "***integrated the AGN acquisition into the Driven platform***" and that Driven had "made ***significant progress***" in continuing to integrate acquired glass businesses.

- On Driven's July 2022 earnings call, Defendant Fitzpatrick stated that Driven had made "***significant progress***" on integrating its additional auto-glass acquisitions and was "very pleased with our progress in glass over the first 180 days."

- At a March 2023 investor conference, Defendant Fitzpatrick assured investors that the AGN integration was completed, functional, and operating as planned, stating that Driven had already "***built out our North America auto glass platform***" in 2022 and had "***built*** a really nice sort of ***base platform*** in the Glass business."

- On Driven's May 2023 earnings call, Defendant Fitzpatrick again assured investors that Driven was successfully integrating its auto-glass acquisitions as planned into a functional platform, stating that Driven had "***made significant progress integrating our 10 acquisitions to create a US glass platform***."

46. Analysts and investors credited Defendants' statements regarding Driven's auto-glass acquisition campaign. In a June 2022 report, Morgan Stanley analysts reported that the Company's auto-glass roll-up was "expected to be a key growth driver in an attractive, fragmented $5b industry." In another June 2022 report, William Blair analysts stated that Driven's auto-glass expansion was an "important growth driver" for the Company. In August 2022, these same analysts cited Driven's "strong momentum" in auto-glass acquisition and integration" in raising the Company's outlook. Goldman Sachs analysts also credited Defendants' statements that Driven

had successfully completed its integration of AGN, reporting in July 2022 that "Glass remains a key growth focus," as "[t]he late-2021 acquisition of Auto Glass Now provided DRVN with an attractive platform to expand from." Likewise, given Defendants' statements concerning the pace and progress of its acquisitions and integrations, Piper Sandler analysts stated in an October 2022 report, "We believe DRVN will have national coverage [in glass] *in a matter [of] months*, which will allow for the company to integrate its glass service offering with its existing insurance contracts across its Collision businesses," and that "[c]apturing insurance business in 2023 should *double the [total addressable market] for DRVN in glass to $5B*."

47.     *Second*, Defendants made a host of statements to investors touting Driven's car wash business, including specifically: (1) the operational scope and size of the car wash business; (2) the consistently high service levels provided to customers through Driven's consolidated car wash platform; and (3) that the Company's operational initiatives were generating significant customer loyalty, resulting in "stickiness" of car wash revenue. For instance:

- On Driven's October 2021 earnings call, Defendant Fitzpatrick touted Driven's investments in its car wash business and the resulting consistent, high-quality car wash service delivered to customers. Fitzpatrick stated that Driven had "*made significant changes to improve [the car wash business'] foundation, which has resulted in higher subscription rates and healthy same-store sales*," that the "Take 5 brand name *stands for . . . quality*," that Take 5 had "*industry-leading [customer satisfaction and loyalty] scores* of over 80% and repeat rates of over 70%," and that "[o]ur customers trust the Take 5 name."

- On Driven's July 2022 earnings call, in direct response to an analyst question about the quality of service provided at Driven's car wash network, Defendant Fitzpatrick touted the supposedly high level of service provided, including as a result of the Company's investments in maintenance and capital improvements. Defendant Fitzpatrick stated, "[T]he *experience for the customer is significantly better*" once a car wash is integrated into the Driven network, including because "*any deferred maintenance that was there is done, so the equipment is working beautifully*."

- During a September 2022 investor conference, Defendant Fitzpatrick touted Driven's subscription car wash model as "***creat[ing] stickiness with the consumer, stickiness with the cash flows, [and] predictability***."

- During Driven's May 2023 earnings call, Defendant Fitzpatrick touted the size and quality of the car wash business' operational capacity, stating that "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants." Likewise, throughout the Class Period, Defendants repeatedly touted Driven's extensive car wash network and operating capacity, stating, for example, that the "scale and sophistication" of the Brand "is truly a compounding long-term, sustainable competitive advantage which most of the industry will never achieve."

48.     Moreover, while Defendants reported declines in same-store car wash sales during the Class Period, they repeatedly reassured investors that any "softness" in revenue was caused by short-term macroeconomic "headwinds." For instance:

- On Driven's October 2022 earnings call, both Defendants Fitzpatrick and Mason told investors that declining same-store car wash sales were "***the result of the macro environment***."

- On Driven's February 2023 earnings call, Defendant Fitzpatrick attributed declining same-store car wash sales to the "macroeconomic environment."

- Likewise, on Driven's May 2023 earnings call, Defendant Mason attributed declining same-store car wash sales to "***the macroeconomic environment and poor weather condition[s]***."

49.     Again, analysts and investors credited Defendants' statements. Analysts consistently hailed Driven's operational execution in the car wash segment, including its investments and management, as enhancing customer experience and loyalty, and therefore powering Company earnings growth. For instance, in a February 2022 report, Morgan Stanley analysts reported that Driven's car wash "acquisitions perform better under DRVN ownership and benefit from its scale and capital," and, as such, "the appropriate foundation is being laid for future growth while the industry backdrop/structure is attractive for DRVN to take share." Barclays analysts similarly Driven's "potential consolidation of systems between various Car Wash brands

when/if DRVN rebrands to Take 5" as a "positive" for investors. Likewise, in a a July 2022 report Goldman Sachs analysts stated that, "[i]n our view, DRVN is taking the necessary steps to position the U.S. business for long-term success, including the decision to proceed with the Take 5 re-branding." And in a September 2022 report, those same analysts stated that "[i]n our view, [Driven's] rebranding [of car washes into its Take 5 platform] is likely to be a key driver for increased subscription penetration longer term."

### D. In Truth, Serious Flaws In Driven's Glass Platform Stalled Integration, While The Company's Car Wash Business Was Hemorrhaging Customers Because Of Driven's Failure To Invest In Service And Maintenance

50.     In truth, and unbeknownst to investors, Defendants' statements were materially false and misleading. Contrary to Defendants' statements touting Driven's "significant progress" integrating its auto-glass acquisitions, Defendants quickly discovered fundamental and severe problems in its AGN platform that—as the Company has **now admitted**—stalled the "progress" of integration, more than **doubling** the Company's timeline to complete its acquisition campaign and deliver on promised growth.

51.     Likewise, contrary to Defendants' statements touting Driven's operational capacity and execution in its car wash segment—e.g., that Driven "**made significant changes to improve**" acquired carwashes and that it performed "**any deferred maintenance . . . so the equipment is working beautifully**"—Defendants not only failed to make **incremental** investments in car wash service and maintenance, they allowed acquired carwashes to fall into disrepair, significantly impairing operational capacity. Accordingly—contrary to Defendants' statements reporting that Driven's initiatives and investments in its car wash segment were yielding substantial customer loyalty and revenue "stickiness," and attributing negative results to "macroeconomic" factors— Driven was losing customers en masse as competition intensified over the Class Period.

52.     As discussed below, Defendants were forced to admit the truth regarding these two key growth drivers when, at the end of the Class Period, Driven terminated its former CFO and the Company's new CFO quickly discovered these facts within weeks of taking over.

> **1.     Unbeknownst To Investors, Driven's Auto-Glass Acquisition Campaign Stalled, As The Company Encountered Significant And Fundamental Integration Problems That More Than Doubled Driven's Timelines**

53.     Contrary to Defendants' statements touting Driven's "significant progress" in integrating its supposedly game-changing auto-glass acquisitions, by no later than May 2022, the Company discovered serious, fundamental issues with its critical auto glass platform, AGN, that set off alarm bells within Driven and were widely understood to entail significant delays to the Company's all-important integration timeline.

54.     FE-1 was a senior executive in Driven's auto-glass business from shortly after the Auto Glass Now acquisition closed until mid-2023. He was personally responsible for overseeing Driven's integrations of acquisitions, tracking progress on integrations, and issuing regular reporting on that progress that ultimately reached Michael Macaluso, the head of Driven's Paint, Collision & Glass segment and one of Driven's named executive officers during the Class Period.[1] As FE-1 explained, by January 2022, Driven's "Operations Excellence Team" formulated a plan to complete the Company's auto-glass campaign, including fully integrating all acquisitions, by the end of 2022. Macaluso issued the directives regarding the pace of integration, including the directive to complete integration of the auto-glass network by the end of 2022. Driven's plans for integration fed into its forecasting.

---

[1] To preserve their anonymity, all former employees referenced in the complaint are referred to using masculine pronouns, regardless of their gender. Because the seniority of this former employee makes him easily identifiable by his formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than his title.

55.    Driven's integration progress was carefully tracked and disseminated to senior Driven executives. For instance, FE-1 explained that the Company project-planned out every layer of integration and used a project management program to prioritize projects. FE-1 further explained that information on integration was rolled up to Mars Shah, the President of Driven Glass North America, in weekly progress reports, and Shah's job was to take this information up to anyone above him keeping an eye on integration, including Macaluso.

56.    Shortly after Driven acquired the AGN platform in December 2021, it quickly learned that its "proven M&A playbook" did not lend itself to the auto-glass business. As FE-1 explained, Driven soon learned that each glass business in its acquisition pipeline followed a different business model, involving different revenue streams and different systems—in part, a function of the fact that each glass business serviced different mixes of customers (e.g., retail versus commercial), fleet accounts, and payor sources (e.g., different insurers with disparate documentation requirements).

57.    The "nerve-center" tying all of these varying operational and financial inputs and outputs together was supposed to be a centralized "POS" sale system—a combination of hardware, software, and payment services—run through the AGN platform. A POS is central to the operation of an auto-care segment and, among other things, is responsible for compiling, storing, and transmitting all of the acquired company's revenue data. Accordingly, FE-1 explained that establishing a functional POS system is one of the first and most important steps in integrating any acquisition—"a huge piece of the puzzle"—and one that must be completed before much of the remaining integration can even begin. As FE-1 explained, it was widely understood within Driven that any delay in erecting a functional POS will delay the integration steps that followed it.

23

58.     FE-1 reported that, when Driven acquired AGN in December 2021, it immediately recognized that AGN's POS was archaic, would pose significant challenges to this key integration step, and that substantial changes would have to be made to the system. By May 2022, following Driven's acquisition of All Star Glass the previous month, FE-1 stated that it became even clearer to the Driven team overseeing the auto-glass acquisition campaign that there were fundamental problems and gaps in the AGN POS system that would prevent Driven from integrating the critical POS nerve center to the differently situated businesses Driven was acquiring. As an example, FE-1 explained that while AGN largely serviced cash-based retail customers, All Star Glass was focused on fleet and insurance service. Because AGN's POS had a problematic insurance portal (among other things), AGN would have serious difficulties processing payments for the vast majority of All Star Glass' business, which, in turn, would lead to the loss of large insurance customers.

59.     Multiple former Driven executives and employees corroborated FE-1's report that AGN's POS system was fundamentally flawed and created highly significant integration problems and delays. FE-2, who was a district manager and regional manager at AGN from prior to Driven's acquisition of AGN until after the Class Period, corroborated FE-1's report that Driven identified major issues in the AGN POS virtually immediately after AGN was acquired in December 2021 and began working to replace the system in January 2022. Echoing FE-1, FE-2 explained that, as additional pipeline acquisitions closed, it became even clearer that the hodgepodge of different business systems, customer mixes, and reporting tools would necessitate a wholesale replacement of the entire platform POS system, which as discussed below, was not completed until 2023.

60.     Similarly, FE-3 served as a Regional Sales Manager for AGN, overseeing sales at approximately 50 locations across New York, New Jersey, and Pennsylvania, from June to

September 2023. FE-3 explained that the outlets he oversaw were only 30-50% integrated on average at the end of his tenure at the Company, and that there were other regions of the country that were even further behind. Moreover, FE-3 stated that there were numerous outlets in his territory that could not even access Driven's partially integrated POS system as of September 2023.

61. As FE-1 explained, given the significant roadblocks to integration posed by AGN's unworkable POS system, Driven executives recognized by no later than May 2022—more than two months before Defendants Fitzpatrick assured investors that he was "very pleased" with Driven's "significant progress" in integrating its glass acquisitions—that the Company would fail to meet its integration goals set at the start of the year by a substantial margin. FE-1 reported that, within weeks of the All Star Glass acquisition—and by no later than June 2022—he recognized that the issues with AGN's POS system were so severe that an entirely new system would need to be constructed, entailing a delay of at least six months for completion of POS integration *alone*.

62. As both FE-1 and FE-2 further explained, POS integration represents just the initial 50% of an acquisition's integration process, with progress on the second half largely frozen while POS integration is completed. Accordingly, by no later than June 2022, senior Driven executives understood that the fundamental issues Driven discovered in AGN's POS system Driven's integration would likely *double* Driven's integration timeline.

63. As discussed above, these delays were communicated from the Driven executives overseeing the auto-glass integration campaign to Macaluso and other senior Company executives. As FE-1 explained, and as discussed above, Driven's head of North American Glass received weekly reports on integration progress and was responsible for transmitting that information to Macaluso and other senior Driven executives. As discussed below, these concerns were ultimately

borne out, as Driven did not even complete its integration of the auto glass POS until the third quarter of 2023, by which time the Company was forced to slash its guidance for fiscal 2023.

64.     By the end of 2022—at the conclusion of Driven's timeline for completing its auto-glass integration—Driven had still not completed its POS integration. As FE-3 reported, even by June of 2023, POS integration was only partially complete—a fact that Driven would itself confirm months later, during the third-quarter 2023 earnings call in November 2023, when Driven announced that it had only just "completed the rollout of [its] new point-of-sale system." Accordingly, even by the end of 2022—the conclusion of Driven's integration timeline—**none** of Driven's auto-glass acquisitions had been fully integrated and, overall, the integration progress was substantially less than 50% complete, totally contrary to Defendants' statements touting Driven's integration progress.

    **2.**   **Also Unbeknownst To Investors, Defendants Failed To Invest In Car Wash Service And Maintenance, Allowing Car Washes To Fall Into Disrepair And Severely Hampering Operational Capacity**

65.     As numerous former Driven executives reported, Driven also failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity. Driven executives, including Fitzpatrick, were provided with reports and plans detailing the significant additional investment in car wash service and maintenance that was required. Despite agreeing with these assessments, Defendants failed to actually make the investments they acknowledged were necessary to maintain operations.

66.     For instance, FE-4 was a Vice President in Driven's car wash segment overseeing national operations from April 2022 through May 2023. FE-5 was also a Vice President in Driven's car wash segment, serving from prior to the start of the Class Period to early 2022. During his tenure, FE-5 oversaw facilities and maintenance operations nationally for Driven's car wash group,

and in fact set up the national maintenance team himself, and so he was "intimately" familiar with the asset quality at each location.

67.     Both FE-4 and FE-5 independently reported that Driven's car wash segment was wracked by mechanical failures and maintenance problems that significantly impaired the segment's operating capacity, and that these failures were a function of Driven's failure to adequately invest in, and budget for, adequate repairs, service, and maintenance. FE-4 reported that *75%* of Driven's more than 300 acquired car washes—the vast majority of the Company's approximately 400 total car washes at the end of the Class Period—required costly full mechanical equipment rebuilds, while *80%* required substantial reinvestment of some form. Likewise, FE-5 reported that Driven neglected to maintain critical, and costly, equipment at its car wash sites. Independently echoing FE-4's report, FE-5 reported that *75%* of the 150 car wash sites operated by Driven's "platform" car wash business required full mechanical equipment rebuilds, while *80%* required substantial reinvestment ranging from $15,000 to $250,000.

68.     The scope and extent of Driven's service and maintenance failures were communicated directly to Defendant Fitzpatrick. FE-5 detailed these failures, including the fact that 75% of Driven's platform car washes required wholesale mechanical rebuilds, in a three-year plan he prepared for restoring equipment to the performance level needed to service customers. This plan called for a substantial $40 million investment in equipment repair alone. In December 2021, FE-5 personally presented this report to Fitzpatrick and discussed it with him. Fitzpatrick did not dispute the report's findings. To the contrary, according to FE-5, Fitzpatrick remarked, "Wow, it sounds like we should have done better due diligence when we took over" Driven's car wash platform. FE-5 reported that Fitzpatrick approved the costly maintenance plan on December 19 or 20, 2021, but the plan was never implemented and the money was diverted to other uses.

Likewise, FE-4 explained that categorical maintenance freezes were routinely put in place in the car wash segment in order to cut costs and boost earnings, and that Defendant Fitzpatrick received bi-monthly P&L reports discussing maintenance cuts.

69. Numerous former Driven employees confirm the accounts of FE-4 and FE-5. FE-6 was one of eight Regional Directors of Driven's car wash business from June 2022 through July 2023, and covered states including Missouri, Arkansas, Oklahoma, Tennessee, Mississippi, Louisiana, and Colorado. FE-7 was, from June 2022 through April 2024, a District Manager in Colorado, which was part of the Mountain West region that had the highest cash flow in the company, with the region accounting for 30% of Company cash flow in the car wash segment; FE-7 oversaw the most lucrative district in the region, consisting of eight stores. FE-8 was a District Manager in Texas for Driven's car wash group from prior to the start of the Class Period through early 2022, who also oversaw eight car washes. And FE-9 was a District Manager from December 2018 through December 2023, whose district included 19 car washes in Indiana, Michigan, and Wisconsin.

70. Each of these former employees corroborated FE-4's and FE-5's reports, explaining that major equipment failures at Driven car washes were routine and significantly impacted operating capacity, but, nevertheless, the Company failed to make the necessary investments in equipment and maintenance. Indeed, FE-8 reported that, at any given time during his tenure at Driven, at least half of the car washes he oversaw had some significant mechanical failure. FE-6 and FE-7 echoed this report, explaining that the maintenance budget was so tight that essential maintenance frequently was not performed. For example, FE-7 reported that the Company's maintenance teams were so far behind that they took months to fix tunnels and that, at any given time, every location he oversaw had at least some equipment that was not functioning,

while FE-6 reported that there were multiple car wash locations in his region that would have an entire wash tunnel that was non-operational for significant periods—not infrequently in locations with only two tunnels to begin with—which ate significantly into the location's projected sales volume. Similarly, FE-9 corroborated FE-4's report regarding routine maintenance freezes, and cited, as examples a complete fourth-month freeze beginning in November 2022 and an at least three-month freeze implemented in September 2023.

71.     Driven's failure to invest in equipment, maintenance, and service had a direct and highly adverse impact on customer retention and same-store sales. As a result, the largest driver of Driven's declining same-store car wash sales was not "macroeconomic" conditions, as Defendants publicly claimed, but rather competitive intrusion—the loss of business to more reliable, higher quality providers—as former Driven employees explained.

72.     FE-4 reported that maintenance and quality issues were driving customer attrition and declining same-store sales. FE-4 reported that the negative impact of competitive intrusion on Driven's car wash business became increasingly significant and dire beginning in 2021, even prior to the start of the Class Period, and that Driven could easily see a 20% drop in revenue at a car wash when even a single competitor moved into the area. In 2022, FE-4 reported to John Teddy, the President of Driven's platform car wash business and one of the Company's named executive officers during the Class Period, that competitive intrusion was an "all hands" problem and that the segment needed a "gameplan for competitive intrusion going into 2023." FE-7, FE-8, and FE-9 each independently corroborated FE-4's report, explaining that, in the regions they oversaw, customer attrition was significant and that poor service quality was the single biggest driver of that attrition.

## E.     The Truth Emerges

73.     As detailed below, the truth concerning Driven's supposed twin growth engines—its auto-glass acquisition campaign and its car wash business—was revealed to investors through two corrective disclosures. First, on October 26, 2022, Driven announced delays in its ability to generate auto-glass revenue and poor car wash results. While Defendants continued to issue a slew of misleading statements designed to assuage investors' concern, they were finally forced to disclose the truth soon after Defendant Mason—Driven's CFO—was suddenly and abruptly terminated. Significantly, Defendant Mason dumped *68% of her Driven stock* following her termination, in her first-ever sale, suggesting that she knew that the full truth concerning the Company's key growth drivers would soon emerge. Then, on August 2, 2023, just three months after Driven's new CFO assumed his role, the Company finally disclosed that: (i) it was slashing its guidance for fiscal 2023 due to significant delays in its auto glass integration and (ii) same store sales in the Company's car wash business were declining—not because of short-term "macroeconomic conditions," as the Company claimed during the Class Period, but because the business was losing customers on a substantial scale to competitors. In all, revelation of the truth concealed from investors during the Class Period wiped out billions in shareholder value.

### 1.     On October 26, 2022, Defendants Announce Delays In Driven's Glass Business And Poor Car Wash Results

74.     On October 26, 2022, Driven issued its third-quarter 2022 earnings release and held its earnings call. Defendants reported surprising and disappointing news in the car wash and glass businesses. With respect to the glass business, Driven disclosed delays in its auto-glass segment's ability to service insurers, a key source of revenue. On Driven's earnings call, Defendant Fitzpatrick acknowledged that Driven's auto-glass business was still a *year away* from being in a position to service insurers, which would not be added until "late 2023 and 2024." This was

particularly disappointing news to investors; as one analyst noted on Driven's earnings call, "a lot of investors are eager for you to open up that insurance opportunity" because it would "probably double the TAM [total addressable market]." With respect to Driven's car wash business, Driven announced, for the first time, that same-store sales in the car wash segment had ***declined*** 3.4% year-over-year even ignoring foreign exchange issues (with a further 5.6% decline attributable to such issues for the international car wash business).

75.     In response to the disclosures on October 26, 2022, Driven's stock price fell from a close of $32.27 on October 25, 2022 to close at $29.96 on October 26, 2022, a decline of over 7%.

76.     Analysts noted that Driven's negative announcements would likely surprise and disappoint investors. For instance, in an October 26 report, Goldman Sachs analysts stated that the delay in Driven's auto-glass business's ability to generate insurance revenue "may have surprised some investors that expected insurance growth within the business sooner." Likewise, in October 27 reports, Morgan Stanley analysts stated that car wash segment underperformance "could continue weighing on sentiment into '23" and that "ex FX comps of -3.4% were likely below expectations" and analysts from J.P. Morgan noted "[s]igns of pullback in US Car Wash" and that the "step down was notable vs. 2Q."

77.     Defendants, however, continued to issue false and misleading statements in an effort to temper market reaction and assuage investor concern. Rather than admit widespread delays in auto-glass integration, including those caused by a non-functional POS system that prevented Driven from servicing insurers, Defendants told investors Driven was simply prioritizing retail and commercial revenue streams and "being appropriately prudent in sort of the

timing of unlocking that insurance opportunity." Moreover, Defendants continued to assure investors that Driven was making "significant progress" in integrating its auto-glass business.

78. Likewise, rather than admit that Driven's car wash business was experiencing substantial customer attrition and competitive pressure (driven by poor service quality and impaired operating capacity), Defendants attributed declining same-store car wash sales to the "macro environment." Moreover, Defendants stated that the car wash business's "retention rate has remained steady" and that car wash patrons were "proving to be a sticky customer."

79. While analysts were disappointed by the negative news, they credited Defendants misleading soothing statements. For instance, JPMorgan reported that Driven's management attributed car wash same-store sales declines to "lower US retail volumes due to softening macro conditions" and highlighted the branding steps the Company had taken to retain customers. Similarly, Morgan Stanley cited Defendants' explanations for the slowdown in the car wash business and gave Driven an "Overweight" rating, while J.P. Morgan urged investors to "[f]ight the [n]oise!" and stated that it was "[e]xpecting a [q]uick [b]ounce" and that the "[l]ong-[t]erm [s]tory [was] [g]etting [b]etter," including because Driven was making "notable progress on [its car wash] re-brand" and "[t]he glass furnace is hot!"

80. In the months that followed, Defendants continued to issue soothing statements to the market. For example, with respect to the glass business, during Driven's February 22, 2023 earnings call, Defendant Fitzpatrick stated that Driven "did a phenomenal job in 2022 building out [the glass] platform from zero to becoming the second largest player in the United States," while he claimed on the May 3, 2023 earnings call that Driven had "combined the best processes, procedures, and technology to inform our standard operating model that has been rolled out across the entire footprint." And with respect to the car wash business, on both calls, Defendants

Fitzpatrick and Mason continued to attribute poor results to transient factors outside of Driven's control, including macroeconomic issues and the weather.

81. The markets continued to credit these statements. For example, after Driven's February 2023 earnings call, Piper Sandler reported that there was "[l]ight at [e]nd of [t]unnel," for the car wash business because its "headwinds should abate meaningfully in 2H 2023." Similarly, Barclays issued a report around that time stating that Driven's "Glass story" was "on track." And after the May 2023 earnings call, J.P Morgan reported that "management [had] indicated roughly half of the 300-bp slowdown in constant-currency Car Wash was due to a softer macro (the other half being weather)," while Barclays again reported that Driven's "Glass story" remained "on track."

### 2. Defendant Mason Is Abruptly Terminated And Driven Cancels Its Inaugural Investor Day Conference

82. On May, 8, 2023—just days after assuring the market that Driven had "integrated our glass businesses" and that Driven's "scale and experience w[ould] remain a significant competitive advantage" in the car wash segment—Driven shocked investors by announcing that it had suddenly terminated its CFO, Defendant Mason, on May 4, just one day after Driven reported its financial results for the first quarter of 2023. Driven's announcement came just two weeks before the company's inaugural Investor Day conference was scheduled, on May 23, 2023—but Driven postponed the conference until September 2023 "due to the Company's recent CFO transition." It nonetheless reaffirmed the 2023 guidance it had issued on May 3, 2023. It also announced that Gary Ferrara would succeed Mason as Driven's CFO, effective May 10, 2023.

83. Significantly, following her termination, but *before* the full truth concerning the Company's supposedly key growth drivers emerged (as discussed below), Defendant Mason dumped *68% of her Driven stock* in a *single* transaction on July 26, 2023, selling over 165,000

shares for proceeds of ***$4.46 million***. This was her first-ever sale, and it came just one week before the truth would be revealed. These facts yield a strong inference that Defendant Mason and her fellow senior executives were well-aware that the full truth had yet to emerge.

### 3. On August 2, 2023, Driven Discloses Significant Delays In Glass Integration And Continuing Declines In Car Wash Same-Store Sales

84. On August 2, 2023, just ***two months*** after Driven installed its new CFO, the Company was finally forced to disclose the truth about its key growth drivers, the auto-glass and car wash businesses. First, during the Company earnings call held that day, Driven admitted that—contrary to Defendants' repeated soothing statements describing Driven's progress in its auto-glass strategy—the Company's integrations in that segment were was "***several quarters behind***" and was "***not going as quickly as planned***." Given this, Driven announced that it would significantly reduce the scope of its glass acquisition campaign and slash its new glass unit store growth for 2023 by approximately one-third, from 130 down to 90, in order to "get the integration completed."

85. Driven also announced a further 4% year-over-year same-store car wash sales decline. Contrary to Defendants' statements touting the "stickiness" of Driven's car wash revenue and attributing declining sales to "macro economic" factors, the Company was finally forced to acknowledge that falling same-store sales were driven by "significant competitive . . . growth" over the prior two years—and thus that Driven was actually losing substantial numbers of customers to these competitors.

86. Given the severe problems affecting its two key growth drivers, the Company slashed its 2023 EPS guidance by an astonishing ***24%***, despite having reaffirmed prior guidance just two months earlier after Mason's abrupt departure.

87. Significantly, Defendants' statements demonstrated that the issues in glass and car wash were hardly new. With respect to glass, when shocked analysts asked why Driven was only

just disclosing that Driven was "several quarters behind," given that those problems would have had to be "emerging" for some time, Defendant Fitzpatrick effectively ***admitted*** that there had been no significant external developments that changed the progress or outlook for either business, but rather that Driven's new CFO had looked at the ***same facts known to Defendants during the Class Period*** and had discovered, in less than two months, that Defendants' statements were not accurate. Specifically, Fitzpatrick pointed to Defendant Mason's termination and replacement by Ferrara "60-or-so days ago," which had provided "a chance for Gary with a fresh set of eyes to look at the business, to look at the assumptions" and determine that "we're probably a little bit behind where we want to be." And with respect to car wash, Defendants admitted that the competitive intrusion issues had been building over "the last two years"—*i.e.*, since 2021.

88.     These disclosures caused the price of Driven's stock to plummet by ***41%***, or $10.63 per share, from a close of $25.83 on August 1, 2023 to close at $15.20 the next day.

89.     Analysts reacted with shock and disappointment to Driven's August 2, 2023 disclosures. Credit Suisse analysts, for instance, downgraded Driven stock due to"[t]oday's results—including a worse than anticipated slowdown in the car wash segment [and] unexpected integration challenges in the glass space" and stated that Driven's long-term EBITDA target "may prove to be overly optimistic."

90.     William Blair analysts also downgraded Driven's stock, explaining that "Weakness in two Key Growth Pillars Clouds Visibility" and reporting that "the company materially cut its 2023 outlook on weakness in Car Wash (softer U.S. demand) and auto glass (integration delays)." They further explained: "Both segments represent key growth pillars for Driven and raise questions about how quickly and deeply the businesses have turned (Driven reiterated its outlook as recently as mid-May) and whether the company's diversified business model also translates into enhanced

execution risk." William Blair further explained that the car wash and glass disclosures "call[ed] into question" Driven's ability to hit its 2026 earnings estimates. Likewise, Goldman Sachs analysts reported on the delays in Driven's glass integrations, stating that "[t]he integration of the US glass business is behind schedule, and management cited a high level of complexity with integrating the numerous acquisitions that make up the business" and noting that "the delayed integration is expected to weigh on margins in the near term, while timing for the completion of the integration remains unclear" and that "until further clarity is provided, we believe the . . . uncertainty regarding the completion of the US glass integration is likely to weigh on sentiment." With respect to Driven's car wash business, these analysts worried that the Company's newly disclosed "increased competitive pressures could drive promotional intensity and pricing pressures, potentially weighing on long-term margins."

## V.    POST CLASS-PERIOD EVENTS

91.    Events occurring after the end of the Class Period have further confirmed that Defendants knew or recklessly disregarded the truth about Driven's glass and car wash businesses during the class period, and that their statements about them were materially false and misleading.

92.    To start, on September 20, 2023, Driven finally held the investor day event that it had been forced to reschedule from May after abruptly firing Defendant Mason. During the event, Defendant Fitzpatrick once again acknowledged that the auto-glass integration delay Defendants announced in August was not caused by some sudden and unforeseeable event, but, instead was a function of facts known to Defendants throughout the Class Period, including that Driven had "[taken] on a lot of integration involving a 1,000 employees, multiple businesses and multiple operating models," which "was a lot," and admitted that Driven "should have gone slower."

93.    Moreover, Defendants' acknowledgments further made clear that Driven's auto-glass integration problems were widespread and severe, and thus could not have reasonably

escaped management's attention during the Class Period. For instance, Fitzpatrick disclosed that integration was so stymied that Driven would pause adding new units to its auto glass platform *until 2025* in order to focus on integration.

94.     Just one month later, during Driven's November 1, 2023 earnings call, Driven's COO admitted that the glass business "integration challenges have resulted in underperformance of our US glass business in 2023" and reiterated that the Company was forced to slow growth in this segment as a result. Driven's COO further stated that the Company had only *just* completed its rollout of AGN's new POS system and that the Company expected it would not complete integration until the first quarter of 2024—well over a year beyond the Company's integration timeline during the Class Period.

95.     With respect to Driven's car wash business—and in contrast to Defendants' Class-Period statements touting the Company's operational execution and blaming falling sales on "macro economic" factors—Fitzpatrick acknowledged at Driven's September 2023 investor day conference that Driven's car wash "performance is not acceptable," explaining that Driven had to "fix it or think differently about the long-term." Then, during the November 1, 2023 earnings call, Driven announced a massive *$851 million write-down* for the car wash segment—amounting to more than 10% of Driven's entire asset value as of the end of 2022—after "assessing underperforming stores and their local competitive environment." Driven further announced it would close dozens of its stores and pause opening new ones. Again, Driven did not claim that some sudden, cataclysmic event led to this write-down, but, rather, acknowledged that it was a function of underperformance and competitive pressure, which, as discussed above, numerous former Driven executives reported was highly significant throughout the Class Period.

96. Analyst commentary following the end of the Class Period is telling. For instance, following Driven's September 2023 investor conference, Barclays analysts remarked:

> ***There has been a significant shift in the narrative on DRVN in recent months***; this has gone from a company that had executed very well since going public, generally exceeding expectations and gaining share in a favorable consumer segment, to more recently one that has moved too quickly, struggled with execution, and is facing competitive issues.

97. Driven's stock price has never recovered, and currently trades at less than $15 per share, down approximately 60% from its Class Period high.

## VI.  ADDITIONAL ALLEGATIONS OF SCIENTER

98. Numerous allegations set forth above and summarized below give rise to the strong inference that Defendants knowingly or at least recklessly misled investors about Driven's car wash business and glass acquisitions. These allegations include the following:

99. ***First***, by no later than December 2021, Defendant Fitzpatrick was personally informed that failing equipment, poor service, and inadequate maintenance were pervasive in Driven's car wash business, severely impairing operational capacity and exposing the Company to competitive pressure. As discussed above, FE-5 presented Fitzpatrick with a report showing that ***75%*** of the 150 car wash sites operated by Driven's "platform" car wash business required costly full mechanical equipment rebuilds, while ***80%*** required substantial reinvestment in equipment repair or replacement. That report further provided that it would take three years and at least $40 million to address car wash equipment failures in the "platform" business alone. As discussed above, Fitzpatrick did not dispute these findings; rather, he stated that Driven "should have done better due diligence when we took over" Driven's car wash platform. Nevertheless, Fitzpatrick continued to tout the service quality, operational capacity, and customer retention at Driven's car washes, while inaccurately ascribing slipping same-store sales to "macro environmental" factors.

Likewise, FE-4 reported that Defendant Fitzpatrick received biweekly P&L reports detailing regular maintenance cuts that Driven imposed in the car wash segment.

100. **Second**, knowledge was widespread among Driven's senior management concerning both the severe integration problems plaguing the Company's auto-glass segment and the pervasive service and operational deficiencies causing significant car wash customer losses. As alleged above, the serious integration problems, including fundamental deficiencies in AGN's POS, and delays in the pace of integration, were compiled in weekly progress reports that were sent to Mars Shah, President of Driven's North America glass business, and were raised by him to Michael Macaluso, Driven's Executive Vice President and President of its Paint, Collision & Glass segment—a named Driven officer and one of Fitzpatrick's direct reports. Moreover, Fitzpatrick's statements following Mason's termination make clear that Mason was responsible for reviewing, and did review, data tracking the progress of auto-glass integration, including Fitzpatrick's statements that CFO Ferrara reviewed that same information with "fresh eyes" and quickly understood that the Company was, in truth, "several quarters" behind. Further, as discussed above, the executive team responsible for overseeing the auto-glass acquisition campaign—and reporting on its progress—was in agreement by no later than May 2022, following Driven's acquisition of All Star Glass, that there were fundamental problems and gaps in the AGN POS system that would cause serious delays in integration. These facts yield a strong inference of scienter as to Driven, and also as to Defendants Mason and Fitzpatrick, who either consulted with the senior executives overseeing auto-glass integration and the reports they prepared, in which case they knew the truth, or else failed to conduct the kind of oversight and investigation they assured investors they were performing, in which case their statements were reckless.

101.    Likewise, as discussed above, senior Driven executives FE-4 and FE-5 reported that widespread equipment and service failures in the car wash segment were well known to other senior Company executives, including Fitzpatrick, who received detailed reporting on this subject by no later than December 2021. Moreover, FE-4 described that reviewing year-over-year traffic and revenue data was a daily, weekly, and monthly practice at Driven, that such information was reported up to John Teddy, the President of Take 5 Car Wash, another of Driven's named executive officers during the Class Period, and that the information was frequently discussed at the senior level. He further detailed how he reported to Teddy that Driven's biggest need was a gameplan for competitive intrusion going into 2023 and that Driven needed "all hands tracking competitive intrusion," including because Driven could easily see a 20% drop in revenue at a car wash when a competitor moved into the area.

102.    *Third*, the timing and circumstances of the termination of Mason, Driven's CFO, and the speed with which her successor discovered and disclosed facts undermining Defendants' Class-Period statements, yields a strong inference of scienter—particularly as to Mason herself and, therefore, as to Driven.

103.    Defendant Mason, who had been Driven's CFO even before its IPO, was abruptly terminated on May 4, 2023—just one day after presenting first quarter 2023 financial results to investors on the Company's earnings call and shortly before the full truth was finally disclosed to investors. Driven's announcement came just two weeks before the company's inaugural Investor Day conference, which the Company was then forced to postpone, confirming that the transition was not part of any orderly succession plan. Nevertheless, despite terminating Driven's CFO, Defendants made a point to reaffirm the Company's growth guidance.

104. Defendant Mason's highly suspicious stock sale following her sudden termination, which was made just one week before the truth would be revealed by Driven's August 2, 2023 disclosure, likewise gives rise to the inference that she was aware of the negative information concerning Driven's core growth drivers Defendants' misstatements had concealed from investors, and that disclosure of those negative facts—precipitated by her successor—would soon cause the Company's stock price to fall significantly. Mason's transaction was not only suspicious in timing, it was suspicious in size as well. In just a single transaction, Mason sold the overwhelming majority of her Driven stock, selling more than 165,000 shares—comprising **68%** of her holdings—and reaping $4.5 million in proceeds. Mason's post-termination-sale was her first and only sale during her entire tenure as a reporting executive of Driven.

105. Finally, the speed with which CFO Ferrara, Mason's replacement, discovered facts showing that Defendants' Class-Period statements were inaccurate further yields the inference that their falsity was readily apparent upon even cursory investigation, including to his predecessor, Defendant Mason. Within just **60 days**, CFO Ferrara discovered that—contrary to Defendants' consistent drumbeat of "significant progress" during the Class Period—the **opposite** was true: Driven was, at least, "**several** quarters behind" on integration due to significant and substantial integration problems. As discussed above, Driven then announced substantial revisions to both its revenue guidance and integration timelines.

106. Likewise, after just a few weeks of Ferrara reviewing Driven's car wash business, Defendants disclosed that Driven's car wash business was severely impacted by competitive pressure—again, in stark contrast to Defendants' Class-Period statements touting the segment's sticky revenue, operational capacity, and drivers of success. Astonishingly, shortly after this disclosure, Driven announced a nearly **$1 billion write-down of the car wash business** and, again,

slashed financial guidance. The speed with which Ferrara discovered the truth about Driven's performance and financial well-being strongly suggests that this information was readily available, including to the Individual Defendants, which in turn supports an inference that their statements were severely reckless at minimum.

107.     **Fourth**, that Defendants' false and misleading statements concerned two of the three most important growth drivers of Driven's business during the Class Period further supports a strong inference of scienter. Throughout the Class Period, Defendants held out Driven's car wash and glass businesses and the Company's growth strategies as being of paramount importance to the Company, including the highly attractive growth forecasts that helped stoke investor enthusiasm. For example, during Driven's February 16, 2022 earnings call, Defendant Fitzpatrick called the car wash and glass businesses two of Driven's "three highest growth priorities," explaining that these two strategies would "set Driven up for the next 20 years"; similarly, on Driven's September 7, 2022 earnings call, he described car wash and glass as two of Driven's three "priority growth levers" where Defendants were putting most of their "energy," while at the Bank of America Securities Consumer & Retail Conference on March 14, 2023, he called the two businesses "core growth priorities." Defendants also held themselves out as knowledgeable about these topics—discussing the results of the car wash and glass businesses, and the reasons for those results, at length during their prepared remarks on every single earnings call during the Class Period.

108.     In addition, analysts and investors closely focused on these very issues. Every Class Period earnings call, analysts asked detailed questions about Driven's car wash and glass businesses, and they were discussed in detail in scores of Class Period analyst reports.

109.    The significance of these topics to Driven and the market, and the fact that Defendants repeatedly held themselves out as knowledgeable about them and discussed them at length, further supports an inference that Defendants' misrepresentations were made knowingly or at least recklessly.

110.    **Fifth**, and relatedly, the issues affecting Driven's auto-glass and car wash businesses were severe, widespread, enduring, and had a significant impact on each segment's performance—which further supports an inference that they could not reasonably have escaped management's attention, particularly given the significance of these businesses to Driven's growth strategy. Early in the Class Period, Driven management recognized that AGN's critical POS system—the very nerve-center of the segment and a key element of its integration across multiple businesses—was so fundamentally flawed that it would need to be rebuilt from scratch, making clear that Driven would fall behind its integration timeline by a significant margin (a fact Defendants finally disclosed at the end of the Class Period). As discussed above, as of December 2022, the time by which Driven's timeline dictated that integration was to be complete, Driven's auto-glass integration was less than 50% complete. In fact, Driven's integration was so incomplete that even by mid-2023—months after the business was to have been completely integrated—huge swaths of the Company's glass network could not communicate *at all* with the AGN platform and Defendants could not service an entire, and highly significant, segment of the business' customers, namely, insurers. And these issues were so severe and the delay they caused so profound that Defendants were ultimately forced to massively revise Driven's growth projections and admit that there would be years' long delays in Driven's ability to service insurers or integrate new glass acquisitions.

111.    Similarly, as discussed above, the problems affecting Driven's car wash business were severe and widespread. As reported to Fitzpatrick, *75%* of the outlets comprising Driven's platform car wash business required a complete mechanical rebuild—a process that would require, at a minimum, tens of millions of dollars of reinvestment and likely would take years. Managers of large regions reported that major equipment failures at Driven car washes were routine and significantly impacted operating capacity, but, nevertheless, the Company failed to make the necessary investments in equipment and maintenance. And senior Driven executives reported that the competitive pressure eroding the Company's car wash business was *highly* significant and, in fact, the most significant issue facing the segment during the Class Period. These issues were so severe that, within just a couple of months of Mr. Ferrara's succession to the CFO position, Driven recognized that it would have to write-down its car wash segment by nearly *$1 billion*, equal to more than *10% of Driven's entire asset value* as of the end of 2022.

112.    *Sixth*, Defendants' disclosures at the end of the Class Period—that auto-glass integration was "several quarters behind" and that the car wash businesses was losing significant business to competitors—were not prompted by sudden and unforeseeable events. Instead, Defendants admitted that Driven's disclosures concerning the auto-glass business were prompted by Mason's termination and CFO Ferrara's review of the same information available to the Individual Defendants during the Class Period with "fresh eyes." Likewise, Defendants stated that the issues in Driven's car wash business were anything but new and had in fact been building for at least "two years." Consistent with this, in announcing the nearly $1 billion car wash write-down, Defendants pointed to no new developments that precipitated it.

## VII.    FALSE AND MISLEADING STATEMENTS

113.    As summarized in detail below, throughout the Class Period, Defendants Driven, Fitzpatrick, and Mason each made materially false and misleading statements and omissions

concerning Driven's car wash and glass businesses. Defendants' materially false and misleading statements are set forth in full below, along with a summary of the material facts that Defendants withheld from the public that rendered their statements materially false and misleading.

## A. Materially False And Misleading Statements About Driven's Car Wash Business

114. Throughout the Class Period, Defendants made materially false and misleading statements concerning Driven's car wash business, specifically: (1) the operational scope and size of the car wash business; (2) the consistently high service levels provided to customers through Driven's consolidated car wash platform; (3) that the Company's operational initiatives were generating significant customer loyalty, resulting in "stickiness" of car wash revenue; and (4) attributing Driven's negative same-store car wash sales to short-term headwinds, including "macro economic" conditions.

### 1. Defendants' Materially False And Misleading Statements During The Fourth Quarter Of 2021

115. On Driven's October 27, 2021 earnings call, Defendant Fitzpatrick stated that Driven was "committed to having the best stores" and "to offer[ing] customers the best experience" in the car wash business. Defendant Fitzpatrick further stated that Driven's car wash brand "stands for . . . quality."

116. These statements were materially false and misleading. It was false and misleading for Defendants to tout Driven's "commit[ment] to having the best stores" and to "offer[ing] customers the best experience," and that Driven's car wash brand "stands for . . . quality" when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and

(iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

117.    On November 1, 2021, Driven issued a press release touting the car wash segment's operating capacity, stating that Driven had "over 300" car washes in the U.S. and that Driven was "the fastest-growing express conveyor car wash operator in North America."

118.    These statements were materially misleading. It was misleading for Defendants to tout the operating capacity of Driven's car wash segment when, in truth, (i) a majority of those locations suffered from suffered from pervasive equipment failures and poor service that prevented them from adequately servicing customers, leading to significant customer attrition and declining same-store sales; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 2.    Defendants' Materially False And Misleading Statements During The First Quarter Of 2022

119.    On Driven's February 16, 2022 earnings call, a securities analyst specifically asked Defendants about Driven's investment in upgrading car wash equipment in order to attract and retain customers. In response, Defendant Fitzpatrick stated, "we are continuing to invest into the existing asset base as well specifically to upgrade equipment, to add maybe incremental components to that equipment package, which then helps driving incremental new customers."

120.    These statements were materially false and misleading. It was false and misleading for Defendants to state that Driven was "continuing to invest into the existing asset base" and "specifically" was "upgrad[ing] equipment" "which then helps driving incremental new customers" when, in truth, (i) Driven's car wash business suffered from pervasive equipment

failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 3. Defendants' Materially False And Misleading Statements During The Second Quarter Of 2022

121. On May 25, 2022, Driven issued a press release touting the car wash segment's operating capacity, stating that Driven was "continu[ing] its growth trajectory" and had "celebrated another significant milestone – opening its 350th express car wash."

122. These statements were materially misleading. It was misleading for Defendants to tout the operating capacity of Driven's car wash segment when, in truth, (i) a majority of those locations suffered from suffered from pervasive equipment failures and poor service that prevented them from adequately servicing customers, leading to significant customer attrition and declining same-store sales; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

### 4. Defendants' Materially False And Misleading Statements During The Third Quarter Of 2022

123. On Driven's July 27, 2022 earnings call, a securities analyst asked Defendants how customer experience and satisfaction changed at Driven's car washes as a result of being integrated into the Company's Take 5 platform. Defendant Fitzpatrick responded: "[T]he experience for the customer is significantly better pre and post . . . rebranding," including because "any deferred maintenance that was there is done, so the equipment is working beautifully."

47

124.    These statements were materially false and misleading. It was false and misleading for Defendants to tout the Driven customers' "significantly better" experience at Driven car washes and to stated that "any deferred maintenance that was there is done, so the equipment is working beautifully," when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

125.    On September 7, 2022, Defendant Fitzpatrick attended the Goldman Sachs Global Retailing Conference on behalf of Driven. At that investor conference, Defendant Fitzpatrick touted Driven's subscription car wash business and stated that "it creates stickiness with the consumer, stickiness with the cash flows, predictability."

126.    This statement was materially misleading. It was materially misleading to tout the "stickiness" and "predictability" of Driven's subscription revenue when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

**5.    Defendants' Materially False And Misleading Statements During The Fourth Quarter Of 2022**

127.    On Driven's October 26, 2022 earnings call, after Driven posted negative same-store sales growth in the car wash segment, Defendant Fitzpatrick stated that Driven "did experience some headwinds in the third quarter related to . . . softening retail volume as the result

of the macro environment." At the same time, Defendant Mason reassured investors about Driven's car wash business and touted the car wash segment's "sticky" revenue and customer retention. Defendant Mason stated that Driven "continue[d] to grow our Wash Club program" which was "not only a great recurring revenue stream that provides a level of predictability to this business, but it is also proving to be a sticky customer."

128.     These statements were materially misleading. It was misleading for Defendants to attribute Driven's same-store sales declines to the "macro environment," and to tout Driven's "grow[ing]" car wash business and its "sticky customer," when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

129.     On December 6, 2022, during the Morgan Stanley Global Consumer Conference Defendant Fitzpatrick referred to competition as only "a small piece" of the "weakness" in the car wash segment.

130.     This statement was materially false and misleading. It was materially false and misleading to state that competition as only "a small piece" of the "weakness" in the car wash segment when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

**6.    Defendants' Materially False And Misleading Statements During The First Quarter Of 2023**

131.    On Driven's February 22, 2023 earnings call, after Driven reported negative same-store sales growth in the car wash segment, Defendant Fitzpatrick stated that the Company's poor car wash results were caused "softer retail volume, as a result of the macroeconomic environment." At the same time, Defendant Fitzpatrick reassured investors about Driven's car wash business, touting the segment's operating scale and service quality as providing significant competitive advantages. Defendant Fitzpatrick stated that Driven's "scale and experience will remain a significant competitive advantage" and touted Driven's "significant network benefits that deepen our competitive moat and differentiate our business."

132.    Likewise, on that same earnings call, Defendant Mason also reassured investors about Driven's car wash business, stating that the Company "continued to . . . grow our subscription [car wash] program" and that it was "a great recurring revenue stream that provides a level of predictability to this business," and that was "not only a great recurring revenue stream that provides a level of predictability to this business, but it's also proving to be a sticky customer and an important focus for Driven Brands."

133.    These statements were materially misleading. It was misleading for Defendants to attribute Driven's same-store sales declines to the "macroeconomic environment"; to state that the car wash subscription business "continue[d] to grow" and provided "a great recurring revenue stream" and "a sticky customer"; and to tout the car wash segment's "scale and experience" and "significant network" as competitive advantages when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant

customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

134. On March 29, 2023, Driven issued a press release touting the car wash segment's operating capacity, stating that Driven had "more than doubled its total footprint since Driven Brands entered in the car wash business in August 2020" and had "celebrated the grand opening of its 400th car wash."

135. These statements were materially misleading. It was misleading for Defendants to tout the operating capacity of Driven's car wash segment when, in truth, (i) a majority of those locations suffered from suffered from pervasive equipment failures and poor service that prevented them from adequately servicing customers, leading to significant customer attrition and declining same-store sales; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

**7.     Defendants' Materially False And Misleading Statements During The Second Quarter Of 2023**

136. On Driven's May 3, 2023 earnings call, after Driven again posted negative same-store sales growth in the car wash segment, Defendant Fitzpatrick attributed that result to "softer retail volume as a result of the macro environment" but stated that Driven's "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants" Likewise, Defendant Mason stated that "retail volume was soft again this quarter as a result of the macroeconomic environment and poor weather condition." She further stated: "[W]e attribute the softness over the last few quarters to both the macroeconomic environment and then this quarter, in particular, to poor weather

conditions in . . . the US." She also stated that "we've seen macroeconomic pressure specifically in the car wash business since about Q2 of last year" in the U.S. and that "in Q1, it's probably equal parts, continued macroeconomic pressure, and then . . . the poor weather conditions."

137. These statements were materially misleading. It was materially misleading for Defendants to attribute Driven's same-store sales decline to the "macroeconomic environment" and "weather," and to tout growing Driven's "competitive advantage" in the car wash business when, in truth, (i) Driven's car wash business suffered from pervasive equipment failures and poor service; (ii) Driven failed to adequately invest in service, equipment, and maintenance in its car wash business, leading to severe impairments to the segment's operating capacity; and (iii) Driven's car wash business was experiencing significant customer loss, competitive intrusion, and declining same-store sales as a result of these operational failures.

**B.      Materially False And Misleading Statements About Driven's Auto Glass Acquisition Campaign**

138. Throughout the Class Period, Defendants made a series of false and misleading statements concerning Driven's auto glass business and acquisition campaign. Defendants told investors that its auto-glass acquisition campaign was proceeding as planned; that Driven had successfully completed the integration of its critical auto-glass "platform," AGN—the nerve-center for its auto-glass network; and that Driven was effectively integrating its further "bolt-on" auto-glass acquisitions into the AGN platform.

**1.      Defendants' Materially False And Misleading Statements During The Second Quarter Of 2022**

139. On Driven's April 27, 2022 earnings call, Defendant Fitzpatrick stated that Driven had "made significant progress" in its glass strategy and that he was "very pleased with our progress over the first 90 days." He further stated that Driven was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities." Likewise,

Defendant Mason touted Driven's progress in integrating its auto-glass business, stating that Driven's "proven M&A playbook" was "delivering" in its "glass businesses."

140. These statements were materially false and misleading. It was false and misleading for Defendants to state that Driven had made "significant progress" in integrating its auto-glass business; that Driven's "proven M&A playbook" was "delivering" in acquiring, integrating, and consolidating the auto-glass platform; and that Driven had made "good progress" in attracting insurance customers to "our glass capabilities" when, in truth, (i) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and prevented it from adding or servicing many important customers, including insurers; (ii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iii) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; and (iv) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

### 2. Defendants' Materially False And Misleading Statements During The Third Quarter Of 2022

141. On Driven's July 27, 2022 earnings call, Defendant Fitzpatrick stated that he was "very pleased with our progress in glass over the first 180 days" and again stated that Driven was "making good progress with Driven's existing . . . insurance partners and introducing them to our

glass capabilities," while Defendant Mason again assured investors that Driven's "proven M&A playbook" was "delivering" in its "glass businesses."

142. These statements were materially false and misleading. It was false and misleading for Defendants to tout Driven's "progress over the first 180 days" since acquiring AGN; to state that Driven's "proven M&A playbook" was "delivering" in acquiring, integrating, and consolidating the auto-glass platform; and to tout Driven's "good progress" in attracting insurance customers to "our glass capabilities" when, in truth, (i) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and prevented it from adding or servicing many important customers, including insurers; (ii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iii) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (iv) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

### 3. Defendants' Materially False And Misleading Statements During The Fourth Quarter Of 2022

143. On Driven's October 26, 2022 earnings call, Defendant Fitzpatrick stated that "we continued to make significant progress across our key growth levers [including] glass, leveraging our proven playbook."

144. These statements were materially false and misleading. It was false and misleading for Defendants to tout Driven's "significant progress" in integrating Driven's auto-glass business when, in truth, (i) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and prevented it from adding or servicing many important customers, including insurers; (ii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iii) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (iv) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

### 4. Defendants' Materially False And Misleading Statements During The First Quarter Of 2023

145. On Driven's February 22, 2023 earnings call, Defendant Fitzpatrick assured investors that construction of the glass platform itself was complete, stating that "did a phenomenal job in 2022 building out that platform from zero to becoming the second largest player in the United States."

146. This statement was materially false and misleading. It was misleading for Defendants to state that Driven had done a "phenomenal job" "building out" its auto glass "platform" in 2022 when, in truth, (i) construction of Driven's "platform" was not complete—it was not even functional, was beset by fundamental issues, was run through a POS system that

would need to be rebuilt entirely, and could not service critical customers, including insurers; (ii) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and made it impossible for the Company to add new companies or service important customers, including insurers; (iii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iv) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (v) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

147.    On March 14, 2023, Defendant Fitzpatrick attended the Bank of America Securities Consumer & Retail Conference on behalf of Driven. At that investor conference, Defendant Fitzpatrick stated that Driven had "built out our North America auto glass platform" in 2022 and had "built a really nice sort of base platform in the Glass business."

148.    These statements were materially false and misleading. It was false and misleading for Defendants to state that Driven had already "built out" its "North American auto glass platform" and "built a really nice . . . base platform in the Glass business" when, in truth, (i) construction of Driven's "platform" was not complete—it was not even functional, was beset by fundamental issues, was run through a POS system that would need to be rebuilt entirely, and could not service critical customers, including insurers; (ii) Driven's auto-glass integration was

beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and made it impossible for the Company to add new companies or service important customers, including insurers; (iii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iv) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (v) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

### 5. Defendants' Materially False And Misleading Statements During The Second Quarter Of 2023

149. On Driven's May 3, 2023 earnings call, Defendant Fitzpatrick stated that Driven had "made significant progress integrating our 10 acquisitions" during the first quarter, explaining: "We've combined the best processes, procedures, and technology to inform our standard operating model that has been rolled out across the entire footprint." For her part, Defendant Mason stated that Driven was "currently integrating our series of acquisitions under the Auto Glass Now brand name and implementing our new standard operating procedures" and that "we expect glass margins to expand from here as we integrate the business."

150. These statements were materially false and misleading. It was false and misleading for Defendants to state that Driven had "made significant progress integrating" its glass acquisitions and had already "combined the best processes, procedures, and technology to inform

our standard operating model that has been rolled out across the entire footprint," and that Driven was Driven was "integrating our series of acquisitions under the Auto Glass Now brand name and implementing our new standard operating procedures" and Defendants "expect[ed] glass margins to expand from here as we integrate the business" when, in truth, (i) construction of Driven's "platform" was not complete—it was not even functional, was beset by fundamental issues, was run through a POS system that would need to be rebuilt entirely, and could not service critical customers, including insurers; (ii) Driven's auto-glass integration was beset by severe problems, including fundamental deficiencies in the critical platform POS system, that significantly expanded Driven's integration timeline and made it impossible for the Company to add new companies or service important customers, including insurers; (iii) AGN's POS system, the erection of which was a critical gating step to further integration, would have to be rebuilt from scratch, causing significant delays in integration and, thus, in growth and profitability; (iv) even once the POS system was constructed, which would not be completed until after Driven's deadline to complete all integration, integration would still only be 50% complete; (v) these delays were having a significant negative impact on the auto-glass business' performance because huge swaths of the Company's acquired businesses could not even communicate with the AGN platform, Driven was unable to service key customers thus losing present and prospective business, and Driven was unable to integrate its new acquisitions, which negatively impacted revenue and earnings growth.

## VIII.   **LOSS CAUSATION**

151.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Throughout the Class Period, Driven's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions.

152. Two separate disclosures revealed to the market on a piecemeal basis the false and misleading character of Defendants' statements and omissions. *First*, on October 26, 2022, Driven disclosed delays in its auto-glass segment's ability to service insurers, as well as declines in same-store sales in the car wash segment. In response to these disclosures, Driven's stock price fell over 7%, from a close of $32.27 on October 25, 2022 to close at $29.96 on October 26, 2022, and analysts connected the stock price declines to the disclosure of the above-described information.

153. However, the October 26, 2022 disclosure did not reveal the full truth to investors. Rather than admit that Driven was experiencing widespread delays in auto-glass integration, including due to its non-functional POS system that prevented Driven from servicing insurers, Defendants instead continued to mislead investors, stating that Driven was making significant progress in its integration and was simply prioritizing non-insurance customers and "being appropriately prudent." Similarly, rather than admit that Driven's car wash business was experiencing substantial customer attrition and competitive pressure (driven by poor service quality and impaired operating capacity), Defendants attributed declining same-store car wash sales to the "macro environment." Over the next several months, Defendants continued to issue similar statements touting integration progress in glass and blaming same-store sales declines in car wash to factors beyond Driven's control, and the market credited Defendants' representations.

154. *Second*, on August 2, 2023, Driven announced that it was "several quarters behind" in its auto glass integration and that it was suffering continued same-store sales declines in its car wash business that had been building for the prior two years. Moreover, these factors caused Driven to reduce its 2023 guidance—including slashing EPS guidance by 24%—despite having reaffirmed it just two months prior. In response to these disclosures, Driven's stock price plummeted by 41%, or $10.63 per share, from a close of $25.83 on August 1, 2023 to close at

$15.20 the next day. Analysts again connected the stock price decline to the disclosure of the above information.

155.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Driven's stock. It was also foreseeable to Defendants that the revelation of the truth about Driven's glass and car wash businesses, including that Driven's glass integration was far behind plans and Driven was failing to adequately maintain its car washes, leading Driven to cede customers to its competitors, would cause the price of Driven's stock to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## IX.    PRESUMPTION OF RELIANCE

156.    At all relevant times, the market for Driven common stock was an efficient market for the following reasons, among others:

(a)    Driven common stock met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Driven filed periodic public reports with the SEC and NASDAQ;

(c)    Driven regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Driven was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

157. As a result of the foregoing, the market for Driven common stock promptly digested current information regarding Driven from all publicly available sources and reflected such information in the price of Driven common stock. Under these circumstances, all purchasers of Driven common stock during the Class Period suffered similar injury through their purchases of Driven common stock at artificially inflated prices and the presumption of reliance applies.

158. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves a failure to disclose material adverse information regarding Driven's business and operations, information that was required to be disclosed, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Driven's ability to integrate its auto glass acquisitions and the performance of its car wash business to the Company's growth, that requirement is satisfied here.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

159. To the extent that any of the alleged false statements described in this Complaint were forward-looking, Driven's "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

160. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Driven who knew the statement was false or misleading. None of the historic or present tense

statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or statements of future economic performance made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.     CLASS ACTION ALLEGATIONS

161.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Driven common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Driven and their families and affiliates.

162.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of November 6, 2023, Driven had over 163 million shares of common stock outstanding, owned by hundreds or thousands of investors.

163.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Driven common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damages sustained by Class members and the appropriate measure of damages.

164.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

165.     Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

166.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XII.    CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

167.     Plaintiffs repeat, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

168.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Driven common stock at artificially inflated prices.

169.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Driven common stock in an effort to maintain artificially high market prices for Driven common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

170.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

171.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

172.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Driven's true condition from the investing public and to support the artificially inflated prices of Driven common stock.

173.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Driven common stock. Plaintiffs and the Class would not have purchased Driven common stock at the prices they paid, or at all, had they been aware that the market prices for Driven common stock had been artificially inflated by Defendants' fraudulent course of conduct.

174. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Driven common stock during the Class Period.

175. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

176. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

177. The Individual Defendants acted as controlling persons of Driven within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Driven, the Individual Defendants had the power and ability to control the actions of Driven and its employees. By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.   <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: August 13, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton
Abe Alexander
Michael M. Mathai
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
JohnR@blbglaw.com
Abe.Alexander@blbglaw.com
Michael.Mathai@blbglaw.com

-and-

Chloe Jasper
2121 Avenue of the Stars
Suite 2575
Los Angeles, California 90067
Telephone: (310) 819-3481
Chloe.Jasper@blbglaw.com

*Counsel for Lead Plaintiffs Genesee and
Oakland County and Lead Counsel for the
Class*

**TERPENING LAW PLLC**
William R. Terpening
221 West 11th Street
Charlotte, North Carolina 28202
Telephone: (980) 265-1700
Facsimile: (980) 265-1729
terpening@terpeninglaw.com

*Liaison Counsel for Lead Plaintiffs Genesee
and Oakland County*

**VANOVERBEKE MICHAUD
 & TIMMONY, P.C.**
Thomas C. Michaud
Francis E. Judd
79 Alfred Street
Detroit, Michigan
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiffs
Genesee and Oakland County*