# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

-------------------------------------------------------------------x

GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, on behalf of itself and all
others similarly situated,

          Plaintiffs,

v.

DRIVEN BRANDS HOLDINGS INC.,
JONATHAN G. FITZPATRICK, and
TIFFANY L. MASON,

          Defendants.

-------------------------------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 3:23-cv-00895-MOC-DCK

## <u>CLASS ACTION</u>

## <u>ORAL ARGUMENT REQUESTED</u>

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT</u>

**ROBINSON, BRADSHAW & HINSON, PA**
Adam K. Doerr
Emma W. Perry
101 N. Tryon St., Ste. 1900
Charlotte, NC 28246
Tel.: (704) 377-8114
adoerr@robinsonbradshaw.com
eperry@robinsonbradshaw.com

*Local Counsel for Defendants Driven Brands
Holdings Inc. and Jonathan G. Fitzpatrick*

**GIBSON, DUNN & CRUTCHER LLP**
Christopher D. Belelieu
Nathan C. Strauss
Bethany Saul
200 Park Ave.
New York, NY 10166
Tel.: (212) 351-4000
cbelelieu@gibsondunn.com
nstrauss@gibsondunn.com
bsaul@gibsondunn.com

*Counsel for Defendants Driven Brands Holdings
Inc. and Jonathan G. Fitzpatrick*

**WINIKER LAW FIRM, PLLC**
S. Frederick Winiker, III, Esq.
Winiker Law Firm, PLLC
352 N Caswell Rd.
Charlotte, NC 28204
Tel.: (704) 333-8440
swiniker@winikerlaw.com

*Local Counsel for Defendant Tiffany L. Mason*

**ROTTENBERG LIPMAN RICH, P.C.**
Steven Kayman (*pro hac vice pending*)
Jennifer A. Kreder (*pro hac vice pending*)
230 Park Ave., 18th Floor
New York, NY 10169
Tel.: (212) 661-3080
skayman@rlrpclaw.com
jkreder@rlrpclaw.com

*Counsel for Defendant Tiffany L. Mason*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................ 1

II. STATEMENT OF FACTS .................................................................................. 4

   A. DRIVEN IS A LEADING PROVIDER OF AUTOMOTIVE SERVICES IN NORTH AMERICA ................................................................................ 4

   B. DRIVEN ENGAGES IN TYPICAL FINANCIAL REPORTING DURING THE PROPOSED CLASS PERIOD ................................................................ 5

   C. DRIVEN ACQUIRES AND BEGINS INTEGRATING CAR WASH BUSINESSES & AGN FROM 2020-2021 ............................................... 6

   D. DEFENDANTS MAKE TRUTHFUL DISCLOSURES ABOUT THE CAR WASH BUSINESSES AND AGN ......................................................... 7

      1. Defendants Issue Truthful Disclosures About AGN ......................................... 7

      2. Defendants Update Investors Regarding Performance of Car Wash Segment, Including Negative Same-Store Car Wash Sales in Late 2022 ......................... 8

      3. Defendants Disclose Slow-Down with AGN Integration in Early 2023 ........... 10

   E. DEFENDANTS DISCLOSE DELAYS WITH INTEGRATION OF AGN & CAR WASH PERFORMANCE CHALLENGES ....................................... 11

III. STANDARD OF REVIEW ................................................................................ 12

IV. ARGUMENT ..................................................................................................... 13

   A. PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION ..................................................... 13

      1. Plaintiffs Do Not Allege That Any of Defendants' Statements Were False or Misleading When Made ................................................................. 14

      2. Plaintiffs Have Failed to Plead That Defendants Had a Duty to Disclose Omitted Information ................................................................. 18

      3. Plaintiffs Have Failed to Allege That Defendants' Statements and Omissions Were Material ................................................................. 21

      4. Several of Defendants' Statements Are Forward-Looking Statements Protected by the PSLRA's Safe-Harbor Provision ....................................... 24

   B. PLAINTIFFS HAVE NOT ADEQUATELY PLEADED SCIENTER ................... 28

i

1. Plaintiffs' Confidential Witness Statements Do Not Support a Strong Inference of Scienter ............................................................................ 29

2. Allegations That Management Knew or Must Have Known About Alleged Issues With the Company's "Important Growth Drivers" Are Insufficient to Support a Strong Inference of Scienter ............................................................. 31

3. Temporal Proximity Between Alleged Misstatements and Subsequent Events Does Not Support an Inference of Corporate Scienter ..................................... 34

4. Plaintiffs' Additional Allegations Against Mason Are Insufficient to Support a Finding of Scienter Against Mason or the Company ..................................... 36

5. Plaintiffs' Additional Allegations Against Fitzpatrick Are Insufficient to Support a Finding of Scienter Against Fitzpatrick or the Company ................. 38

C. PLAINTIFFS FAIL TO STATE A 20(A) CLAIM ................................................. 40

V. CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................12

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................2, 14, 18, 21

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022)........................................................................................34

*Carlucci v. Han*,
886 F. Supp. 2d 497 (E.D. Va. 2012) ..................................................... 20, 22, 24

*Chapman v. Fennec Pharms. Inc.*,
2021 WL 7209981 (M.D.N.C. Dec. 16, 2021) *report and recommendation
adopted*, 2022 WL 613378 (M.D.N.C. Mar. 2, 2022) ..........................................25

*In re CIENA Corp. Sec. Litig.*,
99 F. Supp. 2d 650 (D. Md. 2000)................................................................................25

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013).........................................................................36

*In re Constellation Energy Grp., Inc.*,
738 F. Supp. 2d 602 (D. Md. 2010).............................................................................22

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
2012 WL 1067651 (D. Md. Mar. 28, 2012)................................................................23

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008)..........................................................................................4

*In re DXC Tech. Co. Sec. Litig.*,
2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd sub nom. KBC Asset Mgmt.
NV*, 19 F.4th 601 (4th Cir. 2021).....................................................15, 16, 25, 26

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..........................................................................................23

*Elec. Workers Pension Tr. Fund of IBEW Loc. Union No. 58 v. CommScope, Inc.*,
2013 WL 4014978 (W.D.N.C. Aug. 6, 2013) ..................................... 3, 15, 26

*Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.
MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023)............................................................... 20, 22

*Fanucchi v. Enviva Inc.*,
2024 WL 3302564 (D. Md. July 3, 2024).................................................................32

Case 3:23-cv-00895-MOC-DCK    Document 38    Filed 10/14/24    Page 4 of 48

*In re Fed Ex Corp. Sec. Litig.*,
   517 F. Supp. 3d 216 (S.D.N.Y. 2021)................................................................................27

*In re First Union Corp. Sec. Litig.*,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) ....................................... 3, 14, 17, 21, 23, 27

*Giarratano v. Johnson*,
   521 F.3d 298 (4th Cir. 2008)............................................................................................13

*Graff v. Prime Retail, Inc.*,
   172 F. Supp. 2d 721 (D. Md. 2001), *aff'd sub nom. Marsh Grp. v. Prime
   Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002) ............................................... 17, 20

*Hillson Partners, Ltd. v. Adage, Inc.*,
   42 F.3d 204 (4th Cir. 1994)............................................................................13, 14, 18, 19

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
   219 F. Supp. 2d 675 (D. Md. 2002)................................................................................28

*Janies v. Cempra, Inc.*,
   816 F. App'x 747 (4th Cir. 2020)....................................................................................29

*Johnson v. Pozen Inc.*,
   2009 WL 426235 (M.D.N.C. Feb. 19, 2009) *report and recommendation
   adopted*, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009) ............................... 3, 24

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021)......................................... 3, 29, 31, 32, 36, 37, 38, 39

*Keeney v. Larkin*,
   306 F. Supp. 2d 522 (D. Md. 2003), *aff'd*, 102 F. App'x 787 (4th Cir. 2004)........... 19, 20, 27

*In re Lab'y Corp. of Am. Holdings Sec. Litig.*,
   2006 WL 1367428 (M.D.N.C. May 18, 2006) ....................................... 24, 25, 26

*Leacock v. IonQ, Inc.*,
   2023 WL 6308045 (D. Md. Sept. 28, 2023), *reconsideration denied*, 2024 WL
   3360647 (D. Md. July 10, 2024) ......................................................................................31

*Lerner v. Nw. Biotherapeutics*,
   273 F. Supp. 3d 573 (D. Md. 2017)................................................................................17

*Longman v. Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999)....................................................................................21, 22

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
   876 F.3d 541 (4th Cir. 2017)................................................................28, 33, 34, 38

*In re Marriott Int'l, Inc.*,
   31 F.4th 898 (4th Cir. 2022)............................................................................................18

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   543 F. Supp. 3d 96 (D. Md. 2021) *aff'd sub nom. In re Marriott Int'l, Inc.*, 31
   F.4th 898 (4th Cir. 2022) ....................................................... 20, 21, 23, 30, 39

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788 (D. Minn. 2022)...............................................................................36

*Matrix Cap. Mgmt. Fund v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009)................................................................... 2, 13, 29

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..................................................................... 18, 20

*Miss. Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008)......................................................................35

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom. Yates v. Municipal Mortg.
& Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) ......................................................30

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003)......................................................................39

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999)......................................................................19

*Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*,
2013 WL 1192004 (E.D.N.C. Mar. 22, 2013)......................................................23

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. 2013) ................................................12, 13, 31, 40

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680 (E.D. Va. Mar. 24, 2021)......................................20, 22, 23, 24

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ......................................................................22

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023)......................................33, 34, 35, 36, 37, 38, 39

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) ......................................................................13

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007)......................................................3, 29, 36, 37, 40

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ......................................................................4, 28

*In re Tibco Software, Inc.*,
2006 WL 1469654 (N.D. Cal. May 25, 2006)......................................................27

*In re Trex Co., Inc. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) ......................................................................30

*In re Triangle Cap. Corp. Sec. Litig.*,
2019 WL 1083777 (E.D.N.C. Mar. 7, 2019)......................................................26

v

*In re Triangle Cap. Corp. Sec. Litig.*,
988 F.3d 743 (4th Cir. 2021)..................................................................................................35

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ...............................................................................................................14

*In re Under Armour Sec. Litig.*,
2024 WL 811478 (D. Md. Feb. 26, 2024)...............................................................................13

*In re Under Armour Sec. Litig.*,
342 F. Supp. 3d 658, (D. Md. 2018).......................................................................................16

*Weidman v. Exxon Mobil Corp.*,
776 F.3d 214 (4th Cir. 2015)..................................................................................................13

*In re Willis Towers Watson*
*plc Proxy Litig.*, 937 F.3d 297 (4th Cir. 2019) .....................................................................25

*Yates v. Municipal Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014)...........................................................3, 13, 28, 32, 33, 35, 37

*Zucco Partners v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)............................................................................................ 33, 38

## Statutes

15 U.S.C. § 78j ......................................................................................... 1, 3, 13, 18, 39, 40

15 U.S.C. § 78u–5(c).................................................................................... 2, 14, 19, 24, 28

15 U.S.C. § 78u-4(b) ............................................................................................... 13, 28

## Rules

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 12, 30

Defendants Driven Brands Holdings Inc. ("Driven" or the "Company"), Jonathan G. Fitzpatrick, and Tiffany L. Mason (the "Individual Defendants," and collectively with Driven, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs'[1] Amended Complaint ("Complaint" or "AC") for failure to state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78j.

## I.    PRELIMINARY STATEMENT

This case spins a tale of a company that rashly acquired businesses and neglected to keep shareholders updated on the company's performance and integration efforts. Based on this fictitious narrative, Plaintiffs claim that Driven misled its shareholders about "failed" integration efforts and "failed" to invest properly in acquired stores. Yet Plaintiffs cannot point to a single statement that was false when made, and the statements they do rely on—projections of future performance, expressions of optimism, and true facts about the then-current performance of recently acquired businesses—are all are either true when made, immaterial to shareholders, or otherwise protected under law. Simply put, Plaintiffs' revisionist and made-for-litigation narrative fails to state a securities law violation.

Throughout its history, Driven has acquired businesses and integrated them over time, while both delivering value to shareholders and making appropriate disclosures to meet its legal obligations. That is exactly what happened here when Driven acquired the car wash and auto glass repair businesses, including Auto Glass Now ("AGN"). In line with its reporting obligations, and to the extent the information was material, Driven disclosed the status of its acquisitions and

---

[1] The court-appointed lead plaintiffs in this matter are the Genessee County Employees' Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association (collectively, the "Michigan Funds"). *See* Dkt. No. 20, Order Granting Motion to Appoint Lead Counsel.

1

integration efforts. Contrary to Plaintiffs' claims, a public company is not required to disclose every single detail of its business and operations. It is only required to disclose material information, i.e., that which may impact a shareholder's decision to buy or sell shares. Here, Plaintiffs have failed to plead that the Company misstated or omitted any material information. Instead, Plaintiffs strain to make out a claim by repeatedly alleging, without any basis, that Driven's efforts to integrate its U.S. glass acquisitions lagged and that undefined car wash locations needed repair (which, even if true, would not need to be disclosed). But simply repeating the same false narrative over and over—while ignoring the Company's accurate and complete disclosures—does not amount to a securities fraud claim.

*First*, Plaintiffs have failed to plead a material misstatement or omission. Plaintiffs do not, and cannot, point to a single statement by any Defendant that was actually false when made; rather, they contend that Defendants were under an obligation to disclose additional information about allegedly delayed AGN integration, glitches with AGN's Point of Sales (POS) system, and supposed issues with the quality of Driven's car washes. However, Plaintiffs fail to allege that (i) these supposed problems and delays were material to shareholders' decision-making, or (ii) any Defendant was aware of their existence and had a duty to disclose. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). At best, Plaintiffs have alleged a claim of "fraud by hindsight," which courts in this Circuit routinely dismiss for failure to state a claim. *Matrix Cap. Mgmt. Fund v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

*Second*, even if Plaintiffs adequately alleged misstatements (and they have not), the majority of the purported misstatements are forward-looking and should be dismissed because they were accompanied by meaningful cautionary language and thereby protected under the Private Securities Litigation Reform Act's ("PSLRA") "safe harbor." 15 U.S.C. § 78u–5(c). Statements

2

that Driven is "committed to having the best stores," AC ¶ 115, and "continuing to invest," *id.* ¶ 119, are paradigmatic forward-looking statements "immunized from liability if … accompanied by meaningful, cautionary statements." *Johnson v. Pozen Inc.*, 2009 WL 426235, at *14, 21 (M.D.N.C. Feb. 19, 2009), *report and recommendation adopted*, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009). Similarly, Driven's forward-looking statements about the progress of integration efforts and its statements concerning competition, which were accompanied by meaningful cautionary language, are protected by the PSLRA's safe harbor. *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 892 (W.D.N.C. 2001); *Elec. Workers Pension Tr. Fund of IBEW Loc. Union No. 58 v. CommScope, Inc.*, 2013 WL 4014978, at *10 (W.D.N.C. Aug. 6, 2013).

*Third*, Plaintiffs' claims must independently be dismissed because their conclusory allegations of intent to defraud do not satisfy the PSLRA's heightened pleading standard for scienter. *See Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014). Plaintiffs' confidential witness statements should be disregarded due to unreliability, *see Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007), and their allegations against the Individual Defendants fail to plead a single fact that speaks to their mental state, much less facts that support a strong inference of scienter. Instead, Plaintiffs rely on bare bones claims that Defendants "must have known" their statements about acquired businesses were false or misleading because "the issues affecting [them] were severe, widespread, [and] enduring," AC ¶ 110, which is insufficient to support a strong inference of scienter. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021).

*Fourth*, because Plaintiffs have failed to state a claim under Section 10(b), they have also failed to state a claim against the Individual Defendants under Section 20(a).

For each—or any—of these reasons and the others explained herein, Defendants

3

respectfully request that the Court dismiss the AC with prejudice.

## II.  STATEMENT OF FACTS[2]

### A.  DRIVEN IS A LEADING PROVIDER OF AUTOMOTIVE SERVICES IN NORTH AMERICA

Driven is the largest automotive services company in North America with approximately 5,000 locations across 49 U.S. states and 13 other countries.  AC ¶ 27.  The Company offers automative services "including paint, collision, glass, and repair services, [and] high-frequency services, such as oil changes and car washes."  Ex. 1, 2022 Form 10-K at 4.[3]  Driven completed its Initial Public Offering ("IPO") on January 14, 2021.  *Id.* at 37.  In fiscal year 2023, the Company generated approximately $2.3 billion in net revenue from approximately $6.3 billion in system-wide sales.  Ex. 2, 2023 Form 10-K at 5.

A significant part of Driven's growth strategy has involved executing strategic acquisitions and integrating them into the Company's existing platforms.  AC ¶ 28.  Since 2015, Driven has grown its paint and collision services through acquisitions.  Ex. 3, 2021 Form 10-K at 4.  The Company also expanded its complementary service offerings such as oil changes, auto glass repair services, and car wash services through several large acquisitions from 2016 to 2020.  *Id.*  As part of its acquisition strategy, Driven frequently acquires a platform business and may "bolt on," additional acquired businesses, AC ¶ 7, allowing the Company to leverage "training initiatives,

---

[2] Driven disagrees with many of the Complaint's factual allegations but accepts them as true for purposes of this motion.  The Court may properly consider the documents referenced in this brief and attached to the October 14, 2024 Declaration of Christopher Belelieu submitted herewith ("Belelieu Declaration" or "Belelieu Decl.") because they are integral to and explicitly relied upon in the Complaint.  *See Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (holding that courts "must examine the facts as a whole, including facts found in 'documents incorporated into the complaint by reference'" when analyzing a securities fraud claim (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)); *see, e.g.*, AC ¶¶ 27, 28, 48, 74, 107, 117, 121, 131 (citing and quoting SEC filings, press releases, and earnings calls).

[3] All exhibits cited in this brief are in reference to exhibits defined in the Belelieu Declaration.

targeted marketing enhancements, procurement savings and cost efficiencies." Ex. 2, 2023 Form 10-K at 7. Since 2015, the Company has executed many scalable and highly strategic acquisitions and successfully integrated them, demonstrating that "mergers and acquisitions is a core competency . . . across the Driven platform." *Id.*

Jonathan Fitzpatrick has served as President and Chief Executive Officer ("CEO") of Driven since 2012 and serves as a member of the Company's board of directors. AC ¶ 24. Tiffany L. Mason was the Company's Executive Vice President and Chief Financial Officer from March 2020 through May 2023. AC ¶ 25.

**B. DRIVEN ENGAGES IN TYPICAL FINANCIAL REPORTING DURING THE PROPOSED CLASS PERIOD**

As a public company, Driven discloses financial and business metrics related to its operations. The Company provided this reporting in at least three forms during the proposed Class Period: (i) SEC reporting forms, (ii) quarterly earnings calls, and (iii) industry conferences. Plaintiffs allege that Defendants made misstatements about Driven's car wash business during six earnings calls on October 27, 2021 ("Q3 2021 Earnings Call"), February 16, 2022 ("Q4 & YE 2021 Earnings Call"), July 27, 2022 ("Q2 2022 Earnings Call"), October 26, 2022 ("Q3 2022 Earnings Call"), February 22, 2023 ("Q4 & YE 2022 Earnings Call"), and May 3, 2023 ("Q1 2023 Earnings Call"), and three press releases on November 1, 2021, May 25, 2022, and March 29, 2023. *See* App'x A & C; AC ¶¶ 115, 117, 119, 121, 123, 127, 131, 132, 134, 136.[4] Plaintiffs also allege misstatements were made regarding Driven's auto glass repair acquisitions during the Q2 2022, Q3 2022, Q4 & YE 2002, and Q1 2023 Earnings Calls, in addition to the earnings calls on April 27, 2022 ("Q1 2022 Earnings Call"). *See* App'x A & C; AC ¶¶ 139, 141, 143, 145, 149.

---

[4] The alleged misstatements are laid out in chronological order in App'x A. For the Court's convenience, each alleged misstatement and the reasons it is inactionable are set forth in App'x C.

To the extent Driven commented on the Company's future prospects during these earnings calls, it included meaningful cautionary language and incorporated by reference specific "Risk Factors" from its annual Forms 10-K. *See* App'x B.[5] For example, on the February 22, 2023 earnings call for year-end 2022, Driven cautioned about the "competitive intensity of new entrants." Ex. 4, Q4 & YE 2022 Earnings Call Tr. at 5. Driven also pointed investors to further "risks uncertainties set forth in [its] earnings release and [its] filings with the [SEC]." *Id*. at 3; *see* Ex. 5, Form 8-K, Ex. 99.1 (Press Release dated Feb. 22, 2023) at 4. Each Form 10-K contained risk factors that might affect its future performance, including, for example, that "[c]ompetition is intense and may harm [its] business and results of operations." Ex. 3, 2021 Form 10-K at 14. Similarly, Driven advised that it "may not be able to successfully integrate acquired businesses and may incur significant costs to integrate and support acquired companies." *Id.* at 20–21, 31.

Plaintiffs also allege that misstatements were made at the following industry events during the proposed Class Period: (1) Goldman Sachs Global Retailing Conference (Sept. 7, 2022); (2) Morgan Stanley Global Consumer Conference (Dec. 6, 2022); and (3) Bank of America Securities Consumer & Retail Conference (Mar. 14, 2023). AC ¶¶ 125, 129, 147.

## C. DRIVEN ACQUIRES AND BEGINS INTEGRATING CAR WASH BUSINESSES & AGN FROM 2020-2021

In 2020, Driven acquired the largest global car wash company by location count, alongside "tuck-in" acquisitions of 17 additional car wash sites. Ex. 6, 2020 Form 10-K at 4. As disclosed in its contemporaneous filings, Driven sought to create value from these acquisitions by integrating them into its existing car wash platform. Ex. 3, 2021 Form 10-K at 4. Yet Driven also cautioned shareholders about problems associated with the acquisition of new stores and competition. *See*

---

[5] App'x B provides a comprehensive overview of meaningful cautionary language and risk factor discussion contained in the Company's public filings.

App'x B.  Driven warned investors that "[it] may also discover . . . deficiencies associated with any companies acquired" and "[it] may not be able to successfully integrate . . . acquired businesses . . . affect[ing] [its] financial results."  Ex. 6, 2020 Form 10-K at 21.  With respect to competition, Driven cautioned that it "expect[ed] competition to intensify," that "new competitors may emerge at any time," and that "intense" competition "may harm [the Company's] business and results of operations."  *Id.* at 14.  Driven also warned that "if [it] experiences delays in the construction or remodeling processes, [it] may be unable to complete such activities at the planned cost, . . . affect[ing] [its] business and results of operations."  Ex. 3, 2021 Form 10-K at 38–39.

On December 30, 2021, Driven acquired AGN.  Ex. 3, 2021 Form 10-K at 55.  Given AGN's significant experience in auto glass repair and replacement, Driven planned to "leverage [the Company's] growth blueprint" and "accelerate [the Company's] presence" in glass services by adding auto glass providers onto AGN's platform.  Ex. 7, Q4 2021 Earnings Call Tr. at 4.  Driven anticipated that the "highly fragmented" and "growing" auto glass market presented an excellent opportunity for consolidation and expansion, as well as "strong unit level economics." *Id.*  The Company began implementing this "bolt-on" strategy for acquisitions of smaller auto glass providers in the United States throughout 2022 to "leverage . . . existing same-store sales levers" and existing "insurance relationships."  *Id.*

### D.     DEFENDANTS MAKE TRUTHFUL DISCLOSURES ABOUT THE CAR WASH BUSINESSES AND AGN

#### 1.     Defendants Issue Truthful Disclosures About AGN

During the Q1 2022 Earnings Call on April 27, Fitzpatrick informed investors that "over the first 90 days" since AGN's acquisition, the Company had made "good progress with Driven's existing fleet and insurance partners, and [with] introducing them to our glass capabilities."  Ex. 8, Q1 2022 Earnings Call Tr. at 6.  During the Q2 2022 Earnings Call on July 27, Fitzpatrick

7

expressed satisfaction "with [Driven's] progress in glass over the first 180 days" and "expect[ed] the balance of 2022 to be busy in terms of additional bolt-on acquisitions." Ex. 9, Q2 2022 Earnings Call Tr. at 6. During this call, Fitzpatrick emphasized that the Company ended fiscal year 2021 with "zero glass locations in the [United States]" and then, "in the first half of 2022 alone," grew the Company's auto glass repair locations to 120 stores and 350 mobile units, with more than 750 employees operating across 27 states. *Id.*

While Driven was optimistic about prospects for integration, its guidance remained cautious in 2022 and warned investors that difficulties might arise. *See* App'x B. As early as AGN's acquisition, Driven cautioned investors that "failure to build and maintain relationships with insurance partners could adversely affect [the] business." Ex. 3, 2021 Form 10-K at 20. The Company further emphasized that "these relationships can change quickly," and "we may not be able to successfully integrate acquired businesses," which "could adversely affect our financial results" and "incur significant costs to integrate and support acquired companies." *Id.* at 20–21.

### 2. Defendants Update Investors Regarding Performance of Car Wash Segment, Including Negative Same-Store Car Wash Sales in Late 2022

Throughout 2022, Driven continued to accurately describe the growth of its car wash segment, the quality of services, and goals for car wash subscription services, as well as challenges with negative same-store car wash sales. After multiple car wash acquisitions in 2020, subscriptions for the Company's car wash services expanded "across [the Company's] car wash stores," ultimately accounting for "approximately half of domestic car wash revenue in 2022." Ex. 1, 2022 Form 10-K at 5. When asked about the quality of service at the Company's car wash network in Nashville during the Q2 2022 Earnings Call on July 27, Fitzpatrick explained that "the experience for the customer is significantly better" and the "equipment is working beautifully" due to maintenance. Ex. 9, Q2 2022 Earnings Call Tr. at 17–18. Both the analyst's question and the

8

Company's response referred specifically to rebranding and customer reactions in Nashville, not the quality of car wash services across the United States, as Plaintiffs contend. *Id.*

Driven also replied truthfully when an analyst asked about Driven's car wash subscription program during an investor conference on September 7, 2022. Ex. 11, Goldman Sachs Global Retailing Conference Tr. at 4. In response, Fitzpatrick explained that subscriptions create "stickiness with the consumer . . . cash flows [and] predictability" and that "50% of [Driven's car wash] revenue is coming from . . . subscriptions." *Id.* at 5. He further explained that revenue for "others in the industry who've been around longer" is "60% from subscription services" giving Driven a "medium term goal" of increasing "subscription levels to 60%-plus." *Id.*

During the Q3 2022 Earnings Call on October 26, Fitzpatrick reported that the number of the Company's car wash locations "doubled over the past two years," creating "long-term opportunit[ies]," while Mason reported declines in same-store sales and competitive challenges to its car wash segment. Ex. 10, Q3 2022 Earnings Call Tr. at 4, 7 (noting negative same-store sales of 9%). Similarly, during the Q4 & YE 2022 Earnings Call on February 22, 2023, Mason disclosed that "the Car Wash segment posted negative same-store sales of 10%" in the last quarter of 2022. Ex. 4, Q4 2022 Earnings Call Tr. at 8. The car wash segment was "evolving to a single brand and operating standard," prompting Mason to further explain that though "retail volume was soft again this quarter, [the Company] continued to . . . grow [its] subscription program." *Id.*

While Driven remained optimistic about the future of the car wash segment, Defendants continued to caution investors about business integration and competition. With respect to quality of services, Driven warned that the "quality of existing . . . operations may be diminished by factors beyond [its] control" and that the "growth strategy may not succeed" if it is "unable to . . . construct new locations, complete remodels of [its] existing locations, or convert non-Driven Brands

9

locations into [its] locations." Ex. 1, 2022 Form 10-K at 17, 28. Driven further cautioned that delays in construction and remodeling of car wash locations could mean that the Company would be "unable to complete such activities at the planned cost, . . . affect[ing] [its] business and results of operations." *Id.* at 18. The Company also warned that "the automotive aftermarket industry is highly competitive, and subject to a wide variety of competitors." *Id.* at 12.

### 3. Defendants Disclose Slow-Down with AGN Integration in Early 2023

During the first half of 2023, Driven continued to provide updates on expansion efforts in the auto glass repair sector while further cautioning investors regarding the challenges facing the business. On March 14, 2023, Fitzpatrick stated that Driven had "built out [its] North America auto glass platform" in 2022 and "built a really nice sort of base platform in the Glass business." Ex. 12, Bank of America Securities Consumer and Retail Conference Tr. at 7. Fitzpatrick cited the addition of "200 [store] locations and close to 1,000 mobile vans" as evidence of Driven's growth and ability to reach a larger "consumer base." *Id.* Relatedly, during the Q1 2023 Earnings Call on May 3, Fitzpatrick disclosed that Driven had made "significant progress integrating our 10 acquisitions to create a US glass platform." Ex. 13, Q1 2023 Earnings Call Tr. at 5. Mason provided further details about Driven's ongoing efforts to integrate U.S. glass acquisitions since Driven "enter[ed] the market just over a year ago." *Id.* at 7.

Even statements about then-current integration efforts and growth were made in the context of substantial cautionary language and risk-factor disclosures in Driven's public filings. For example, Driven specifically warned that it "may not be able to successfully integrate acquired businesses." Ex. 1, 2022 Form 10-K at 18. The Company further cautioned that "problems with maintenance, upgrading or transitioning to replacement systems . . . could result in loss of sales . . . , cause delays in customer service . . . , reduce efficiency, [or] cause delays in operations." Ex.

10

1, 2022 Form 10-K at 25. Driven also explained to investors that the Company employed "proprietary software to run point-of-sale, diagnostics, pricing, inventory and various other key functions," and that, as a result, integration of new businesses like AGN may result in "delay [and] additional costs" when "integrating a large number of substitute software programs contemporaneously," which could "adversely impact the operation of our locations." *Id.*

**E. DEFENDANTS DISCLOSE DELAYS WITH INTEGRATION OF AGN & CAR WASH PERFORMANCE CHALLENGES**

During the Q1 2023 Earnings Call on May 3, Mason explained that Driven "expected Q1 to be pressured from a margin perspective . . . because of the state of the maturity of glass integration as well as the car wash rebranding." Ex. 13, Q1 2023 Earnings Call Tr. at 10. During the Q2 2023 Earnings Call on August 2, Fitzpatrick similarly disclosed that "integrating the 12 acquisitions in our Glass business, . . . is not going as quickly as planned." Ex. 14, Q2 2023 Earnings Call Tr. at 9. This was not news to investors—Driven had previously warned that "we may not be able to successfully integrate acquired businesses," including because of the possibility of failures to integrate POS software systems or to maintain relationships with insurance partners. Ex. 1, 2022 Form 10-K at 17–18, 25.

During the same call, Fitzpatrick advised investors that the car wash segment was "challenged currently." Ex. 14, Q2 2023 Earnings Call Tr. at 4. Again, this was not new information to shareholders—Defendants had disclosed negative same-store sales in the last two quarters of 2022 and Fitzpatrick had explained to investors during the Q1 2023 Earnings Call that the Company "continue[d] to experience softer retail volume" in the car wash segment. Ex. 13, Q1 2023 Earnings Call Tr. at 4. Despite the challenges of "competitive . . . growth" in this segment, Driven added that "large-scale, single-branded, well-capitalized, long-term-focused owners like Driven" would continue to grow. Ex. 14, Q2 2023 Earnings Call Tr. at 5.

11

During the Q3 2023 Earnings Call on November 1, the Company struck the same tone when disclosing integration challenges, noting that "underperformance of our US Glass business in 2023" would "take several quarters to get through." Ex. 15, Q3 2023 Earnings Call Tr. at 5. Driven also added that it "completed the rollout of [a] new point-of-sale system" and "new centralized call center" with plans to "centraliz[e] all product purchasing." *Id.* at 15. The Company remained optimistic about putting "integration challenges behind [it] . . . by the end of Q1 [2024]." *Id.* at 15. The potential for integration challenges was not news to investors, as the Company advised that "we may not be able to successfully integrate acquired businesses," and "integrating . . . software programs contemporaneously could adversely impact the operation of our locations." Ex. 1, 2022 Form 10-K at 18, 25. With regards to the car wash segment, Driven disclosed that "after a detailed review . . . [the Company] decided to close 29 U.S. Car Wash locations." Ex. 15, Q3 2023 Earnings Call Tr. at 3. Those locations were over 13 years old on average, "had significant competitive intrusion," as well as negative same-store sales and negative EBITDA contribution. *Id.* This again was not news to investors, as the Company previously disclosed negative same-store car wash sales as early as October 2022. *Id.* at 4, 7; Ex. 4, Q4 2022 Earnings Call Tr. at 8. The Company had similarly warned that "competition is intense" and it "expect[s] competition to intensify" in the car wash segment. Ex. 3, 2021 Form 10-K at 14.

### III.    STANDARD OF REVIEW

Dismissal is warranted under Fed. R. Civ. P. 12(b)(6) where a complaint fails to state a claim upon which relief can be granted. Plaintiffs must plead sufficient factual allegations "to raise a right to relief above the speculative level, so as to nudge . . . claims across the line from conceivable to plausible." *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 538 (M.D.N.C. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (omissions in original)).

Critically, courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

Plaintiffs' claims are also subject to the heightened pleading standards Congress demands of securities claims under the PSLRA, which governs Section 10(b) and 20(a) securities fraud claims. For each alleged misrepresentation or omission, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). These circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (internal cites omitted). When a complaint fails to meet the PSLRA's requirements, it must be dismissed. *Id*. § 78u-4(b)(3)(A); *see Yates*, 744 F.3d at 894 (affirming dismissal of securities fraud complaint for failure to meet PSLRA pleading requirements).

## IV.  ARGUMENT

### A.  PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

A Section 10(b) securities fraud claim requires an actionable misstatement or omission. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Matrix Cap. Mgmt. Fund v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009). To satisfy this element, Plaintiffs must plead facts showing that (1) the statement was false, or the omission was misleading and (2) the statement or omission is material. *In re Under Armour Sec. Litig.*, 2024 WL 811478, at *11 (D. Md. Feb. 26, 2024) (citing *Hillson Partners, Ltd. v. Adage, Inc.*, 42 F.3d 204, 208–09 (4th Cir. 1994). Plaintiffs have failed to satisfy either requirement here. Furthermore, with respect to any alleged omissions, Defendants had no duty to disclose more information than they already disclosed where disclosure would not have "significantly altered the 'total mix' of information

13

available" to investors. *Basic*, 485 U.S. at 231–32 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Lastly, Plaintiffs cannot meet the PSLRA's heightened pleading standards because alleged misstatements that are "forward-looking" were accompanied by "meaningful" cautionary language and are therefore protected under the PSLRA's "safe harbor," 15 U.S.C. § 78u–5(c).

### 1. Plaintiffs Do Not Allege That Any of Defendants' Statements Were False or Misleading When Made

For an affirmative misrepresentation to be actionable, the factual assertion must have been false when made. *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 at 893 (granting motion to dismiss). Importantly, a statement believed to be true when made but later shown to be false does not support liability. "Mere allegations of fraud by hindsight will not satisfy the requirements of [Federal] Rule [of Civil Procedure] 9(b)." *Hillson Partners Ltd. P'ship*, 42 F.3d at 209. Plaintiffs must "identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud." *Id.* Here, Plaintiffs fail to allege that *any* of the 18 alleged misstatements were false or misleading when made. *See* AC ¶¶ 116, 118, 120, 122, 124, 126, 128, 130, 133, 135, 137 (listing same three, operational complaints, unrelated to alleged misstatements); *id.* ¶¶ 142, 144, 146, 148, 150 (listing same three, generic alleged problems with auto glass integration unrelated to specific alleged misstatements).

### a) Statements about Driven's plans to earn loyalty and grow its car wash segment were not false when made

Plaintiffs have failed to plead any facts showing that Defendants' statements about Driven's car wash business were false or misleading when made. AC ¶¶ 115, 117, 119, 121, 123, 125, 127, 129, 131, 132, 134, 136. For example, Plaintiffs point to a November 1, 2021 press release, in which the Company announced that it had "over 300" car wash locations and was "the

14

fastest-growing express conveyor car wash operator in North America." AC ¶ 117; *see also id.* ¶ 134. This statement is true. Driven *did* have over 300 car washes as of November 1, 2021. Likewise, it *was* the fastest-growing operator in North America. Instead of challenging either one of these facts, Plaintiffs allege that the Company was facing equipment failure and service problems, did not adequately invest in equipment, and was facing competitive intrusion and declining same-store sales. *Id.* ¶ 118. Even if these problems did exist at the time, they would not render the Company's statement about acquisition-driven expansion false or misleading. Where "Plaintiff has alleged no facts to dispute [accuracy], . . . the recitation of a mere fact . . . is not false and, taken independently, cannot be misleading." *Elec. Workers Pension Tr. Fund*, 2013 WL 4014978, at *15.

Similarly, Plaintiffs also point to Fitzpatrick's statement at the September 7, 2022 Goldman Sachs Global Retailing Conference that the Company's subscription program "creates stickiness with the consumer, stickiness with the cash flows, predictability." AC ¶ 125; *see also id.* ¶ 127. This statement was true when made: consumer loyalty programs, including Driven's, *do* increase stickiness by providing discounts and other incentives for customers to return. Rather than challenging the truthfulness of the statement directly, Plaintiffs again allege unrelated problems Driven faced at the time such as increased competition and service failures. *Id.* ¶ 126. None of those alleged "truths," even if they were proven, would render the Company's non-controversial statement about the utility of loyalty programs false or misleading.

As to Plaintiffs' remaining arguments about the car wash segment, expressing "disagreements over [the Company's] strategic choices" is not the same as pleading "materially false statements that would be actionable under securities laws." *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *10 (E.D. Va. June 2, 2020), *aff'd sub nom. KBC Asset Mgmt. NV*, 19 F.4th

15

601. Plaintiffs cannot demonstrate that the Company was not "committed" to providing quality services or investing in its existing asset base. AC ¶¶ 115, 119, 123. Even if it were true that Driven periodically "cut costs" on "maintenance," *id.* ¶ 68, or "failed to make the necessary investments in equipment" at undisclosed car wash sites, *id.* ¶ 70, those facts as pled would not render Defendants' statements false when made, *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *10 ("[T]he allegation that [Defendant] was making significant cuts to its workforce does not make plausible that [Defendant] was not also training current workers and recruiting new workers in different areas."). Nor can Plaintiffs plead with particularity that the Company was not or did not intend to continue growing its business. AC ¶¶ 119, 121, 127.

Plaintiffs also allege that Defendants misled investors when Driven attributed declining sales in the car wash business to macroeconomic factors and poor weather conditions, rather than competition or declining service quality. AC ¶¶ 129, 131, 133, 136. Courts in this Circuit have rejected similar claims. In *In re Under Armour Sec. Litig.*, plaintiffs alleged that defendant's statement that "[t]he decrease in gross margin . . . was primarily driven by . . . increased liquidation" due to "changing inventory management strategy" was false because "[i]n reality, demand was shifting." 342 F. Supp. 3d 658, at 676–77 (D. Md. 2018). The court dismissed this argument because defendants' statement was "an accurate recitation of historical financial data," defendants stated their position in SEC filings, and to the extent defendants were wrong in their cause-and-effect analysis, "[p]laintiffs do not get the benefit of 20/20 hindsight." *Id.* at 677. Here, even if Plaintiffs plead facts showing that economic conditions were not contributing to Driven's challenges—and they have not—Plaintiffs cannot support fraud claims based on *ex post facto* criticisms of Driven's business analysis. *See id.*; *see* Ex. 16, Q3 2022 Form 10-Q at 66 (disclosing "macro" pressures on retail); Ex. 17, Q2 2023 Form 10-Q at 53 (discussing "negative weather

16

patterns" affecting car wash businesses). And to the extent Plaintiffs challenge the Company's growth predictions writ large, Plaintiffs cannot "refer to discrete customer service and other operational problems allegedly experienced by the Company" and then "imply that, in view of these problems, various statements—generally consisting of predictions of the overall prospects for the Company or for . . . merger[s]—must have been false." *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 896. Ultimately, Plaintiffs plead no facts to suggest Defendants issued "false[] or inaccurate[]" statements and instead, "merely disagree with Defendants' . . . conclusions" after the fact. *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 587 (D. Md. 2017).

**b)     Statements about Driven's strategy and efforts to integrate its auto glass repair business were not false when made**

Plaintiffs similarly fail to show that Defendants' statements about AGN were false or misleading when made. *See* AC ¶¶ 139, 141, 143, 145, 147, 149. First, Plaintiffs cannot prove Defendants' statements that they were "pleased" with results or that Driven did a "phenomenal job" were false because those are inactionable opinions. *Id.* ¶ 139 ("very pleased with our progress"), ¶ 141 ("very pleased with our progress"), ¶ 145 ("did a phenomenal job"); *see infra,* § IV.A.3. "Plaintiffs' disagreement with Defendant[s'] optimism is not tantamount to proving [their] comment[s] w[ere] false when made." *Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721, 727 (D. Md. 2001), *aff'd sub nom. Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002). As to the other statements regarding AGN—*i.e.*, that Driven had made "significant," AC ¶¶ 139, 143, or "good," ¶ 141, progress and was "the second largest player in the United States," ¶ 145—Plaintiffs have pleaded zero facts to suggest that this information was false when made. *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 891 (finding not actionable "[we] are very pleased with our progress . . . and with the growth prospects"). The remaining statements about

17

the auto glass repair segment similarly fail. AC ¶ 147 ("built a really nice sort of base platform"), ¶ 149 ("made significant progress").

### 2. Plaintiffs Have Failed to Plead That Defendants Had a Duty to Disclose Omitted Information

Plaintiffs have also failed to allege that Defendants had a duty to disclose further information about its car wash or auto glass repair business. "Silence, absent a duty to disclose, is not misleading." *Hillson*, 42 F.3d at 219 (quoting *Basic*, 485 U.S. at 239 n.17). And "[n]ot all material omissions are actionable" because, "[a]lthough investors would surely prefer to know everything about a company, Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information.'" *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901–02 (4th Cir. 2022) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)) (internal quotation marks omitted). Here, Plaintiffs argue that representations about service quality and competitiveness in Driven's rapidly expanding car wash business created a duty to disclose alleged weaknesses in that business. *See* AC ¶¶ 115, 117, 119, 121, 123, 125, 127, 129, 131, 132, 134, 136. Likewise, Plaintiffs allege that statements regarding Driven's newly acquired auto glass repair businesses created a duty to disclose possible delays in the integration process of that business. AC ¶¶ 139, 141, 143, 145, 147, 149. But none of these statements triggered a duty to disclose because they were either forward-looking or too generalized to be actionable.

### a) Projections do not trigger a duty to disclose

Where a company makes projections, no "duty to disclose" attaches unless a "reasonable investor would have considered the omitted information significant at the time." *Basic*, 485 U.S. at 232–34. Critically, "[a]n inability to foresee the future does not constitute fraud." *Hillson*

*Partners*, 42 F.3d at 213. Here, Defendants' statements projecting growth or anticipating integration progress are not actionable because they were forward-looking when made. *Id.*[6]

Furthermore, to the extent that acquisition and integration efforts of car washes and AGN were mixed statements of ongoing facts and forward-looking expectations, Driven had no obligation to disclose because investors were already aware of the challenges inherent in the Company's acquisitions. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999) (no duty to disclose when investor "possesses [sufficient] information"). Shareholders knew that Driven's business model consisted of acquiring companies and then integrating those companies into the larger business. "[G]iven that the very business plan of [Driven] . . . contemplated an ongoing series of acquisitions of disparate companies, the market surely would not reasonably believe that, during the class period, there was some finite point in time at which [Driven] could have completed all integration efforts, or even most efforts at integration of even *already-acquired* companies." *Keeney v. Larkin*, 306 F. Supp. 2d 522, 531 (D. Md. 2003), *aff'd*, 102 F. App'x 787 (4th Cir. 2004) (emphasis in original). This is especially true here, where investors were already aware that Driven's car wash segment was experiencing some issues and that integration of AGN carried risks. *See* Ex. 10, 2022 Q3 Earnings Call Tr. at 4, 7 (disclosing declining same-store sales); *id.*, Ex. 4, 2022 Q4 & YE Earnings Call Tr. at 8 (same); *id.*, Ex. 1, 2022 Form 10-K at 18, 25 (warning that "we may not be able to successfully integrate acquired businesses" and of potential "delay" in integrating "point-of-sale" software). As the *Keeney* court explained, "every investor knew or is charged with knowledge of" the nature of serial acquisitions as an ongoing process, especially

---

[6] These and other forward-looking statements are independently inactionable because they are protected under the PSLRA's "safe harbor." 15 U.S.C. § 78u–5(c); *see infra,* § IV.A.4.

when these risks are already part of the "'total mix' of information that [is] available to the market in respect to [the Company's] evolution into a fully integrated whole." 306 F. Supp. 2d at 531.

### b) Generalized statements do not trigger a duty to disclose

"Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 144 (D. Md. 2021) *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022) (quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 44). Where "[a]t most, . . . Plaintiffs allege a failure by [Defendants] to disclose general mismanagement . . . such claims are not actionable under the securities laws." *Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721, 728 (D. Md. 2001), *aff'd sub nom. Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002). And to the extent a duty to disclose exists, it only exists at the same level of generality as the information the Company already chose to reveal to the market. *See Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 383–84 (4th Cir. 2023) (finding no duty to disclose "graph[s]" or "full trial data" where company only spoke to "top-line results" of study) (internal quotation marks omitted).

With respect to Defendants' statements about the general quality of its AGN business, AC ¶¶ 141, 145, 147, 149, or generalized descriptions of services at the Company's car wash locations, *id.* ¶¶ 115, 119, 123, 125, 127, 131, 132, 136, these statements are too vague to trigger a duty to disclose. *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *27 (E.D. Va. Mar. 24, 2021) (quoting *Carlucci v. Han*, 886 F. Supp. 2d 497, 522 (E.D. Va. 2012) (no duty where misstatements are "so vague 'that no reasonable investor could find them important to the total mix of information available'")); *see*, *e.g.*, AC ¶ 143 ("we continued to make significant progress across our key growth levers [including] glass").

As to the Company's disclosures about integration of newly acquired businesses, AC ¶¶ 117, 121, 131, 134, 139, 141, 143, 145, 147, 149, courts in this Circuit have already considered similar language touting progress with integration efforts and found them inactionable. *Compare In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d at 117 (alleged misstatement that "we are pleased with the results" of efforts to integrate acquired company was "puffery and opinion that is not actionable"), *with* AC ¶ 149 ("currently integrating our series of acquisitions" and that "we expect glass margins to expand from here as we integrate the business"). Here, Plaintiffs fixate on problems with "point-of-sale" software. AC ¶¶ 139, 141, 143, 145, 147, 149. But Defendants were under no obligation to disclose each minor roadblock to investors, especially where, as here, serial acquisition and integration efforts had been core to the Company's strategy for years. For instance, the *In re First Union* court explicitly found that "given the scale of the merger, the market would have regarded disclosure of discrete customer service problems associated with . . . integration as immaterial." 128 F. Supp. 2d at 892. Here, Plaintiffs argue that Driven had an obligation to disclose exactly this type of information—equipment failures and service problems across a mere handful of stores out of 400 nationwide locations—despite the fact the car wash acquisitions were numerous and ongoing for a number of years.

### 3. Plaintiffs Have Failed to Allege That Defendants' Statements and Omissions Were Material

In order to allege materiality, Plaintiffs need to plead a substantial likelihood that investors (1) would consider the fact important in deciding whether to buy or sell the security, or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact. *Basic*, 485 U.S. at 231–32; *see Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir. 1999). With respect to the alleged misstatements, Plaintiffs have failed to meet the materiality requirement. For example, a projection that a company is "poised to carry the growth and success

21

[in a particular business segment] well into the future" does not trigger a duty to disclose because "statements such as these generally lack materiality [as] the market price of a share is not inflated by vague statements predicting growth." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993). Critically, many of the statements are immaterial expressions of corporate optimism or "puffery" that are "so vague 'that no reasonable investor could find them important to the total mix of information available.'" *Plymouth Cnty. Ret. Sys.*, 2021 WL 1439680, at *27 (quoting *Carlucci*, 886 F. Supp. 2d at 522); *see* AC ¶¶ 115, 119, 123, 139, 141, 143, 145.

a) **Generalized statements about business expansion and improved customer service are corporate optimism and not actionable**

Many of the alleged misstatements are generic expressions of optimism, either predicting growth or touting the quality of services. *See* AC ¶ 115 ("committed to having the best stores"), ¶ 119 ("continuing to invest"), ¶ 121 ("continu[ing] its growth trajectory"), ¶ 127 ("continue[d] to grow our Wash Club program"), ¶ 132 (same). It is well established that "[t]he market price of a share is not inflated by vague statements predicting growth." *Raab v. General Physics Corp.*, 4 F.3d at 289; *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 611 (D. Md. 2010) ("[O]ptimistic statements regarding future earnings are generally not actionable, as they do not have a material effect on share price."). Alleged misstatements about "[positive] trends" or predicting a "positive trend . . . to continue" are "nothing more than expressions of optimism." *Employees' Ret. Sys. of the City of Baton Rouge*, 61 F.4th at 377, 386. And "Defendants' use of the words 'positive,' 'excited,' and 'promising' are textbook examples of puffing statements that reasonable investors cannot rely upon in the hopes of a grand slam." *Id.* at 386.

Similarly, statements about the quality of a product or customer enthusiasm towards that product are also immaterial. *Longman*, 197 F.3d at 685 (finding statement that newly acquired "clean and conveniently located stores are especially well suited to the demands of our customers"

22

was puffery). Ultimately, Plaintiffs' arguments that Defendants misled investors fail because "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every [similar company] makes these statements." *In re Constellation Energy Grp., Inc. Sec. Litig.*, 2012 WL 1067651, at *12 (D. Md. Mar. 28, 2012) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

> **b)** **Generic expressions of optimism about integrating the newly-acquired AGN are immaterial puffery**

Plaintiffs allege that Defendants misled investors by touting Driven's progress integrating auto glass repair businesses into a single "platform." AC ¶ 139 ("pleased with our progress over the first 90 days" after acquisition), ¶ 141 ("making good progress with . . . introducing [insurance partners] to our glass capabilities"), ¶ 143 ("continued to make significant progress across our key growth levers [including] glass"), ¶ 145 ("did a phenomenal job in 2022 building out that platform from zero"), ¶ 147 ("built a really nice sort of base platform in the Glass business"). But courts have found nearly identical statements that "[w]e are in the home stretch on integrating the companies" and "the prospects of the combined company are favorable" are "puffery and opinion that is not actionable." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d at 117, 119; *see also In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 891 (finding statement that "'[w]e are very pleased with our progress in integrating recent acquisitions and with the growth prospects stemming from these transactions' is . . . 'puffery' and patently immaterial"). Courts have similarly dismissed statements that a company is working well with third parties like insurers. *Plymouth Cnty. Ret. Sys.*, 2021 WL 1439680, at *24–25 (dismissing statement that "[i]n terms of growth to our existing partners," company is "excited about our work across the last year" as "puffery"). Lastly, representations about the general quality of a company's software systems such as the Company's third-party POS system are also inactionable. *Pipefitters Loc. No. 636*

23

*Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at \*8 (E.D.N.C. Mar. 22, 2013) (finding claims about "[defendant's] development of . . . system" integrating "service providers and their networks" were "immaterial puffery"). Indeed, the alleged misstatements regarding the auto glass repair business are "so vague that no reasonable investor could find them important to the total mix of information available." *Plymouth Cnty. Ret. Sys.*, 2021 WL 1439680, at \*27 (quoting *Carlucci*, 886 F. Supp. 2d at 522).

### 4. Several of Defendants' Statements Are Forward-Looking Statements Protected by the PSLRA's Safe-Harbor Provision

Even if Plaintiffs had alleged that Defendants' alleged misstatements were material to investors (and they have not), many of the alleged misstatements that Plaintiffs point to are inactionable for the independent reason that they are protected by the PSLRA's "safe harbor" provision. AC ¶¶ 115, 119, 127, 131, 132, 136, 139, 141, 149. "[F]orward-looking statements are immunized from liability if they [are accompanied by] 'meaningful cautionary statements'" that "identif[y] important factors that could cause actual results to differ materially" from forecasts. *Johnson*, 2009 WL 426235, at \*14 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). Cautionary language is "meaningful" if it is "enough to properly warn an investor of significant risks similar to th[ose] actually realized." *In re Lab'y Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at \*5 (M.D.N.C. May 18, 2006). Under the safe harbor's disjunctive test, even if Driven's cautionary language is insufficient—and, here, it was plainly sufficient—Plaintiffs must still plead specific facts demonstrating the speaker had actual knowledge that the alleged misstatements were false when made. 15 U.S.C. § 78u–5(c)(1)(B); *see also Pozen, Inc.*, 2009 WL 426235, at \*14. Plaintiffs fail on both counts.

Plaintiffs allege that statements that Driven was "committed to having the best stores," AC ¶ 115, and "continuing to invest," *id.* ¶ 119, were misleading because its car wash segment suffered

equipment failures and poor service, which hampered expansion efforts. Looking at the forward-looking statements as a whole, however, Defendants clearly warned investors about the risks associated with business acquisition and integration. *In re Lab'y Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *5 (reviewing disclosures *as a whole* to determine if warning—incorporated by reference[7]—was sufficient); *see also In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *8 (statements inactionable when company warned it may not be able to "expand [its] service offerings" or "attract and train qualified personnel"). In particular, Driven warned that it may not "attract and retain qualified personnel," "successfully operate stores in a manner consistent with our standards and requirements," or "successfully integrate . . . acquired businesses." Ex. 6, 2020 Form 10-K at 2, 15, 21. To the extent Plaintiffs allege that service problems increased during the car wash business's expansion, Driven explained that it "pursue[s] strategic acquisitions as part of [its] business strategy" and "may also discover liabilities or deficiencies associated with any companies acquired." Ex. 1, 2022 Form 10-K at 18; *see also* Ex. 3, 2021 Form 10-K at 21; Ex. 6, 2020 Form 10-K at 21. Thus, Plaintiffs have also failed to plead securities fraud because the

---

[7] "[I]n determining the total mix of publicly available information, a court ruling on a 12(b)(6) motion may look to documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely." *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 313 n.3 (4th Cir. 2019) (internal quotation marks omitted). This is especially true where, as here, SEC filings are incorporated by reference into earnings calls. *In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 661 (D. Md. 2000); *see, e.g.*, Ex. 8, Q1 2022 Earnings Call Tr. at 2 ("Factors that may cause actual results to differ materially from expectations are detailed in the company's SEC filings, including, the Form 8-K filed today."); Ex. 18, Form 8-K, Ex. 99.1 (Apr. 27, 2022) at 4 ("[R]isks include . . . 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended Dec. 25, 2021."); *see also* Ex. 19, Form 8-K, Ex. 99.1 (May 3, 2023) at 3; Ex. 5, Form 8-K, Ex. 99.1 (Feb. 22, 2023) at 4; Ex. 20, Form 8-K, Ex. 99.1 (Oct. 26, 2022) at 4; Ex. 21, Form 8-K, Ex. 99.1 (Jul. 27, 2022) at 4; Ex. 22, Form 8-K, Ex. 99.1 (Feb. 16, 2022) at 4; Ex. 23, Form 8-K, Ex. 99.1 (Oct. 27, 2021) at 4. Where the documents containing alleged misstatements point to "certain risks . . . detailed from time to time in the Company's filings with the [SEC] including its Annual Report on Form 10-K," those filings are incorporated by reference. *Chapman v. Fennec Pharms. Inc.*, 2021 WL 7209981, at *8 (M.D.N.C. Dec. 16, 2021), *report & rec. adopted*, 2022 WL 613378 (M.D.N.C. Mar. 2, 2022).

Company plainly warned investors that service quality and operational consistency are not always guaranteed when acquiring new businesses. *Id.* at *8.

Next, Plaintiffs challenge statements that Driven's car wash business had a "competitive advantage" or "moat" that allowed it to retain customers as misleading because Driven ultimately lost more business to competitors than expected. *See* AC ¶¶ 127, 131, 132, 136. But where forward-looking statements touting a company's ability to compete are accompanied by warnings that competitors may win out, those statements are protected. *Elec. Workers Pension Tr. Fund*, 2013 WL 4014978, at *10 (cautioning investors about "competitive pricing and acceptance of products"). Here, Driven warned that "[t]he automotive aftermarket industry is highly competitive, and . . . subject to a wide variety of competitors" capable of challenging the Company regarding "scale, geographic reach, price, service, quality, brand awareness, customer satisfaction and adherence to various insurance carrier performance indicators." Ex. 6, 2020 Form 10-K at 14; *see also* Ex. 1, 2022 Form 10-K at 12; Ex. 3, 2021 Form 10-K at 14. Between 2020 and 2022, Driven also warned that it "expect[ed] competition to intensify" and "new competitors may emerge at any time." Ex. 6, 2020 Form 10-K at 14; *see also* Ex. 1, 2022 Form 10-K at 12; Ex. 3, 2021 Form 10-K at 14. Courts have consistently deemed language such as this sufficient to trigger safe harbor protection over statements about competitive position. *See In re Triangle Cap. Corp. Sec. Litig.*, 2019 WL 1083777, at *10 (E.D.N.C. Mar. 7, 2019) (statements about "investment opportunities" inactionable when accompanied by warning that "[the company] operate[s] in a highly competitive market" and "other companies might offer better pricing and more flexible structuring"); *In re Lab'y Corp.*, 2006 WL 1367428, at *4 (statements about "downward trends" in competition inactionable when defendants warned "increased competition" was possible).

Lastly, Plaintiffs allege that Driven expressed optimism that it would be able to swiftly integrate AGN and its other auto glass acquisitions into a single "platform." AC ¶¶ 139, 141, 149. It is well established that forward-looking statements about the progress or success of an integration process, when accompanied by meaningful cautionary language, are protected by the safe harbor. *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 892. Throughout the proposed Class Period, Driven's Forms 10-K warned that "certain acquisitions could adversely affect our financial results," that Driven "may not be able to successfully integrate acquired businesses," and that Driven "may incur significant costs to integrate and support acquired companies." Ex. 1, 2022 Form 10-K at 18; *see also* Ex. 3, 2021 Form 10-K at 21; Ex. 6, 2020 Form 10-K at 21. This Circuit has found nearly identical language sufficient where "the very business plan of [defendants] . . . contemplated an ongoing series of acquisitions" that needed to be integrated. *Keeney*, 306 F. Supp. 2d at 531–33 (statements projecting "continued" success at integrating acquired companies not actionable when defendant disclosed that it "may not be able to integrate the operations or the necessary systems and procedures" or "implement the [c]ompany's acquisition and operating strategies"). Similar language has also been found sufficient in other circuits. *See, e.g.*, *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 233 (S.D.N.Y. 2021) ("[F]ailure to integrate successfully the businesses and operations . . . in the expected time frame and at the expected cost may adversely affect our future results"); *In re Tibco Software, Inc.*, 2006 WL 1469654, at *27 (N.D. Cal. May 25, 2006) ("Any failure to successfully integrate [the acquired company's] business operations could adversely affect our financial results."). Plaintiffs cannot maintain a claim for securities fraud where such cautionary language plainly put investors on notice.[8]

---

[8] As it relates to Plaintiffs' complaints about issues with the Company's third-party POS system, AC ¶¶ 140, 142, 150, Driven also warned that "delay, additional costs, and possible business

*(Cont'd on next page)*

Plaintiffs "have [also] failed to allege particularized facts that show Defendants had actual knowledge that the forward-looking statements were false when made—the substantive standard they must meet to blow the statements out of the safe harbor." *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (dismissing "conclusory" allegations that defendants' receipt of "Flash Reports" indicated defendants "must have known" their statements were false); *see also supra* § IV.A.1 (describing Plaintiffs' failure to plead actual falsity of *any* alleged misrepresentation). Because of Plaintiffs' failure to plead falsity, even if the statements were not accompanied by sufficient cautionary language, they would still be inactionable under the safe harbor. 15 U.S.C. § 78u–5(c)(1)(B).

**B.      PLAINTIFFS HAVE NOT ADEQUATELY PLEADED SCIENTER**

In addition to failing to allege that Defendants made any false or misleading statements, the Complaint must independently be dismissed because its conclusory allegations of intent to defraud do not satisfy the PSLRA's heightened pleading standard for scienter. *See Yates*, 744 F.3d at 883–84. Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud," *Yates*, 744 F.3d at 884 (quoting *Tellabs*, 551 U.S. at 319). To establish a "cogent and compelling" inference of scienter, *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546–47 (4th Cir. 2017), Plaintiffs must plead facts showing that the alleged conduct was "either intentional or severely reckless," *Yates*, 744 F.3d at 884.

Plaintiffs have failed to allege that Defendants acted intentionally or with severe recklessness. Severe recklessness is satisfied only by allegations demonstrating "such an extreme

---

interruptions associated with . . . integrating . . . software programs contemporaneously could adversely impact the operation of our locations." Ex. 1, 2022 Form 10-K at 25; Ex. 3, 2021 Form 10-K at 31; Ex. 6 2020 Form 10-K at 31.

departure from the standard of ordinary care" that the danger of misleading the plaintiff must have been "either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Capital,* 576 F.3d at 181 (citation and internal quotation marks omitted). As this Circuit has held in affirming dismissal for lack of scienter, such a claim fails when the more compelling inference was that "defendants . . . acted with a genuine confidence in [the business's] prospects and ultimately were mistaken." *Janies v. Cempra, Inc.*, 816 F. App'x 747, 749 (4th Cir. 2020). Plaintiffs advance general theories of scienter but fail to plead with particularity any facts sufficient to establish a strong inference of scienter. Plaintiffs focus primarily on what Defendants allegedly *knew*, either based on vague and conclusory statements of former employees or a weak core operations theory, but alleging knowledge alone is insufficient to support a strong inference of scienter. Plaintiffs plead no facts that speak to the mental state of any Defendant, much less facts that support a strong inference of scienter.

### 1. Plaintiffs' Confidential Witness Statements Do Not Support a Strong Inference of Scienter

Lacking any direct evidence of scienter, Plaintiffs cobble together a series of vague statements by purported confidential witnesses, all alleged former employees who provide hearsay statements regarding Driven executives' alleged knowledge. Allegations of confidential witnesses to support an inference of scienter "will only be afforded the weight they are due given their indicia of reliability," *KBC Asset Mgmt. NV*, 19 F.4th at 609. Plaintiffs fail, however, to "describe the sources with sufficient particularity to support the probability that [the confidential witnesses] [were] in the position . . . [to] possess the information alleged." *Teachers' Ret. Sys. Of LA*, 477 F.3d at 174 (internal quotation marks omitted).

Confidential witnesses FE-1 to FE-9, defined as "former employees," impermissibly rely on hearsay. AC ¶ 54 n.1. "[C]onfidential witness must have personal knowledge, [and] the

29

testimony cannot be based on hearsay." *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006). FE-2, FE-3, FE-4, FE-6, FE-7, FE-8, and FE-9 were "district manager[s]," "regional . . . manager[s]," or "vice president[s]," none of whom are alleged to have had direct regular contact with senior executives or knowledge of those executives' state of minds. AC ¶¶ 59, 60, 66, 69. Here, "none of the Confidential Witnesses reported to the Defendants" and rather than speak to their personal knowledge, "speculate about what the Individual Defendants . . . may have known" about "deficiencies." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d at 144. That is not enough to support an inference of scienter.

Plaintiffs allege that FE-1 worked in Driven's auto glass repair business from shortly after the AGN acquisition closed on December 30, 2021 until mid-2023. AC ¶ 54. Yet FE-1 did *not* have direct contact with Michael Macaluso, the head of Driven's Paint, Collision & Glass and did not have any direct knowledge; FE-1 therefore relies on hearsay when alleging that Macaluso issued the directives for the pace of business integration. AC ¶ 54. Similarly, FE-1's allegation that integration information "rolled up" to Mars Shah, the President of Driven Glass North America, who then "took that information up to anyone above him" also relies impermissibly on hearsay. AC ¶ 55. Further, FE-1 attempts to explain that "Driven executives" recognized "by no later than May 2022" that "the Company would fail to meet its integration goals set at the start of the year by a substantial margin." AC ¶ 61. Yet FE-1 does not have any direct or personal knowledge of the glass acquisition team or Driven's executive decisions. It is pure hearsay and speculation. *See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 640 (D. Md. 2012), *aff'd sub nom. Yates*, 744 F.3d 874 ("Hearsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion.") (citation omitted).

Similarly, confidential witness allegations will not be credited if the witnesses "left [the company's] employment before the Class Period began." *Plymouth Cnty. Ret. Ass'n.*, 966 F. Supp. 2d at 544; *see Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *14 (D. Md. Sept. 28, 2023), *reconsideration denied*, 2024 WL 3360647 (D. Md. July 10, 2024) ("CW1 left [defendant company] . . . five months before the end of the Class Period" and so "cannot speak to developments after he departed."). Many of the confidential witnesses here were employed by the company for a very limited time, with FE-4 and F-6 being at the company for 13 months and FE-5 and FE-8 for less than a year "from the start [or prior to] the [proposed] Class Period [on October 27, 2021] through early 2022." AC ¶¶ 66, 69. They were not in a position to have knowledge of executive decision-making or actual knowledge during most of the three-year Class Period.

### 2. Allegations That Management Knew or Must Have Known About Alleged Issues With the Company's "Important Growth Drivers" Are Insufficient to Support a Strong Inference of Scienter

Plaintiffs allege that senior management knew, or must have known, about issues affecting the car wash and auto glass repair businesses because these operations constituted "two of the three most important growth drivers of Driven's business," AC ¶ 107, and because "the issues affecting [them] were severe, widespread, [and] enduring," *id.* ¶ 110; *see also id.*, ¶¶ 100–01, 108–09, 111. While core operations allegations may be relevant to a "holistic analysis of scienter," "bare allegations that officers have knowledge of key facts because of their positions or because such knowledge relates to the business's core operations are not enough, standing alone, to support a strong inference of scienter." *KBC Asset Mgmt. NV*, 19 F.4th at 612 (citations omitted) (internal quotation marks omitted). Furthermore, Plaintiffs cannot "simply . . . assume scienter because part of [the Company's] business plan was not going smoothly." *Id.*

Even if the integration of the auto glass and car wash businesses constituted "important growth drivers" of the Company at the time, AC ¶ 107, Plaintiffs have failed to plead

31

"particularized allegations regarding Defendants' knowledge of [alleged] shortcomings," *KBC Asset Mgmt. NV*, 19 F.4th at 612.  In *Yates*, this Circuit rejected the contention that defendants "must have acted intentionally or recklessly . . .  merely because (1) they were senior executives, and (2) the [subject of alleged misstatements] represented a core business of the Company." 744 F.3d at 890.  "[W]ithout additional detailed allegations establishing the defendants' actual exposure to" the underlying facts, the court found that the allegations in *Yates* (primarily the statements of several confidential witnesses) "[fell] short of the PSLRA's particularity requirements." *Id.*  Here, Plaintiffs have broadly alleged that "Defendants . . . held themselves out as knowledgeable" about the performance of the auto glass and car wash businesses during two earnings calls and at an investor conference—and "analysts asked detailed questions about [the] businesses." AC ¶¶ 107–08.  Attention to revenue and business growth by executive management during earnings calls and an investor conference is exactly the type of broad allegation that courts in this Circuit dismiss.  *KBC Asset Mgmt. NV*, 19 F.4th at 612; *Yates*, 744 F.4th at 890 (finding no inference of scienter "without additional detailed allegations establishing the defendants' actual exposure to the accounting problem"); *Fanucchi v. Enviva Inc.*, 2024 WL 3302564, at *14 (D. Md. July 3, 2024) (holding inference not permitted where plaintiffs set forth only a "bare assertion" that defendants must have been aware of issues affecting core operation).

Plaintiffs' allegation that problems affecting the AGN and car wash businesses were so "severe" and "widespread" that they "could not reasonably have escaped management's attention" fares no better.  AC ¶ 110.  As an initial matter, Plaintiffs have failed to plead particularized facts demonstrating that Defendants' possessed knowledge of "widespread" problems with the newly acquired businesses.  Even if Plaintiffs had established that the alleged "progress reports," *id.* ¶¶ 100, 101, 110, or "data," *id.* ¶ 100, that circulated within mid-level management contained

information on acquisition growing pains that contradicted Defendants' public statements (and Plaintiffs have not established as much), such allegations would still be insufficient to establish scienter "without additional detailed allegations establishing the defendants' *actual exposure* to the [alleged issues]." *Yates*, 744 F.3d at 890 (emphasis added). Critically, Plaintiffs have failed to allege that Defendants reviewed any of these inadequately defined reports.[9] Furthermore, Plaintiffs have pled no facts to suggest that these reports and data included facts contradicting the Company's public disclosures about the newly-acquired businesses.

Even if Plaintiffs had adequately pled that Defendants possessed knowledge of "widespread" problems (and they have not), "[s]imply knowing this information would not be enough for scienter. Defendants would also have to know—or, at a bare minimum, be reckless to a risk—that declining to share that information would render their . . . predictions *misleading*." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 243 (4th Cir. 2023) (emphasis in original); *see also Maguire Fin., LP*, 876 F.3d at 548 (declining to infer scienter based on inference that defendant knew his statement was false because inference does not support an intent to *deceive*); *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (declining to infer scienter when alleged facts suggest defendant "was simply overwhelmed with integrating a large new division into its existing business"). In other words, Plaintiffs must show that Defendants "affirmatively sought to advance or calculatedly sought to obscure" the economic

---

[9] Aside from one report that FE-5 allegedly discussed with Fitzpatrick in December 2021, Plaintiffs allege only that Fitzpatrick and other executives received reports, not that they reviewed them. *See, e.g.*, AC ¶¶ 68, 100, 101. And the allegations regarding whether executives even received these reports are themselves hearsay. Plaintiffs do not describe what was contained in these reports or whether they contradicted the Company's public disclosures. Furthermore, Plaintiffs also attempt to infer that Mason "was responsible for reviewing, and did review, data tracking the progress of auto-glass integration" based on Fitzpatrick's statements, AC ¶ 100, which is an impermissible attempt to "stack inference upon inference to satisfy the PSLRA's pleading standard," *Maguire Fin., LP*, 876 F.3d at 548.

realities of their business, *Maguire Fin.*, 876 F.3d at 548, or that Defendants were severely reckless in their failure to disclose these realities.

In *San Antonio Fire*, plaintiffs claimed that defendants knowingly misled shareholders regarding the success of a merger when defendants failed to disclose material information about one of the pre-merger companies. 75 F.4th at 238. This Circuit held that even if the defendants had conducted due diligence on the companies, defendants' knowledge of allegedly adverse facts "d[id] not necessarily support the further inference that [they] knew (or were reckless to the risk that) their future predictions would be misleading without including that information." *Id.* at 243. Here, Plaintiffs' allegations attempt to "fuse[] an inference that [Defendants] knew enough to realize that [their] characterization" of the businesses "was technically incorrect with an inference that [they] intended it to deceive." *Maguire Fin.*, 876 F.3d at 548. That is not enough. Without facts suggesting intent to mislead shareholders, Defendants "might well have believed that . . . earnings projections were unaffected by [alleged issues]." *San Antonio Fire*, 75 F.4th at 238.

Plaintiffs have similarly failed to allege that Defendants were "severely reckless" when making statements about the integration of the auto glass and car wash businesses. Defendants' optimism regarding these businesses was reasonable and, in any event, not "such an extreme departure from the standard of ordinary care" as to be misleading. *Boykin v. K12, Inc.*, 54 F.4th 175, 187 (4th Cir. 2022) (finding no support for severe recklessness where defendants were "optimistic about [a] contract" that ultimately did not pan out).

### 3. Temporal Proximity Between Alleged Misstatements and Subsequent Events Does Not Support an Inference of Corporate Scienter

Plaintiffs allege that Mason's departure, the "speed" with which the new CFO "discovered" information about Driven's performance, and Driven's subsequent disclosures at the end of the

proposed Class Period, taken together, generate a strong inference of scienter. AC ¶¶ 102, 105, 106, 112. These allegations, however, are insufficient to create the requisite inference of scienter.

*First*, Mason's departure from the Company and the Company's issuance of updated disclosures three months later is not enough to infer scienter on the part of the Company. In *In re Triangle Cap. Corp. Sec. Litig.*, the Court held that one executive's departure and another executive's subsequent changes to investment strategy were not sufficient to support an inference of scienter. 988 F.3d 743 at 753–54 (4th Cir. 2021). The Court found that "[t]he far more reasonable inference to draw from these facts is that Defendants were at a crossroads and had an honest, genuine debate about whether to continue with [current] strategy or transition." *Id.* at 754. Accordingly, the executive's departure was "more reasonably read as an extension of that debate, rather than as an effort to cover up his (and others') fraud." *Id.*; *see also Yates*, 744 F.3d at 889 (finding that departure of an executive "d[id] not compel an inference that she and the other individual defendants were bent on committing fraud"). The same rationale applies here: updated disclosures regarding continuing financial and business developments or the new CFO's modifications of the Company's predictions reflect nothing more than "an extension of [the] debate" regarding the best path forward for Driven, but they are not evidence of fraud. *Triangle Cap.*, 988 F.3d at 754. Plaintiffs have failed to plead additional facts to suggest otherwise.

*Second*, Plaintiffs allege that the "speed" at which new CFO supposedly "discovered and disclosed" facts was indicative of Defendants' intentional and/or reckless conduct. AC ¶¶ 102, 105, 106, 112. While "temporal proximity between . . . allegedly false statements or omissions and the subsequent disclosure of the truth can sometimes help support an inference of scienter," the proximity must be "very close." *San Antonio Fire*, 75 F.4th 243–44 (citation omitted) (internal quotation marks omitted) (three-month gap too long to infer scienter); *cf. Miss. Pub. Employees'*

35

*Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (*one-week gap* between claiming that a vehicle defect was "fixed" and issuing a recall "strong evidence" of scienter). Otherwise, "the link between an earlier misstatement and a later revelation is purely speculative." *San Antonio Fire*, 75 F.4th at 244 (citation omitted) (internal quotations omitted). Here, Plaintiffs point to a three-month gap between Mason's departure and the new CFO's supposed "discoveries," which is too long to support an inference of scienter. *Id.*; *KBC Asset Mgmt. NV*, 19 F.4th at 612–13 (three-month gap "little more than pleading fraud by hindsight").

### 4. Plaintiffs' Additional Allegations Against Mason Are Insufficient to Support a Finding of Scienter Against Mason or the Company

Plaintiffs claim that Mason's post-departure stock sale indicates that "she was aware of the negative information" concerning Driven's prospects. AC ¶ 104. Plaintiffs are wrong. As an initial matter, and as Plaintiffs conveniently omit, Mason's stock sale was in connection with the exercise of options. Ex. 24, SEC Form 144 (dated July 26, 2023) at 2. Nothing about the timing or manner of Mason's options exercise was either unusual or suspicious. First, Mason was a *former* officer when she exercised her options. *See Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 820–21 (D. Minn. 2022) (sale of stock did not support strong inference of scienter when officer retired); *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (sale of stock was "a 'normal and expected' consequence of . . . retirement" rather than conspiracy to defraud). Mason exercised her options when she did because she was no longer an executive. Second, Mason's options *were set to expire* three months after her departure. Ex. 25, Form 8-K/A (dated Jun. 8, 2023); Ex. 24, SEC Form 144 (dated July 26, 2023). Had she failed to exercise her options when she did, they would have expired and she would have lost the value of those options. That is a legitimate reason for her to exercise her options when she did. *See Teachers' Ret. Sys. of LA*, 477 F.3d at 185 (finding sales of defendants' holdings unremarkable).

36

Furthermore, the quantity of Mason's sale in connection with her options exercise was neither unusual nor suspicious. In *Teachers' Retirement System of LA*, the Court found that sales of 92%, 100%, and 82% of defendants' holdings were "unremarkable" in context. 477 F.3d at 185. Similarly, the *Yates* court, held that "the extent of . . . divestiture" was not "particularly alarming" where a former CFO sold 78% of his shares prior to the company's announcement of a restatement. 744 F.3d 874, 890–91; *see also KBC Asset Mgmt.*, 19 F.4th at 610–11 (no strong inference of scienter where one defendant sold 77% of shares during class period). Here, Plaintiffs allege that Mason sold 68% of her shares—an "unremarkable" amount given that she was exercising options and had departed the Company.[10] Far from supporting a strong inference of scienter, the context of Mason's option exercise more logically supports an inference that she was divesting herself of her holdings in a company with which she was no longer affiliated.

Additionally, the timing and circumstances of Mason's departure from Driven do not suggest that she acted with the requisite scienter. Plaintiffs allege that Mason's departure, together with the fact that she left shortly after presenting Q1 2023 financial results, generate an inference of scienter as to Mason, and therefore, as to Driven. AC ¶¶ 102–03. But an executive's departure is not, without more, strong evidence of scienter against the executive or the company. *See San Antonio Fire*, 75 F.4th at 244 ("[E]xecutive departures are, at best, weak evidence of scienter… we decline to read anything nefarious into the leadership changes of a company in flux.").

In *KBC Asset Management NV*, plaintiffs argued that the termination of an executive for "failure to adequately cut costs" in his division demonstrated that "[the company] deliberately

---

[10] Indeed, the "sale" was a result of a "cashless" options exercise, whereby a stockholder pays the exercise price for the options by selling a portion of the shares immediately upon exercise. Further, pursuant to a "lock-up agreement," Mason was required to retain all net shares acquired as a result of the cashless exercise for a period of 12 months, meaning that she did not receive any proceeds from the exercise. Ex. 25, Form 8-K/A (Jun. 8, 2023) at 16; Ex. 24, SEC Form 144 (Jul. 26, 2023).

37

deceived investors by making statements about the [company's] success . . . while knowing that they could not meet their revenue projections." 19 F.4th at 608. The court, in dismissing the complaint, held that "these allegations support only a weak inference of scienter." Similarly, in *Zucco Partners, LLC*, the fact that the CFO, two controllers, and an independent accounting firm resigned shortly after a restatement was issued was not enough to support a strong inference of scienter. 552 F.3d at 1002. The court held "the resignations . . . [were] not so numerous or suspicious as to raise . . . an inference [of scienter]" when plaintiffs had failed to plead particularized allegations that the resignation was "a result of" the misstatements at issue. *Id.* Here, Plaintiffs fail to plead any reasons for Mason's departure and so the most reasonable inference is simply that Mason's exit was a "leadership change[] of a company in flux," which is not sufficient to support a finding of scienter. *San Antonio Fire*, 75 F.4th at 244.[11]

### 5. Plaintiffs' Additional Allegations Against Fitzpatrick Are Insufficient to Support a Finding of Scienter Against Fitzpatrick or the Company

Plaintiffs have similarly failed to allege any facts suggesting that Fitzpatrick acted with intentional or severely reckless conduct to establish scienter. First, Plaintiffs' suggestion that Fitzpatrick was reckless in not performing more "due diligence" is unsupported by the alleged facts and, in any event, is not evidence of intentional or severely reckless conduct. Plaintiffs allege that Fitzpatrick's off-hand statement that Driven "should have done better due diligence," is evidence of his failure to perform due diligence. AC ¶ 99. But "that proposition, in effect, merely

---

[11] The lack of confidential witness statements attesting to Mason's conduct and knowledge further confirms Plaintiffs' lack of support for a strong inference of scienter as to Mason. Plaintiffs fail to allege facts as to Mason's mental state, instead attempting to infer from her departure and stock sale that she "was aware of the negative information," and to infer *from that inference* that Mason intended to deceive, manipulate, or defraud investors. AC ¶¶ 102–05. But a "plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard"—to do so would "violate[] the statute's mandate that the strong inference of scienter be supported by *facts*, not other inferences." *Maguire Fin., LP*, 876 F.3d at 548 (emphasis added).

argues that Defendants negligently performed due diligence . . . [a]nd mere negligence cannot support a § 10(b) claim." *San Antonio Fire*, 75 F.4th at 242; AC ¶ 99; s*ee also Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (finding "[m]ere negligence will not suffice" to establish scienter).

Furthermore, Fitzpatrick's alleged knowledge does not, on its own, yield a strong inference of scienter as to himself or the Company, particularly since Plaintiffs have failed to allege facts that speak to his intent to mislead or deceive. *See* § IV.B.2, *supra*. Plaintiffs' allegations of his actual knowledge are based on FE-4 and FE-5's insufficient testimony. AC ¶ 99. FE-4 and FE-5 were Vice Presidents in the Company's car wash segment with limited authority and little to no access to Fitzpatrick and other Company executives. *See* AC ¶ 66. Plaintiffs fail to allege that FE-4 had *any* contact with Fitzpatrick and allege that FE-5 presented an undefined three-year plan proposal to Fitzpatrick in December 2021, which was never implemented. *See* AC ¶¶ 66–68. Accordingly, rather than speak to their personal knowledge, FE-4 and FE-5 "speculate about what [Fitzpatrick] . . . may have known" about "deficiencies" at the Company. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d at 145.

FE-4 and FE-5 make allegations as to their own personal knowledge, but Plaintiffs fail to allege that FE-4 and FE-5 actually shared their knowledge with Fitzpatrick beyond a single, undefined report in December 2021. *See* AC ¶¶ 66–68. FE-4 and FE-5 further allege that Fitzpatrick and other executives received various reports, but fail to specify the content of those reports, including whether they contradicted Fitzpatrick's statements. *See id.* ¶¶ 68, 72, 99–101. FE-4 and FE-5's allegations are emblematic "vague and conclusory" statements "lack[ing] particularized facts demonstrating . . . intentional[] or reckless[] [conduct]," that courts disregard as evidence of scienter. *KBC Asset Management*, 19 F.4th at 609–10. As a result, the AC lacks

39

any well pled allegations—from confidential witnesses or otherwise—as to Fitzpatrick's mental state, and as such, Plaintiffs' claims against him should be dismissed for failure to allege scienter.

## C. PLAINTIFFS FAIL TO STATE A 20(A) CLAIM

Plaintiffs' Section 20(a) claim also fails because, as demonstrated above, the Complaint does not adequately allege any Defendant is liable for a primary violation of Section 10(b). Because Section 20(a) requires a finding that there was a "primary violation of the securities laws," the Section 20(a) claim should be dismissed as well. *Plymouth Cnty. Ret. Ass'n*, 966 F. Supp. 2d at 552–53 (citation omitted); *see also Teachers' Ret. Sys. of LA*, 477 F.3d at 169 (affirming dismissal of Section 20(a) claims for failure to allege primary violation).

## V. CONCLUSION

For the above reasons, the Complaint should be dismissed in its entirety with prejudice, together with such other relief as the Court deems just and proper.

[*Signatures and Artificial Intelligence Certification on following page*]

40

Dated: October 14, 2024

Respectfully submitted,

/s/ Adam K. Doerr_____

**ROBINSON, BRADSHAW & HINSON**
Adam K. Doerr, *N.C. Bar No. 37807*
Emma W. Perry, *N.C. Bar No. 58848*
101 N. Tryon St., Ste. 1900
Charlotte, NC 28246
Tel.: (704) 377-8114

**GIBSON, DUNN & CRUTCHER LLP**
Christopher D. Belelieu *(pro hac vice)*
Nathan C. Strauss *(pro hac vice)*
Bethany Saul *(pro hac vice)*
200 Park Ave.
New York, NY 10166
Tel.: (212) 351-4000

*Counsel for Driven Brands Holdings Inc. and Jonathan G. Fitzpatrick*

/s/ S. Frederick Winiker, III_____

**WINIKER LAW FIRM, PLLC**
S. Frederick Winiker, III, Esq.,
*N.C. Bar No. 22390*
352 N Caswell Rd
Charlotte, NC 28204
Tel.: (704) 333-8440

**ROTTENBERG LIPMAN RICH, P.C.**
Steven Kayman *(pro hac vice pending)*
Jennifer A. Kreder *(pro hac vice pending)*
230 Park Ave., 18th Floor
New York, NY 10169
Tel.: (212) 661-3080

*Counsel for Defendant Tiffany L. Mason*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 order in *In re: Use of Artificial Intelligence*, Dkt. No. 3:24-mc-104, the undersigned counsel hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 14th day of October, 2024.

/s/ Adam K. Doerr_____
Adam K. Doerr

41