# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CASE NO. 3:23-cv-00895-MOC-DCK

GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, on behalf of itself
and all others similarly situated,

        Plaintiffs,

        v.

DRIVEN BRANDS HOLDINGS INC.,
JONATHAN G. FITZPATRICK, and
TIFFANY L. MASON,

        Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ iv

I. INTRODUCTION ............................................................................................................. 1

II. STATEMENT OF FACTS .................................................................................................. 5

    A. Driven's Auto Glass And Car Wash Businesses Were Critical Elements Of The Company's Growth During The Class Period .................................................. 5

    B. Throughout The Class Period, Defendants Assured Investors That Driven Was Executing On Its Plans To Drive Rapid Growth, Successfully Integrating Its Auto Glass Network, And Delivering On Operational Performance In Its Car Wash Business .................................................................... 7

    C. In Reality, Driven's U.S. Auto-Glass Integration Was Stalled, And Its Car Wash Business Was Suffering From Significant Customer Attrition Due To Driven's Failure To Invest In Maintaining Its Facilities .................................... 8

        1. Driven's Auto Glass Campaign Encountered Fundamental Integration Problems, Snarling Progress and More Than Doubling The Strategy's Timelines ............................................................................... 9

        2. Driven Failed To Maintain Its Carwashes, Hampering Operational Capacity and Causing Massive Customer Attrition. ................................ 10

    D. The Truth Begins To Emerge ................................................................................ 11

    E. Defendant Mason Is Abruptly Terminated Then Dumps The Vast Majority Of Her Driven Stock ............................................................................................ 12

    F. The Truth Is Fully Revealed ................................................................................. 12

    G. Post-Class Period Events Further Confirm The Alleged Fraud ............................ 13

III. ARGUMENT ................................................................................................................... 14

    A. The Complaint Adequately Pleads That Defendants Made Material Misrepresentations And Omissions ...................................................................... 14

        1. Defendants Made Materially False And Misleading Statements About Driven's Glass Strategy ..................................................................... 15

        2. Defendants Made Materially False And Misleading Statements About Driven's Car Wash Strategy ........................................................... 25

B. The Complaint Adequately Pleads Scienter ........................................................ 31

    1. The Complaint Pleads Strong Evidence Showing That Defendant Fitzpatrick, Defendant Mason, And Other Senior Driven Executives Were Personally Informed About And Aware Of The Challenges Facing Driven's Auto-Glass And Car Wash Businesses ....... 32

    2. Defendant Mason's Abrupt Termination And Stock Sale, And CFO Ferrara's Quick Discovery Of The Fraud, Also Support Scienter ...................................................................................................... 36

    3. That Defendants' Fraud Concerned Driven's Most Significant Initiatives And Were The Focus Of Both Company and Investor Attention Further Strengthens The Inference of Scienter ......................... 38

C. The Complaint Adequately Pleads Control Person Liability ............................... 40

IV. CONCLUSION ....................................................................................................... 40

Case 3:23-cv-00895-MOC-DCK    Document 42    Filed 12/13/24    Page 3 of 52

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Aetna, Inc. Sec. Litig.*,
  34 F. Supp. 2d 935 (E.D. Pa. 2002) ...................................................................................23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ...........................................................................................................24

*Blue v. Doral Fin. Corp.*,
  123 F. Supp. 3d 236 (D.P.R. 2015) ...................................................................................17

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ..............................................................................17

*City of Omaha & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)...........................................................................20, 26

*In re Constellation Energy Grp.*,
  738 F. Supp. 2d 602 (D. Md. 2010) ..................................................................................31

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) ..............................................................................18

*In re DXC Technology Co. Securities Litigation*,
  2020 WL 3456129 (E.D. Va. June 2, 2020) ......................................................................29

*Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.
  MacroGenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) .............................................................................................31

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016)...................................................................................15

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) .............................................................................20

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  2013 WL 11319408 (S.D.N.Y. Dec. 12, 2013) ..................................................................20

*First Union Corp. Securities Litigation*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ..............................................................................21

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................27

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................................35

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)....................................................................................................19

*Genworth Fin. Inc. Sec. Litig.*,
    103 F. Supp. 3d 759 (E.D. Va. 2015) ............................................................... *passim*

*Hedick v. Kraft Heinz*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ........................................................................26

*IBT Emp. Grp. Welfare Fund v. Compass Minerals. Int'l, Inc.*,
    706 F. Supp. 3d 1225 (D. Kan. 2023)....................................................................................35

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2016 WL 3981236 (D.S.C. July 25, 2016) ............................................................................27

*Keeney v. Larkin*.
    306 F. Supp. 2d 522 (D. Md. 2003)........................................................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..................................................................................................37

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ............................................................... *passim*

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..................................................................................................32

*In re Marriott International, Inc., Customer Data Security Breach Litigation*,
    543 F. Supp. 3d 96 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.,* 31 F4th
    898 (4th Cir. 2022)..........................................................................................................20, 21

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ..................................................................................................40

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ..................................................................................................15

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...............................................................................16, 22

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..................................................................................................19

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ..................................................................................................34

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ......................................................................34

*Ollila v. Babcock & Wilson Enters., Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................24, 25

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
  2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) .........................................................21

*Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*,
  2019 WL 3336119 (D. Minn. July 25, 2019) ..........................................................36

*Plymouth County Retirement System v. Evolent Health, Inc.*,
  2021 WL 1439680 (E.D. Va. Mar. 24, 2021)..........................................................21

*Raab v. General Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ..........................................................................31

*Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
  564 F. Supp. 3d 1272 (N.D. Ga. 2021)...............................................................27

*Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...........................................................27

*Ret. Sys. v. Sonoco Prods. Co.*,
  827 F. Supp. 2d 559 (D.S.C. 2011)................................................................30, 31

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...........................................................................31

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  2024 WL 1898512 (S.D.N.Y. May 1, 2024) .........................................................36

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
  75 F.4th 232 (4th Cir. 2023) .......................................................................40

*In re SCANA Corp. Sec. Litig.*,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ...............................................16, 24, 25

*SEC v. Merch. Cap., LLC*,
  483 F.3d 747 (11th Cir. 2007) ......................................................................31

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ................................................................... *passim*

*Sinnathurai v. Novavax, Inc.*,
   645 F. Supp. 3d 495 (D. Md. 2022) .................................................................................38, 39

*In re St. Jude Med., Inc. Sec. Litig.*,
   836 F. Supp. 2d 878 (D. Minn. 2011) ...................................................................................18

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
   552 U.S. 148 (2008) ..............................................................................................................14

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..................................................................................23

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ...........................................................................................15, 31

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..............................................................................................................32

*In re Triangle Capital Corp. Securities Litigation*,
   988 F.3d 743 (4th Cir. 2021) ................................................................................................38

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ........................................................................28

*U.S. S.E.C. v. Pirate Investor LLC*,
   580 F.3d 233 (4th Cir. 2009) ...........................................................................................32, 33

*In re Under Armour Securities Litigation*,
   342 F. Supp. 3d 658 (D. Md. 2018) ......................................................................................29

*In re: Use of Artificial Intelligence*,
   Dkt. No. 3:24-mc-104 ..............................................................................................................1

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................................36, 37

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009) ..................................................................................17

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ............................................................................................................18

**STATUTES**

§ 10(b), 15 U.S.C. § 78j(b) ...........................................................................................................14, 17

§ 20(a), 15 U.S.C. § 78t(a)..................................................................................................................40

15 U.S.C. § 78u-5 ...............................................................................................................................22

## I. INTRODUCTION[1]

This case concerns Defendants' false and misleading statements about Driven's two most important strategic growth pillars, which Defendants asserted would propel Driven to more than double its profits: (i) its campaign to quickly build a nationwide auto-glass operation by buying a "platform" business and then acquiring smaller businesses and integrating them into that platform (the "Glass Strategy"); and (ii) its efforts to grow earnings by driving sales and customer retention in Driven's car wash business (the "Car Wash Strategy").

For the first year of the Class Period, Defendants provided glowing updates on both strategies. They stated, for example, that Driven had already "integrated" the Glass Strategy's platform business, AGN, and "made significant progress" in integrating subsequently acquired businesses into it. ¶45. They stated that the Car Wash Strategy was providing a "significantly better" "experience for the customer" because Driven was doing "any deferred maintenance," "so the equipment is working beautifully," and "creat[ing] stickiness with the consumer, stickiness with the cash flows, [and] predictability." ¶¶47, 51, 123-25. Analysts credited these disclosures – raising Driven's outlook on its "strong momentum" in the Glass Strategy and hailing how Driven's car washes "perform better under DRVN" and "benefit from its scale and capital," laying "the appropriate foundation . . . for future growth" in an industry where Driven could "take share." ¶49.

In reality, however, Driven was failing badly on both fronts. With respect to the Glass Strategy, the Complaint cites numerous well-placed former Driven executives – including the person responsible for overseeing Driven's integration of acquisitions – who recounted that Driven immediately ran into severe problems when it acquired AGN in December 2021. ¶¶56-63.

---

[1] Emphasis is added and internal citations, alterations, and quotation marks are omitted. Capitalized terms not defined herein are defined in the Complaint (Dkt. No. 31). Citations to "¶__" refer to the Complaint and to "Mot." refers to Defendants' brief (Dkt. No. 38).

Specifically, AGN's point-of-sale ("POS") system – the electronic "nerve-center" of the business and one of the first systems required for integrations – was archaic, posed severe problems for integrating subsequent acquisitions, and would require substantial changes. ¶¶57-58, 110. The problem became even more stark when Driven made its next acquisition in April 2022, since AGN's POS system could not properly service that business's insurance customers. ¶¶53, 58. As a result, Driven quickly realized that it needed an entirely new POS system, and thus that its auto-glass integrations would take *twice as long* as planned to complete. ¶61-62. These issues were tracked and reported up to Driven's senior-most management, including Michael Macaluso, one of Driven's named executive officers. ¶55.

As to the Car Wash Strategy, the Complaint includes allegations drawn from other equally well-placed former senior executives who reported that, throughout the Class Period, 75% of Driven's acquired car washes required costly mechanical rebuilds and 80% needed substantial reinvestments. ¶¶67-68, 99, 111. Other former employees who oversaw operations around the country confirmed these facts, recounting that, at any given time, most or all of their car washes had malfunctioning equipment. ¶¶69-72. Yet Driven refused to make the required outlays, and in fact routinely froze the maintenance budget for months. ¶¶68-70. The former employees also reported that these problems caused Driven to lose customers to its competitors in droves, decimating same-store sales, and that they were raised directly to Defendant Fitzpatrick and John Teddy, the head of the car wash business and another named executive officer – but nothing was done about them. ¶¶68-72.

The truth began to be revealed in October 2022, when Driven was forced to announce declining U.S. same-store car wash sales and that Driven's auto-glass business was still a year away from servicing insurers – a huge market the investing community was particularly excited

about. ¶¶74-76. In response to these disclosures, Driven's stock price dropped by over 7%. ¶75. But Defendants did not come fully clean: instead, they attributed the car wash results to the economy and the delay in the Glass Strategy to "prudence." ¶¶77-78. Over the next several months, Defendants reassured investors about the car wash business – including by denying that competition was a problem – and touted progress in the Glass Strategy, stating repeatedly that Driven had completed the buildout of its platform in 2022. ¶¶80-81. Then, in May 2023, days after Driven's first-quarter earnings call, Defendant Mason was fired. ¶82. Two months later – just a week before the next earnings call – she suspiciously sold nearly 70% of her Driven stock. ¶83.

The full truth was finally revealed on that earnings call in August 2023. During the call, Defendant Fitzpatrick reported that Mason's replacement had reviewed the Glass Strategy and determined that integrations were "*several quarters behind*," and that persistent same-store sales declines in the car wash business were being caused by "competitive pressure" that had been mounting for *two years*. ¶¶84-85. As a result, Driven cut its growth plans for the Glass Strategy by a third and slashed its 2023 EPS guidance by 24%. ¶¶84, 86. Market reaction was swift and severe: Driven's stock plummeted by *41%*, and analysts connected the decline to the alleged corrective disclosures. ¶¶88, 90. And events after the class period have confirmed the fraud: within months, Driven revealed that it would only complete auto-glass integration in 2024, years behind schedule, and was pausing all auto-glass growth until 2025, and further that it was writing down its car wash business by almost a billion dollars and closing dozens of car washes. ¶¶91-95.

Defendants seek to dismiss the Complaint as a matter of law on falsity and scienter grounds, before any discovery has occurred. Confronted with the Complaint's well-pleaded allegations and their own admissions, their arguments mischaracterize the Complaint and the applicable law.

Defendants contend that none of their statements were misleading, but repeatedly focus on

parts of the statements that are not challenged and ignore the parts that are. They also studiously ignore that several of their statements – such as ones asserting that they completed integration of AGN in 2022 or were making investments in the car wash business – clearly were false, and the rest were properly alleged to be misleading for omitting material facts. Defendants also claim that their statements were non-actionable opinions, puffery, or – oddly – forward-looking statements, even though the statements misrepresented or omitted present or historical facts, concerned topics of critical importance to investors, and were relied on by the market.

Defendants' scienter arguments also fail. They try to wave away the Complaint's remarkable allegations about the information that they knew or disregarded, based on the first-person accounts of former senior Driven executives, as mere hearsay – but ignore that such allegations are permitted at the pleading stage. They also try to discredit allegations that Fitzpatrick and his fellow executives were directly informed about the issues they misrepresented, arguing that more detail is needed, but the Complaint's allegations of direct communications with those executives more than suffice. Remarkably, Defendants also try to argue that even their knowledge of the truth would be insufficient to establish scienter, and that more facts are needed to evince an intent to deceive – but ignore that the law is clear that knowledge of the undisclosed information is the cornerstone of scienter, and the nature of the statements and undisclosed facts here are incompatible with an innocent state of mind. And Defendants' arguments seeking to discount Mason's abrupt termination and sale of 70% of her shares – *a week* before the truth was revealed and their price dropped by over 40% – rely on extrinsic documents that cannot be considered and raise fact issues that cannot be resolved now.

The Complaint's well-pleaded allegations more than suffice to survive dismissal, and the Class should be permitted to test their allegations in discovery and at trial. For these reasons and

those set forth below, Defendants' motion should be denied.

## II.  STATEMENT OF FACTS

### A.  Driven's Auto Glass And Car Wash Businesses Were Critical Elements Of The Company's Growth During The Class Period

Driven is the country's largest automotive care provider. ¶27. Its business model follows the same private equity blueprint the Company's leaders implemented in other industries. ¶¶28-32. Specifically, Driven's success depends on its ability to acquire smaller, local and regional businesses in the "highly-fragmented automotive care industry" and seamlessly integrate them into Driven's operating structure in order reap the benefits of scale, synergies, and efficiencies. ¶¶27-35. Driven told investors that it effectuated these acquisitions using its proven and reproducible "bolt-on" or "tuck-in" strategy, whereby Driven would purchase a "base" or "platform" business in a particular segment—such as car wash or auto glass—and then "bolt on" or "tuck in" additional, smaller acquisitions, integrating them into the platform business and achieving growth. ¶32. Defendants also told investors that this strategy allowed Driven to *quickly* acquire and integrate businesses, standardize and control their operations, and rapidly grow revenue. ¶¶27-28, 30.

In October 2021, just before the start of the Class Period, Driven announced a plan to generate rapid earnings growth, more than *doubling* EBITDA by 2026—from just over $350 million to at least $850 million. ¶36. Defendants told investors that two of the three most important pillars of this growth plan were to: (i) rapidly acquire a platform business and then a network of "bolt on" auto-glass businesses across the country; and (ii) grow earnings by driving sales and customer retention in the Company's supposedly stable car wash business. *Id.* These strategies reflected the Company's core investment thesis as an industry consolidator: expanding opportunistically into fragmented markets on the one hand and delivering cash generation through a fully integrated platform on the other. *Id.* Investors and analysts saw this plan as a key rationale

-5-

for investing in the Company – William Blair, for example, told investors to "expect adjusted EBITDA to more than double over the next five years" as a result of this core strategy. *Id.*

Driven told investors that it would execute its Glass Strategy by acquiring and integrating a large provider called Auto Glass Now, or "AGN," as the "base" business, and then acquiring "a robust pipeline" of smaller auto-glass providers across the country and integrating them with AGN. ¶37. Defendants also trumpeted that the Glass Strategy represented a $5 billion market opportunity, equal to Driven's entire 2021 revenue. *Id.* And, significantly, Defendants emphasized that it would allow Driven to *quickly* boost revenue, because its acquisitions were "simple" and the Company was successfully "leveraging" its vast acquisition-related resources and expertise. ¶38. Defendant Fitzpatrick explained that the auto glass acquisitions had "a simple and differentiated operating model, a simple menu, simple building and strong unit level economics." *Id.* Securities analysts viewed the Glass Strategy as a key element of their investment thesis. For instance, Morgan Stanley characterized the Glass Strategy as "a key growth driver in an attractive, fragmented $5bn industry," that could *quadruple* the Company's segment-wide earnings in the near-term. ¶39.

Defendants also told investors that Driven's Car Wash Strategy, which focused on operational performance, would significantly grow this critical segment of the Company's business—which already accounted for 30% of Company-wide earnings—in two ways: (i) by extending its network of service locations for its "Take 5" platform; and (ii) engendering customer loyalty by taking concrete steps to ensure consistent service quality across locations. ¶¶40-43. Again, securities analysts were focused on Driven's execution of the Car Wash Strategy given that the segmented represented a stable and "resilien[t]" "recurring revenue stream." ¶¶40, 41, 43.

**B.** **Throughout The Class Period, Defendants Assured Investors That Driven Was Executing On Its Plans To Drive Rapid Growth, Successfully Integrating Its Auto Glass Network, And Delivering On Operational Performance In Its Car Wash Business**

Throughout the Class Period, Defendants made numerous misstatements of present and historical fact about the steps Driven *had taken and was taking* to execute on the two strategies, and about the *past and current* progress and success of those steps. These statements led investors to believe that both were progressing as planned and on track to deliver rapid revenue growth.

*First*, Driven made numerous statements to investors about the past and present progress and success of Driven's Glass Strategy, including that Driven *had* successfully completed the integration of its critical auto-glass "platform" and that it was *currently* effectively integrating its subsequent, "bolt-on" acquisitions. On Driven's April 2022 earnings call, Defendant Fitzpatrick assured investors that the auto glass acquisitions were proceeding as planned, stating that Driven had already "*integrated the AGN acquisition into the Driven platform*" and already "made *significant progress*" in subsequent integrations. ¶45. Likewise, on Driven's July 2022 earnings call, Fitzpatrick stated that Driven had "*made significant progress*" on integrating its additional acquisitions and was "very pleased with our progress in glass over the first 180 days." *Id.*

Investors credited these statements and believed that Driven had, indeed, made "significant progress" in its auto glass integration, and was proceeding on schedule to generate rapid revenue growth through this strategy. For instance, in an August 2022 report, analysts from William Blair cited Driven's "strong momentum" in the Glass Strategy in raising the Company's outlook, while Piper Sandler analysts stated in an October 2022 report: "We believe DRVN will have national coverage [in glass] *in a matter [of] months*, which will allow for the company to integrate its glass service offering with its existing insurance contracts across its Collision businesses." ¶46.

*Second*, Defendants made numerous misstatements about Driven's Car Wash Strategy,

specifically concerning: (i) Driven's store growth (¶¶47, 117-18); (ii) the specific steps it was taking to drive new customers to its car washes by "continuing to invest into the existing asset base as well specifically to upgrade equipment" (¶¶119-20); and (iii) that these operational steps were generating significant customer loyalty, resulting in "stickiness" of car wash revenue (¶¶47, 125-26). For instance, Defendants told investors that "the experience for the customer is significantly better" once a car wash was integrated into the Driven network, including because "*any deferred maintenance that was there is done, so the equipment is working beautifully*." ¶¶47, 123. Likewise, Defendants touted the car wash segment's *recurring* revenue performance, telling investors that the model was "*creat[ing] stickiness with the consumer, stickiness with the cash flows, [and] predictability*." ¶47, 125. And relatedly, Defendants repeatedly reassured investors that any "softness" in car wash revenue was caused by short-term macroeconomic "headwinds" (rather than customer attrition due to operational failures). ¶¶48, 136.

Analyst reports again make clear that these statements reassured investors. As Goldman Sachs analysts explained, "DRVN is taking the necessary steps to position the U.S. business for long-term success" and, indeed, that Driven's integration of car washes into its Take 5 platform "is likely to be a key driver for increased subscription penetration longer term." ¶49.

### C. In Reality, Driven's U.S. Auto-Glass Integration Was Stalled, And Its Car Wash Business Was Suffering From Significant Customer Attrition Due To Driven's Failure To Invest In Maintaining Its Facilities

Defendants' statements were materially false and misleading. Contrary to Defendants' statements touting Driven's "significant progress" integrating its auto-glass acquisitions, Defendants quickly discovered fundamental and severe problems in its AGN platform that—as the Company has *now admitted*—significantly stalled the "progress" of integration and more than *doubled* the Company's timeline to complete its acquisition campaign. Likewise, in stark contrast to Defendants' statements touting Driven's investments in its car washes and the stickiness of its

-8-

customer revenue, its critical car wash business was rapidly losing customers to competitors because of quality issues caused by Driven's failure to invest in necessary maintenance at its locations.

### 1. Driven's Auto Glass Campaign Encountered Fundamental Integration Problems, Snarling Progress and More Than Doubling The Strategy's Timelines

Immediately upon acquiring its "base" auto-glass business, AGN, in December 2021, Driven recognized that that AGN's POS system – the platform's critical nerve center – was archaic and would require significant changes. ¶58. FE-1, a senior Driven executive who was responsible for overseeing the Glass Strategy's integration process, reported that Driven executives quickly recognized that AGN's POS system could not effectively tie together the different models, revenue streams, and customer mixes associated with the disparate businesses in the Company's Glass Strategy pipeline. ¶¶54-59. Accordingly, Driven could not complete even the *first* critical step in its Glass Strategy. ¶¶57, 62. By no later than May 2022, following another significant auto-glass acquisition, Driven executives understood that the Glass Strategy would be delayed further as it became clear that AGN's POS system could not handle that business' critical insurance customer base. ¶58. Within weeks, Driven executives overseeing the Glass Strategy determined that AGN's POS system would need to be entirely replaced – a process that, alone, would *double* the Company's integration timeline, making it impossible to meet the Company's deadlines for the campaign's completion. ¶¶59, 62.

As former Driven employees explained, issues with AGN's POS system continued to halt the Glass Strategy's progress and severely disrupt integration, such that even by the end of 2022— the conclusion of Driven's integration timeline: (i) *none* of Driven's auto-glass acquisitions had been fully integrated; and (ii) overall, the integration progress was substantially less than 50% complete, entirely contrary to Defendants' statements to investors. ¶¶61, 64. Driven executives'

conclusion in May 2022 that these fundamental integration issues would double the timeline for completion of the Company's Glass Campaign were borne out, as Driven did not even complete its integration of the auto glass POS until the third quarter of 2023, by which time the Company was forced to slash its guidance for fiscal 2023. ¶¶63-64.

### 2. Driven Failed To Maintain Its Carwashes, Hampering Operational Capacity and Causing Massive Customer Attrition.

As discussed above, during the Class Period, Defendants assured investors that Driven was "continuing to invest" in its car wash assets, to "upgrade equipment," and that "any deferred maintenance that was there is done, so the equipment is working beautifully." Contrary to these statements however, Driven wholly failed to perform basic, critical maintenance, replace failed equipment, and invest in adequate service for its car wash business, leading Driven to lose huge numbers of customers to its competitors and resulting in massive declines in same-store sales.

As former Driven executives explained, Fitzpatrick and other Driven officers were provided with reports showing that critical equipment at the vast majority of the Company's car washes was not "working beautifully" and that significant additional investment in service and maintenance was required. For instance, two former Driven executives responsible for overseeing the Company's national operations, FE-4 and FE-5, independently reported that 75% of the car washes Driven acquired required costly full mechanical rebuilds, and 80% required at least substantial reinvestment. ¶67. As FE-5 reported, despite agreement among Driven leadership, including Fitzpatrick, with these assessments, Defendants failed to actually make the investments they acknowledged were necessary to maintain operations. ¶68.

These reports were further corroborated by FE-6, FE-7, FE-8, and FE-9, who collectively oversaw dozens of car washes in at least 11 different states during the Class Period. ¶69. These former employees each confirmed that equipment failures were routine, pervasive, highly

significant, and led to massive customer losses. ¶¶69-72. Moreover, these former employees all independently confirmed that equipment failures were due in substantial part to Driven's policy of freezing the Company's maintenance budget for months at a time, contrary to Defendants' repeated reassurances that Driven was significantly investing in its car washes' equipment. ¶70.

These issues were routinely raised at Driven's highest levels, including directly with Defendant Fitzpatrick. ¶¶63, 65, 68. In December 2021, FE-5 presented a report to Fitzpatrick detailing the widespread equipment failures discussed above and concluding that at least $40 million worth of investment was needed to remedy them. ¶68. Fitzpatrick agreed with this assessment, and even remarked that Driven should have done better due diligence before acquiring its car washes, but the plan was never implemented. *Id.* Fitzpatrick was also notified of the maintenance cuts and freezes discussed above in bi-monthly P&L reports. *Id.* Further, FE-4 explained that John Teddy, the head of the car wash business and one of Driven's named executive officers, was informed of the enormous problem posed by competitive intrusion. ¶72.

### D. The Truth Begins To Emerge

The truth began to emerge on October 26, 2022, when Driven was finally forced to announce negative news about both its auto-glass and car wash segments. First, Defendant Fitzpatrick announced that Driven's auto glass platform was still a year away from being able to service insurance providers and would only add those customers in "late 2023 and 2024." ¶74. Investors were surprised by this news, as it contrasted sharply with market expectations based on Defendants' repeated assurances that Driven was making "significant progress" in integrating the auto glass platform. ¶76. Indeed, in a report issued just before the call, analysts from Piper Sandler stated that they expected Driven would be able to service insurance customers "in a matter [of] months." ¶46. Second, Driven announced for the first time that same-store sales in the U.S. car wash business had declined year-over-year, contrary to Defendants' statements that Driven's

-11-

operational execution was generating customer loyalty and "sticky" revenue. ¶¶47, 74, 127-28. In response to these disclosures, Driven's stock price declined by more than 7%, which analysts attributed to the insurance-customer delay and poor car wash results. ¶¶75-76.

Defendants, however, did not disclose the full truth. Instead, they attributed these problems to benign causes in an effort to assuage investor concern. Defendants stated that Driven was "prudent[ly]" timing its expansion into the auto glass insurance market and assured investors that the integration was continuing to make "significant progress." ¶77. And Defendants attributed same-store car wash sales declines to the "macro environment," assuring the market that Driven's customer retention rate had remained "steady" and its customers remained "sticky." ¶78. Analysts credited these benign explanations, ¶79, and Defendants continued to issue similar soothing statements to the market over the next several months. ¶¶80, 129-137, 145-150.

### E. Defendant Mason Is Abruptly Terminated Then Dumps The Vast Majority Of Her Driven Stock

On May 8, 2023, Driven abruptly terminated its long-time CFO, Defendant Mason, just days after she represented the Company on a quarterly earnings call. ¶82. The timing and circumstances around Mason's termination leave no doubt that it was unplanned, as, among other things, her departure forced Driven to cancel its first-ever investor day. *Id.* Notably, as Fitzpatrick's statements make clear, Mason was responsible for reviewing the auto glass integration timeline and the Company's public statements about it. ¶100. After her termination, but just one week before Driven's August 2023 earnings call, Defendant Mason sold nearly 70% of her Driven stock in a single transaction, her first-ever sale, with proceeds of $4.46 million. ¶83.

### F. The Truth Is Fully Revealed

Finally, on August 2, 2023, with a new CFO in place, Driven was forced to disclose that, contrary to their repeated assurances throughout the Class Period, Driven was actually "several

quarters behind" on its auto-glass integration and would have to slash its planned store growth for the auto-glass business by nearly one-third in order to "get the integration completed." ¶84. Driven also again disclosed declining same store sales in its car wash business, but acknowledged for the first time that those declines were a function of "significant competitive . . . growth," which the Company admitted it had, in truth, been experiencing *over the prior two years*. ¶85. As a result of its problems with its auto-glass and car wash segments, Defendants reduced Driven's 2023 EPS guidance—which it had reaffirmed just a few months earlier, when Mason was fired—by 24%. ¶86. Defendants did not attribute either of these pieces of bad news to new facts or circumstances that had arisen since Driven's May 2023 earnings call. ¶87. Rather, they explained that the revelations came about as a result Driven's new CFO looking at Driven's existing business with a "fresh set of eyes." *Id.* In response, Driven's stock price declined by a staggering *41%*. ¶88.

Analysts were shocked. Credit Suisse downgraded Driven's stock, citing "a *worse than anticipated* slowdown in the car wash segment" and "*unexpected* integration challenges in the glass space," and expressed new skepticism about Driven's promises that the twin growth campaigns would double EBITDA. ¶89. William Blair analysts were also skeptical that investors had been told the truth, wondering "how quickly and deeply the businesses have turned (Driven reiterated its outlook as recently as mid-May)," and noted that the disclosures called into question Driven's EBITDA target. ¶90.

### G.      Post-Class Period Events Further Confirm The Alleged Fraud

In September 2023, Fitzpatrick acknowledged that the integration issues facing Driven's auto-glass business were widespread and severe, and further explained that Driven had decided to pause entirely any new store growth in the segment for more than a year, until 2025. ¶¶92-93. In November 2023, Driven admitted that it had only just finished rolling out its new auto-glass POS system and that it did not expect to complete auto-glass integration until 2024. ¶94. Further,

following the completion of its new CFO's review of the car wash business, Driven announced it would **write-down the business by $851 million**, amounting to over **10% of the Company's entire asset value**, and would close dozens of car washes and pause any new openings. ¶95. The new CFO's review found that the state of the car wash business was "not acceptable" and that Driven would have to either "fix" the car wash business or "think differently about the long-term." *Id.* Analysts noted that these disclosures represented "a significant shift in the narrative on DRVN." ¶96.

## III.    ARGUMENT

The elements of a Section 10(b) claim are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). In evaluating the sufficiency of a complaint, a court "must accept all factual allegations in the Complaint as true, . . . consider the Complaint in its entirety," and "draw all reasonable inferences in favor of [Plaintiff]." *Id.* at 437. In their Motion, Defendants challenge the Complaint only with respect to two elements: whether it pleads material misrepresentations and omissions, and whether it pleads scienter. Because the Complaint more than adequately does both, the Motion should be denied.

### A.    The Complaint Adequately Pleads That Defendants Made Material Misrepresentations And Omissions

Misstatements are actionable if they fail to disclose information "necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 440. Importantly, "once a company speaks on an issue or topic," such as the progress it is making in integrating acquired businesses, its investment in physical assets, or the recurring quality

of a segment's revenue, "there is a duty to tell ***the whole truth***." *Id*. Accordingly, even "statements literally true on their face may nonetheless be misleading [] in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see Singer*, 883 F.3d at 442 (sustaining allegations based on defendant's "choice to speak . . . without telling the whole, material truth").

To plead falsity, "[i]t is enough for the plaintiff to simply allege 'sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading.'" *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 666 (D.S.C. 2016) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007). As the Fourth Circuit has explained, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Singer*, 883 F.3d at 440. For this reason, "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015).

1.  **Defendants Made Materially False And Misleading Statements About Driven's Glass Strategy**

Throughout the Class Period, Defendants told investors that the Glass Strategy was proceeding successfully and as planned: that Driven had already completed the integration of its base AGN platform and that it was effectively integrating "bolt-on" acquisitions. ¶¶32, 44-45. Defendants repeatedly made such statements, including that Driven had "made significant progress" in its auto glass integration (¶¶139-40, 143-44); had already "built out [its] North America auto glass platform" (¶¶147-48); and was "making good progress with [its] insurance partners" in incorporating this important revenue stream into the auto glass business (¶¶139-42).

Defendants' statements were materially misleading. In truth, Driven never integrated its AGN platform during the Class Period – to the contrary, Driven executives recognized that the

entire AGN's POS system would need to be rebuilt from the ground up, more than doubling the integration timeline and preventing the Company from servicing its critical insurance customer base. ¶¶61-63. Indeed, far from achieving "substantial progress," even by December 2022 – Driven's deadline for *completing* integration—**none** of Driven's auto-glass acquisitions had been fully integrated and, overall, integration progress was substantially less than 50% complete. ¶64. As numerous Driven former employees explained, this failure severely hampered the Company's auto glass business's ability to service customers and generate revenue. ¶¶67-70.

Courts in this Circuit and across the country have repeatedly held that an issuer's statements touting the progress of an important business program or process are actionable where, as here, that progress has stalled due to significant difficulties that delay its completion or hinder performance. *See, e.g.*, *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019) (statements that issuer was making "great progress" on project actionable when defendants were "sufficiently aware" of serious project deficiencies and working to "troubleshoot" them); *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018) (statements that issuer "continue[d] to perform well on projects" adequately alleged to be false and misleading due to alleged "problems at project sites" including "lengthy delays" and confidential witness accounts detailing the "substantial and reoccurring nature of [such] problems"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 959-68 (N.D. Cal. 2014) (issuer's statements that "[m]any commitments in our responses [to FDA inspection] are nearing completion" and that remediation was "on track" actionable where former employees detailed a lack of progress due to significant implementation issues; observing that "it is highly plausible that the investors would find statements by the company's head officers that appropriate responses were 'well underway' or nearly completed to be material"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 756-59 (S.D.

Tex. 2012) (holding actionable statements that "[w]e are making good progress in addressing [remediation] recommendations" where complaint alleged issuer failed to implement reforms).[2]

Defendants assert that these statements are all inactionable as a matter of law, but they ignore the Complaint's allegations and mischaracterize the law. *First*, Defendants incorrectly contend that Plaintiffs have alleged "zero" facts showing that these statements were false. Mot. at 17-18. Not so. As set forth above, the Complaint cites Defendants' own *admissions* – *i.e.*, that Driven was "several quarters behind" in integration – and detailed, mutually corroborating reports from high-level former Driven executives. These sources explain that, contrary to Defendants' statements touting Driven's "significant progress" in integrating its auto glass business, there were fundamental and severe deficiencies in the POS system that significantly delayed integration and prevented the Driven from generating critical revenue. Perhaps cognizant that these well-pled facts contradict their misleading statements touting the Glass Strategy's "significant progress" and the completed construction of the AGN platform, Defendants attack a straw man: they ignore the statements the Complaint *actually* alleges were misleading, and repeatedly focus on passages the Complaint does not challenge.[3] Defendants' attempt to rewrite the Complaint is improper.

*Second*, Defendants contend that their statements concerning the progress of Driven's

---

[2] S*ee also Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236, 257 (D.P.R. 2015) (statements that defendants "were 'expeditiously' implementing a series of 'remedial efforts' to address [internal control] deficiencies" actionable where confidential witnesses reported such "deficiencies were far more systematic and widespread than disclosed."); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) (statements about "progress of internal control improvements" were sufficient bases for Rule 10b–5 claim).

[3] For example, Defendants argue that the statement that Driven was "the second largest player in the United States" was not false (citing ¶145), but the Complaint does not challenge that statement. Mot. at 17. Rather, the Complaint focuses on Defendants' statement that Driven had done "a phenomenal job in 2022 building out [its auto-glass] platform." ¶145. As alleged, *that* statement was false because construction of the AGN platform was *not* completed in 2022, or at any point during the Class Period, and the platform's deficiencies prevented the Company from integrating its acquisition pipeline and from servicing the critical insurance market. *See id.*; ¶146.

auto-glass integration were all immaterial "puffery" – so vague that no investor could possibly rely on them. Mot. at 20-24. But this argument fails for several reasons. To start, puffery is a materiality determination, and the Fourth Circuit has explained that materiality is a question for the jury: "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that ***reasonable minds could not differ*** on the question of their importance." *Singer*, 883 F.3d at 440.

But in any event, none of the alleged misstatements constitute immaterial puffery as a matter of law. The Supreme Court has explained that statements are not puffery when they "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991). Here, the alleged misstatements have a clear factual basis – namely, the progress and success of Driven's auto glass integration – and the lack of such progress due to serious and fundamental problems renders those statements materially misleading (at the very least). For this reason, courts across the country have sustained securities fraud claims arising from virtually identical misstatements, as discussed above.

Further, Defendants' assertion that no reasonable investor could possibly rely on their misstatements is belied by analyst commentary citing and crediting those very misstatements. *See, e.g.*, *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023) (topics of analyst interest are not puffery); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (observing that "even if some portions of individual statements might be too vague and general to be actionable, particular statements by Defendants must be evaluated not only in their entirety, but also in context" and finding that analyst interest showed statements were material). For instance, following the investor calls on which Defendants made the alleged

misstatements, securities analysts issued reports citing Driven's "**strong momentum**" in "auto-glass acquisition and integration" (when, in truth, no such "strong momentum" existed); that "[t]he late-2021 acquisition of Auto Glass Now **provided DRVN with an attractive platform** to expand from" (when, in truth, the AGN platform remained woefully incomplete and dysfunctional); and that "We believe DRVN will have national coverage [in glass] **in a matter [of] months**, which will allow for the company to integrate its glass service offering with its existing insurance contracts across its Collision businesses" (when, in truth, Defendants knew that serious integration problems **doubled** the integration timeline and prevented the Company from servicing critical insurance customers). ¶46.

Likewise, market reaction to disclosure of the truth belies Defendants' assertion that their statements were "so obviously unimportant to a reasonable investor that reasonable minds could not disagree." *See, e.g.*, *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (31% decline in issuer's stock price in response to correction of misrepresentation shows materiality); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("precipitous drop" in stock price upon release of corrective information shows materiality). Here, Driven's stock price declined significantly, including a **41% stock decline** at the conclusion of the Class Period, upon revelation of the significant delays and deficiencies plaguing the Glass Strategy that had been known to Defendants by no later than December 2021. ¶¶87-88, 154. Further, Driven specifically tied the delays in the Glass Strategy to a highly significant **24%** decline in earnings. ¶¶86, 154. And securities analysts issued reports not only highlighting the significant impact of the delays on the Company's financial prospects, but specifically characterizing the "integration challenges in the glass space" as "**unexpected**" and raising questions about Defendants' failure to disclose these issues earlier. ¶¶89-90.

In addition, the importance of Driven's auto-glass business to the Company's business also militates against a finding of immateriality as a matter of law. *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 11319408, at *23 (S.D.N.Y. Dec. 12, 2013) (collecting cases); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) ("[T]he fact that these statements relate to a core aspect of [the company's] business makes it even more likely that a reasonable investor would assign weight to them[.]"); *City of Omaha & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 416-17 (S.D.N.Y. 2020) (the fact that statements "related to a particularly noteworthy segment of" the company showed materiality). Here, analysts predicated their valuations of Driven's stock on the "significant progress" the Company was supposedly making with respect to its lucrative Glass Strategy – a keystone campaign that promised to help ***double*** Driven's Company-wide earnings. As alleged, analysts reported that Drive's Glass Strategy was "a key growth driver in an attractive, fragmented $5bn industry," with the potential to ***quadruple*** the Company's segment-wide earnings in the near-term, and one of the things that "Matters to Us Most" about Driven's business. ¶39. In light of all these factors demonstrating the importance of these misstatements, ***at minimum***, there is a fact issue as to materiality that cannot be decided now.

Defendants cite a handful of cases they contend dismissed statements with similar language (Mot. at 21, 23-24), but those cases are inapposite. For example, *In re Marriott International, Inc., Customer Data Security Breach Litigation*, the plaintiff alleged that the company had misled investors about Marriot's cybersecurity efforts, but the court held that (1) none of the alleged misstatements even concerned cybersecurity; and (2) the plaintiff failed to plead facts showing that Marriot's cybersecurity was deficient. 543 F. Supp. 3d 96, 114 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022). Here, by contrast, the alleged misstatements

specifically concern the progress of auto glass integration and Plaintiffs have alleged specific facts showing that Driven was **not** making the "significant progress" it said it was making.[4]

Defendants also ask this Court to hold, at the motion to dismiss stage, that the undisclosed integration issues themselves are immaterial **as a matter of law**. But the Complaint alleges, based on the Company's own admissions and the mutually-corroborating reports of numerous Driven executives, that Defendants quickly discovered severe and fundamental issues with the auto-glass business's POS system, the "nerve-center" tying the business together. ¶¶57-64. The Complaint alleges that these issues caused highly significant delays in integration and in fact doubled timelines for putting business into operation and generating revenue, prevented Driven from building its critical platform and integrating **any** pipeline business, and prevented the Company from servicing the entire lucrative insurance segment of its customer base. *Id.* Indeed, Defendants tied these delays to significant revisions in earnings estimates and, when disclosed, they caused a 41% decline in the Company's stock price. ¶¶86, 88, 154. Defendants' conclusory and unsupported assertion that these issues are just "minor roadblocks" cannot and should not be accepted as a matter of law at this stage. At best, this argument only raises fact questions.

***Third***, Defendants assert that their statements are insulated from liability by the PSLRA's "safe harbor," *see* Mot. at 27, which protects purely forward-looking statements that are either

---

[4] Defendants' remaining cases are also inapposite. In *First Union Corp. Securities Litigation*, the court dismissed the claims because the plaintiffs "fail[ed] to allege a factual basis for contending" that the company had integration problems when the statements were made, not because they were immaterial. 128 F. Supp. 2d 871, 892 (W.D.N.C. 2001). In *Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, the alleged misstatements were vague characterizations of a technology's capabilities that contained no factual content regarding the alleged fraud, which concerned the reasons for sales declines. 2013 WL 1192004, at *4, *8 (E.D.N.C. Mar. 22, 2013). And in *Plymouth County Retirement System v. Evolent Health, Inc.*, there were no alleged misstatements about progress on a critical business objective and no allegations that investors or analysts credited the misstatements alleged. 2021 WL 1439680, at *25 (E.D. Va. Mar. 24, 2021).

accompanied by meaningful cautionary language or made without actual knowledge of their propensity to mislead. 15 U.S.C. § 78u-5. This argument fails. Defendants' statements all concern present or historical facts: the quality and character of the progress Driven *had* made in integrating its auto glass acquisitions and the steps it *had* and *was* taking to complete that integration: that Driven had "*made* significant progress" in integrating its auto-glass pipeline (¶¶139-40, 143-44); that Driven had already "*built out* [its] North America auto glass platform" (¶¶147-48); that the Company was "*making good progress* with [its] insurance partners" in incorporating this important revenue stream into the auto glass business (¶¶139-42); and that Driven had "*made* significant progress integrating our 10 acquisitions" (¶¶149-50). The fact that the Glass Strategy was on ongoing project does not transform historical statements about the past and current status of that project into forward-looking statement. *See Mulligan*, 36 F. Supp. 3d at 964-65 (rejecting argument that similar statements about drug company's remediation efforts were forward-looking). Indeed, "numerous cases from around the country . . . have held that statements of past or present *facts* are not covered by the safe harbor provision—even when they are inextricably tied with forward-looking statements." *Id*. at 965; *see also Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 789 (E.D. Va. 2015) ("[T]o the extent that plaintiffs allege . . . a representation of present fact, and that such a representation was false or misleading when made, the PSLRA's safe harbor provision is inapplicable.").

Moreover, even if statements concerning present or historical progress could somehow be characterized as forward-looking (and they cannot be), the statements were neither (i) accompanied by meaningful cautionary language nor (ii) made without knowledge of the true facts. As to the first point, the boilerplate "risk warnings" Defendants cite – risk "warnings" that are not voluntary, but which the SEC mandates be included in the Company's periodic filings –

were deficient. This is because they either: (i) describe the risk as merely possible when it has in fact already materialized, or (ii) are not specifically tailored to the risks the Complaint alleges Defendants concealed from investors. For instance, the generic "warning" that Driven "may not be able to successfully integrate acquired businesses" (Mot. at 10) does not communicate the truth, which is that Driven's auto-glass integration efforts had in fact badly stalled as a result of fundamental issues that doubled integration timelines and prevented the Company from servicing a critical customer segment. The law is clear that warning something "may" occur when it ***has*** occurred is not sufficient to trigger safe harbor protection. *See Genworth*, 103 F. Supp. 3d at 790 ("[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false or misleading, then their forward-looking statements are not protected by the safe harbor.'"); *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 946 (E.D. Pa. 2002) (warning that "synergies, if any, may vary materially from those shown" insufficient where "present facts" indicated merger was not "on track"). Likewise, Defendants' remaining "warnings" – that "certain acquisitions could adversely affect our financial results" and that Driven "may incur significant costs to integrate and support acquired companies" – are far too generic (and, frankly, tautological) to be "meaningful." Mot. at 27; *see Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 341 (S.D.N.Y. 2015) ("To avail themselves of safe harbor protection under the meaningful cautionary language prong, ***defendants must demonstrate that their cautionary language was not boilerplate*** and conveyed substantive information identifying important factors that could cause actual results to differ materially from those in the forward-looking statements.")

Further Defendants' misstatements are ineligible for safe-harbor protection because the Complaint alleges that Driven's senior-most executives knew the truth concerning the auto-glass

business. *See* Mot. at 24, 28. *Genworth.*, 103 F. Supp. 3d at 790 (where "there is a question of fact concerning whether Defendants knew the 'potential' risks identified had already occurred," the court cannot "determine at this stage of the litigation whether" safe harbor applies).[5]

**Finally**, Defendants assert that their misstatements that Driven was "very pleased" with its "significant" integration progress and "did a phenomenal job in 2022 building out [its AGN] platform" are inactionable opinion statements. Mot. at 17; *see* ¶¶45, 80, 139-42, 145-46. This argument fails for two reasons. First, the statements are not opinions. As the Supreme Court explained in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, opinion statements express true uncertainty about the underlying proposition using phrases such as "I think" or "I believe." 575 U.S. 175, 183-84 (2015); *see also SCANA*, 2019 WL 1427443, at *9 ("A reasonable person understands and recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content."). By contrast, the statements at issue here do not contain the hallmarks of opinionhood identified by *Omnicare*: they assert that the "building out" of the AGN platform **was** completed, and that "significant progress" **had been** made according to, and even exceeding, the Company's plans. These are false statements of fact, not opinions. *See SCANA*, 2019 WL 1427443, at *9 (statements that "expressed certainty

---

[5] Defendants also assert a "truth on the market" defense based on these generic risk disclosures – namely, that they revealed all relevant facts the Complaint alleges were concealed. Mot. at 14-15. But as the Supreme Court has explained, this argument is fact-intensive and inappropriate for resolution at the motion to dismiss stage. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013) (whether "news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements . . . is a matter for trial"). Moreover, the boilerplate and hypothetical risk "warnings" in no way disclosed the significant issues the Company's integration **was** facing – stalled progress, significant delays, and the inability to generate revenue – and, as such, are entirely unlike the "mass" of risk warnings in *Keeney v. Larkin*. 306 F. Supp. 2d 522, 533 (D. Md. 2003). Indeed, market reaction to disclosure of the truth, including a **41% stock decline** and analysts calling "integration challenges" "**unexpected**" and questioning Defendants' failure to disclose these issues earlier, fatally undermine Defendants' argument. ¶¶88-90.

rather than an uncertain view of a fact" could not "be described as opinions").

Second, even if the challenged statements could be considered opinions, they are actionable. The Supreme Court has held that opinions are actionable where the defendant "lacked the basis for making those statements that a reasonable investor would expect," or the opinion did not "fairly align[] with the information in [his] possession." *Omnicare*, 575 U.S. at 188-89, 196. Here, given the massive stall in integration, the failure to integrate *any* businesses (¶64), the inability to build the critical AGN platform (¶¶59-62), the doubling of integration timelines (*id.*), and the significant remedial work that still remained to be done (¶¶63-64), Defendants' "opinion" that "significant" and satisfactory progress had been made in integration did not "fairly align[] with the information in [their] possession." ¶61; *see SCANA*, 2019 WL 1427443, at *9 (any statements about progress that could be construed as opinions would nonetheless remain actionable in light of regular "progress reports" and "internal correspondence that described deficiencies in . . . progress" and defendants' omission of "material facts showing that they lacked the basis for making those statements that a reasonable person would expect").

### 2. Defendants Made Materially False And Misleading Statements About Driven's Car Wash Strategy

Throughout the Class Period, Defendants told investors that Driven was taking concrete steps to drive new customers to its car washes by investing in maintenance, service, and assets, and that these steps were drawing in customers to Driven's extensive car wash network keeping them coming back. For instance, Defendants stated that Driven was "***continuing to invest*** into the existing asset base as well specifically to ***upgrade equipment***" and that "***any deferred maintenance that was there is done***, so the equipment is working beautifully." ¶¶47, 119, 123. Defendants touted the recurring revenue in the car wash business, stating that they were "***creat[ing] stickiness with the consumer, stickiness with the cash flows, [and] predictability***" and, assuring

investors that any "softness" in same-store car wash sales was not a function of operational failures, customer attrition, or competition, but rather short-term macroeconomic "headwinds." ¶¶47-48, 127-28.

Defendants' statements were materially false and misleading. As numerous former Driven employees reported, Driven failed to perform critical maintenance, replace failed equipment, and invest in adequate service for its car wash business, leading Driven to lose huge numbers of customers to its competitors and resulting in massive declines in same-store sales. ¶¶65-72. Driven's most senior officers were provided with reports that 75% of car washes required costly full mechanical rebuilds, and 80% required at least substantial reinvestment (of up to $250,000 per location). ¶67. Moreover, Fitzpatrick received bi-monthly reports showing substantial and lengthy freezes to the car wash maintenance budget, notwithstanding the already dismal state of the Company's facilities. ¶68. As Defendants ultimately admitted, and as numerous former employees confirmed, these issues led to serious customer attrition, and, indeed, drove the Company to write down the car wash segment by an astonishing **$851 million**, amounting to over **10% of the Company's entire asset value**, close dozens of car washes, and pause any new openings. ¶95.

Courts across the country have repeatedly held that an issuer's statements touting its investments in its assets, maintenance, and operational capacity are misleading where the Company failed to make such investments and, in truth, its assets were deteriorated. *See, e.g.*, *Evoqua*, 450 F. Supp. 3d at 405 (falsity pled where undisclosed cost-cutting "eroded the [c]ompany's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery"); *Hedick v. Kraft Heinz*, 2021 WL 3566602, at *6 (N.D. Ill. Aug. 11, 2021) (statements that company "was increasing its investment in working media" were actionable where complaint alleged no such investments were made); *City of Sterling Heights Gen.*

*Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *27 (N.D. Ill. Feb. 13, 2013) (sustaining allegations that undisclosed cost-cutting "left Hospira understaffed and unable to perform necessary quality control to ensure the safety of its products, plant, and equipment").[6]

Likewise, courts have repeatedly held that, as here, an issuer's misstatements about the quality of its revenue, including statements about its recurring character, are actionable where the revenue is actually transitory, ephemeral, or affected by material attrition. *See Ollila*, 2018 WL 792069, at *4 (falsity pled for "statements touting performance on [] projects that [were] contradicted by undisclosed facts" such as "problems at project sites"); *3D Sys. Corp.*, 2016 WL 3981236, at *5-6 ("positive" statements that defendants "were 'very happy' with how [an initiative] was going" were misleading because they "omitted facts" about related "operating inefficiencies" that "paint a different picture"); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 184-85 (S.D.N.Y. 2010) (statements attributing organic loan growth to "existing customers" misleading where significant number of loans were purchased, low-quality loans).

Relatedly, courts have repeatedly held that misstatements of the causes of a company's negative financial performance, such as Defendants' statements here attributing negative performance to transient or benign factors, are actionable. ¶¶48, 51, 71, 131-33, 136-37. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1292-93 (N.D. Ga. 2021) (allegations that defendants "misrepresented the true reasons underlying any seemingly negative developments . . . by misattributing these developments to reasons such as raw material costs, inflation, the U.S. economy, and geographic expansion" sufficient to plead falsity); *Turocy*

---

[6] *See also See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *6 (D.S.C. July 25, 2016) (statements touting "product quality" – *e.g.*, products were "cutting edge," "breakthrough," and "attractive" – were actionable as complaint alleged "product quality issues continued throughout the Class Period"); *Kiken*, 155 F. Supp. 3d at 604 (statements touting "high quality standards" misleading for "[f]ailure to disclose negative information about the products at issue").

*v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at \*10 (C.D. Cal. Aug. 4, 2017) (finding actionable statements about the "causes of the [sales] declines").

In response to these well-pleaded allegations, Defendants largely rehash the same arguments they advanced with respect to Driven's statements concerning the Glass Strategy – specifically, that all of Defendants' statements about Driven's car wash business were true, immaterial puffery, or forward-looking. Again, these arguments fail.

***First***, Defendants argue that Plaintiff's allegations amount to "disagreements over [Driven's] strategic choices." Mot. at 15-16. As an initial matter, Defendants' characterization of their widespread failure to maintain critical equipment and infrastructure as a "strategic choice" is hard to understand. More importantly, Plaintiffs do not challenge Defendants' "strategic choices," but rather their ***misleading statements to investors describing what those purported strategic choices actually were***. Defendants told investors that Driven ***was*** "continuing to invest into the existing asset base" (¶¶119-20) and ***was*** performing "any deferred maintenance" in rebranded stores (¶¶47, 51, 123-24), such that the "equipment is working beautifully" (*id.*) and "driving incremental new customers." (¶¶119-20). None of these statements were true, and that is the basis for the claims here. Defendants are free to make whatever business decisions they wish, but they are not free to mislead investors about what those decisions are. Likewise, Defendants are not free to mislead investors about the consequences of those decisions, by, for example, misleadingly stating that the car wash business was generating customer loyalty and that competition was only "a small piece" of underperformance in the car wash segment – when it was, in fact, the most significant problem the segment faced and the problem itself was driven by the Company's failure

to invest in the equipment the way it told the market it was doing.[7] ¶¶71-72, 129-30.

**Second**, Defendants again incorrectly assert that their statements are non-actionable "puffery." *See* Mot. at 20, 22. Defendants characterize these statements as "generalized descriptions of services at the Company's car wash locations," *id.*, but this is not so. In reality, Defendants' statements assert that the Company had made investments in equipment and services it did not make (¶¶119, 123) and that these non-existent operational measures generated strong customer loyalty and recurring revenue, when, in fact, the segment was losing customers at an alarming rate (¶¶125, 127, 132), and falsely attributed softness in same-store sales to macroeconomic "headwinds" when, in truth, these results were driven by customer attrition due to Driven's inability to provide basic services to its customers (¶¶127, 131, 136). As discussed above, courts across the country routinely sustain such statements. Indeed, while Defendants downplay their statements about critical investments in Driven's car washes as mere puffery, they ignore that these statements were specifically made *in response to securities analysts' questions on the subject*, making clear that this was an issue of concern and importance to investors. *See* ¶119 ("[A] securities analyst specifically asked Defendants about Driven's investment in upgrading car wash equipment in order to attract and retain customers."), ¶123 ("[A] securities analyst asked Defendants how customer experience and satisfaction changed at Driven's car washes as a result of being integrated into the Company's Take 5 platform."). At minimum, given the importance of this initiative to the Company's growth, and analysts' reliance on these statements, there is a

---

[7] *In re DXC Technology Co. Securities Litigation* is inapposite. In that case, the defendants' statements were consistent with the allegedly concealed facts. 2020 WL 3456129, at *10 (E.D. Va. June 2, 2020). Here, the opposite was true, as reported by multiple former employees and as Driven ultimately admitted. *In re Under Armour Securities Litigation* is similarly inapposite: there, the plaintiff failed to allege **contemporaneous** facts that were inconsistent with the defendants' statements when they were made. 342 F. Supp. 3d 658, 677 (D. Md. 2018).

question of fact as to their materiality.

*Third*, Defendants also reprise their argument that their statements about the maintenance Driven **had** performed, the investments it **had** made, and the quality of the revenue it **was** generating are all somehow forward-looking – "vague statements predicting growth" or "optimistic statements regarding future earnings" – and therefore protected by the PSLRA's safe harbor. Mot. at 24-28. Even putting aside that Defendants elide and cherry-pick portions of the alleged misstatements, even the excerpts they **do** selectively quote demonstrate that the statements at issue are assertions about present and historical fact. *See, e.g.*, *id.* at 24 (Defendants characterize statements as assertions that Driven "**was committed** to having the best stores . . . and **continuing** to invest"), *Genworth*, 103 F. Supp. 3d at 788 (the "plain language" of statements written in the present tense "implicitly refers to the present state of the [c]ompany's affairs").

In addition to the fact that none of these statements are forward-looking, Defendants again (i) fail to point to any "meaningful cautionary language" that disclosed that the Company was not making the investments it claimed it was making; and (ii) ignore that the Complaint alleges actual knowledge – indeed, that Fitzpatrick himself received numerous reports that the Company was failing to maintain its car washes and **even agreed with them**. Again, the handful "risk warnings" that Defendants cite – Driven warned it might not "attract and retain qualified personnel" or "successfully operate stores in a manner consistent with [its] standards and requirements" – are boilerplate and hypothetical. None of these warnings convey any "substantive information" that is "tailored to the specific" undisclosed problems alleged in the Complaint, as is required to invoke the safe harbor. *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 575 (D.S.C. 2011). None warn that, as alleged here, that Driven's senior-most executives were aware of **actually-occurring** pervasive maintenance and service quality problems and their

*ongoing* effects on Driven's customer attrition and same-store sales throughout the class period. As courts have explained, "cautionary language cannot be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred." *Ann Arbor*, 827 F. Supp. 2d at 576; *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 769 (11th Cir. 2007) ("To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").[8]

### B. The Complaint Adequately Pleads Scienter

Importantly, scienter refers to *either* actual knowledge of the facts alleged to have been fraudulently withheld from investors *or* reckless disregard of those facts. *See Singer*, 883 F.3d at 443 ("[A]llegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss."). A defendant is reckless with respect to their misstatements when, for instance, he or she has "access to information contradicting their public statements." *Ollila*, 2018 WL 792069, at *3. A corporate defendants' scienter is pled if scienter is alleged "with respect to at least one authorized agent of the corporation." *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

---

[8] Defendants' cases are entirely inapposite. Defendants rely on *Raab v. General Physics Corp.*, but, unlike here, that case actually involved genuine predictions about future performance – e.g., a projection of an "expected annual growth rate of 10% to 30% over the next several years." 4 F.3d 286, 288 (4th Cir. 1993). The statements here, by contrast, are about the investments Driven *was* making and the quality of the revenue it *was* generating. *See also In re Constellation Energy Grp.*, 738 F. Supp. 2d 602, 611 (D. Md. 2010) (dismissing what were, unlike here, "optimistic statements about . . . future earnings"); *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 386 (4th Cir. 2023) ("[d]efendants' use of the words 'positive,' 'excited,' and 'promising'" made the forward-looking character of the statements clear).

The Supreme Court has directed courts to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. If the inference of scienter is "at least as compelling" as any plausible opposing inference, the complaint must be sustained. *Id*. In other words, "a tie favors the plaintiff." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009).

### 1. The Complaint Pleads Strong Evidence Showing That Defendant Fitzpatrick, Defendant Mason, And Other Senior Driven Executives Were Personally Informed About And Aware Of The Challenges Facing Driven's Auto-Glass And Car Wash Businesses

"[A] defendant publish[ing] statements when in possession of facts suggesting that the statements are false" is "classic evidence of scienter." *U.S. S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009). The Complaint alleges, based on several mutually corroborating accounts of well-placed former senior Driven executives, that Defendant Fitzpatrick and other of Driven's senior-most executives were personally informed about adverse facts concerning Driven's auto-glass and car wash businesses that were withheld from investors. ¶65. With respect to Driven's car wash business, by no later than December 2021, Fitzpatrick was personally informed that failing equipment, poor service, and inadequate maintenance were pervasive, severely impairing operational capacity and exposing the Company to competitive pressure. ¶¶68, 99, 101. As discussed above, FE-5 presented Fitzpatrick with a report showing that *75%* of the 150 car wash sites operated by Driven's "platform" car wash business at the end of 2021 required costly full mechanical equipment rebuilds, while *80%* required substantial reinvestment. ¶¶68, 99. That report further provided that it would take three years and at least $40 million to address car wash

equipment failures in the "platform" business alone. *Id.* Notably, Fitzpatrick did not dispute these findings; rather, he stated that Driven "should have done better due diligence" when it bought the platform car wash business. *Id*. Likewise, FE-4 reported that Defendant Fitzpatrick received regular P&L reports detailing lengthy across-the-board maintenance cuts and freezes that in the car wash segment, directly contradicting Defendants' statements regarding investment in assets, maintenance, and service. *Id.* Nevertheless, Fitzpatrick continued to tout the service quality, operational capacity, and customer retention at Driven's car washes, while inaccurately ascribing slipping same-store sales to "macro environmental" factors. ¶¶47-48, 99, 115-33.

Likewise, with respect to Driven's misstatements regarding the Glass Strategy, Defendants' own admissions make clear that Defendant Mason was personally responsible for reviewing and monitoring the auto glass integration progress and timeline. ¶100. Moreover, Defendants' admissions make clear that the data available to Defendant Mason clearly showed that integration progress was woefully behind: as Fitzpatrick explained, Mason's replacement reviewed that same information with "fresh eyes" and, within ***weeks***, caused the Company to announce that Driven was actually "several quarters" behind in its glass integration efforts. *Id*. Further, FE-1 detailed how these problems, including fundamental deficiencies in AGN's POS system and delays in the pace of integration, were compiled in weekly progress reports that were sent to Mars Shah, President of Driven's North America glass business, and were raised by him to Michael Macaluso, Driven's Executive Vice President and President of its Paint, Collision & Glass Segment who was a named Driven officer and one of Fitzpatrick's direct reports. *Id.* These allegations give rise to a strong inference of scienter. *See Pirate Investor LLC*, 580 F.3d at 243 (defendants' "possession of facts suggesting that the statements are false is classic evidence of scienter"); *Ollila*, 2018 WL 792069, at *2-3 ("allegations that a variety of unfavorable monthly

reports were regularly provided to senior management officers" together with "averments of confidential witnesses who helped to prepare them and provided specific details" were sufficient to "plead[] a strong inference of scienter by pleading actual knowledge or severe recklessness" because, even if plaintiffs "may not be able to show smoking gun documentation that [the individual defendants] explicitly knew of these issues as they made public statements, plaintiffs have sufficiently alleged that they had access to information on such issues").

In response to these detailed and mutually-corroborating reports and admissions, Defendants merely raise a host of factual issues that are inappropriate for resolution at the motion to dismiss stage. Defendants half-heartedly suggest that the Court should discount these reports, including FE-1's allegations, because they are "hearsay." But a motion to dismiss is not trial and a plaintiff need not plead evidence. *See Ollila*, 2018 WL 792069, at *2-3 (crediting confidential witness allegations in finding that scienter was adequately pleaded even though "plaintiff may not be able to show smoking gun documentation that defendants . . . explicitly knew of these issues as they made public statements"); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 n.5 (9th Cir. 2019) (crediting former employee reports over objections that they constitute "hearsay"); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023) (rejecting argument that account of former employee did not support scienter because the complaint did not allege that they made "any contact with the [d]efendants" and explaining that "[a] confidential witness does not need to be a fly on every relevant wall – or directly deliver every relevant [communication] – to plead allegations supporting an inference of scienter"). In any event, FE-1 has ample personal knowledge about the subject matter of his report: he "was ***personally responsible*** for ***overseeing*** Driven's integrations of acquisitions, tracking progress on integrations, and issuing regular reporting on that progress," and, as such, had routine

contact with Shah, Macaluso, or other senior Driven executives. ¶54.

Defendants' efforts to defend their car wash misstatements by attacking FE-4 and FE-5 also fail. Defendants contend that FE-4 was not "alleged to have had direct regular contact with senior executives or knowledge of those executives' state of minds." Mot. at 30. This is preposterous. FE-4 *was* a senior Driven executive and is alleged to have overseen Driven's national car wash operations during the Class Period. Moreover, he reported directly to Driven named executive officer John Teddy, the head of the car wash business, and personally provided Defendant Fitzpatrick bi-monthly P&L reports detailing the lengthy and extensive maintenance cuts and freezes that directly contradicted his public statements. ¶¶66, 68, 72. Defendants also weakly argue that FE-5 was not at Driven throughout the entire Class Period, but this is true of most former employee reports courts routinely rely on in securities fraud litigation – and, in any event, Defendants do not dispute the facts he reported, which rendered Defendants' contemporaneous and subsequent misstatements misleading.[9]

Finally, Defendants' argument that the Complaint does not adequately describe the contents of the reports FE-4 and FE-5 delivered to Fitzpatrick is untrue. Mot. at 38-39. Courts routinely find scienter based on far less detailed descriptions of internal reports than those alleged here. *See IBT Emp. Grp. Welfare Fund v. Compass Minerals. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1260 (D. Kan. 2023) (allegations that defendants had "access" to "unnamed internal reports" that "consistently contained facts contrary to representations [they] made for well over a year" supported scienter); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300-01 (S.D.N.Y. 2018) (allegations that defendants "presumably" received "a monthly email that included an Excel

---

[9] Defendants miss the import of Defendant Fitzpatrick's response to FE-5's report. Mot. at 38-39. Plaintiffs cite Fitzpatrick's statement that Driven "should have done better due diligence" to show that he reviewed and agreed with the report, not to allege deficiencies in that due diligence. ¶68.

report detailing decreases in productivity" and "had access" to "various . . . reports [that] allegedly detailed the negative effects of the Company's integration efforts" sufficient); *see, e.g.*, ¶¶26, 68. Indeed, FE-5 provided a first-hand account of Fitzpatrick's **response** to the reports – a detail that sustained cases typically do not provide.

### 2. Defendant Mason's Abrupt Termination And Stock Sale, And CFO Ferrara's Quick Discovery Of The Fraud, Also Support Scienter

The timing and circumstances of Defendant Mason's termination, the speed with which her successor discovered facts undermining Defendants' Class-Period statements, and Mason's significant insider sales – liquidating **70%** of her Driven holdings in her first ever sale – yield a strong inference of scienter, particularly as to Mason herself and, therefore, as to Driven. *See, e.g.*, *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *11 (S.D.N.Y. May 1, 2024) (terminations support scienter where the "timeline itself is suggestive"); *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2019 WL 3336119, at *20 (D. Minn. July 25, 2019) (resignation that was "abrupt and not discussed on the earnings call held one week prior" "buttresses the inference of scienter under the holistic approach"); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("the proximity of Defendants' departures to the financial restatements and investigations adds 'one more piece to the scienter puzzle'").

Defendant Mason was abruptly terminated after representing Driven at its first-quarter 2023 earnings call. ¶82. She was terminated shortly after the truth was beginning to be revealed and just one quarter before the complete facts were finally disclosed to the market. ¶¶84-87. The facts make clear that her termination was unplanned: not only was she fired *days* after representing Driven management on the Company's earnings call, but the Company was also forced to cancel an upcoming investor conference as a result. ¶82. Within weeks, her replacement discovered Defendants' fraud. ¶87. At Driven's very next earnings call, the Company announced that in less

than 60 days, Driven's new CFO had discovered that, totally contrary to Defendants' statements: (i) Driven was "several quarters behind" on its auto-glass integration; and (ii) Driven's car wash business was severely impacted by competitive pressures that had been building for two years. *Id.* Shortly thereafter, Driven announced that, pursuant to the new CFO's review, the Company would write-down its car wash business *by $851 million*, and would close dozens of car washes and pause any new openings. ¶95. Analysts noted that these disclosures were totally inconsistent with Defendants' Class-Period statements and represented "a significant shift in the narrative on DRVN." ¶96. Significantly, just one week *before* the full truth was disclosed, Mason took advantage of Driven's inflated stock price to dump nearly every share she owned, selling nearly 70% of her stock in a single transaction, her first-ever sale. ¶104.

Once again, Defendants raise a host of unsupported factual assertions, ignoring that this is a *motion to dismiss*, and therefore that the Court must accept the well-pleaded facts of the Complaint as true and draw all reasonable inferences in Plaintiff's favor. *See Singer*, 883 F.3d at 437. Defendants attempt to turn this procedural mandate on its head, asking the Court to draw wild inferences in *their* favor. For instance, Defendants ask the Court to improperly infer from a snippet of a single extrinsic document (when *no* discovery has taken place) that, for some reason, Mason *had* to sell her shares at this highly suspicious time.[10] Mot. at 36-37. But the Court cannot resolve factual disputes, let alone draw dubious inferences in Defendants' favor, at this stage. Defendants also argue that Mason's departure is not sufficiently close in time to the corrective disclosure to

---

[10] Defendants' attempt to resolve factual issues through extrinsic documents is improper. As the Ninth Circuit explained in *Khoja v. Orexigen Therapeutics, Inc.*, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims" – a risk that is "especially significant" in securities fraud cases, "where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." 899 F.3d 988, 998 (9th Cir. 2018).

give rise to an inference of scienter, but her termination is compellingly placed in the timeline: it comes after the truth first began to emerge and just a quarter before the full truth was revealed. *Id.* at 37-38; *see also* ¶¶102-05. Moreover, Defendants have no response to their own admissions that Mason was responsible for reviewing the fraudulently concealed facts and that her predecessor quickly discovered that the truth was inconsistent with Defendants' prior statements.[11] ¶100.

### 3. That Defendants' Fraud Concerned Driven's Most Significant Initiatives And Were The Focus Of Both Company and Investor Attention Further Strengthens The Inference of Scienter

That Defendants' misrepresentations concerned two of Driven's three most important growth drivers during the Class Period, and were the subject of significant Company, analyst, and investor attention, further supports a strong inference of scienter. *See, e.g.*, *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 527 (D. Md. 2022) (that the alleged fraud concerned "a core business or operation of the company is relevant to the analysis of scienter" because "it would be fair to infer that the company officers responsible for public statements were aware of facts relating to that activity"); *Kiken*, 155 F. Supp. 3d at 606 ("whether the alleged fraud dealt with 'core operations' of the business" is relevant to scienter "because high-ranking officers presumably know facts about the core operations of the company"; defendants' repeated discussions of segment "suggest the importance of [these] operations" and "support the inference that Defendants were aware of the alleged [undisclosed facts]"); *Genworth*, 103 F. Supp. 3d at 784 (same).

Throughout the Class Period, Defendants held out Driven's car wash and glass strategies as being of paramount importance to the highly attractive growth forecasts that stoked investor

---

[11] *In re Triangle Capital Corp. Securities Litigation* is entirely inapposite. There, it was clear that executive departures were motivated by a change in investment approach. 988 F.3d 743, 754 (4th Cir. 2021). Unlike here, no one was fired; no successor quickly discovered that facts had been misstated; and the terminated executive did not dump huge amounts of their personal stock.

enthusiasm. For example, during Driven's February 16, 2022 earnings call, Defendant Fitzpatrick called the car wash and glass businesses two of Driven's "three highest growth priorities," explaining that they would "set Driven up for the next 20 years"; on Driven's September 7, 2022 earnings call, he described them as two of Driven's three "priority growth levers" where Defendants were putting most of their "energy"; and at the March 14, 2023 Bank of America Securities Consumer & Retail Conference, he called them "core growth priorities." ¶107. Defendants also held themselves out as knowledgeable about these topics—discussing the results of the car wash and glass businesses, and the reasons for those results, at length during their prepared remarks on every single earnings call during the Class Period. Analysts repeatedly asked questions about them and issued reports discussing them. *See, e.g.*, ¶¶46, 49, 74, 108-09.

Similarly, the fact that the issues that were concealed from the market were widespread and severe also supports the inference of scienter. As detailed in the Complaint based on the accounts of numerous well-placed former employees, Driven's auto-glass POS issues were so significant that, despite senior level directives and plans to complete the integration of all acquired businesses by the end of 2022, Driven knew by the summer of 2022 that it would not get even halfway there. ¶¶58-62. Similarly, in the car wash business, the severe maintenance issues described in the Complaint affected a majority of Driven's car wash locations and were the single biggest driver of the significant customer attrition Driven experienced. *See* ¶¶67-72. Allegations such as these have regularly been found to contribute to an inference of scienter in this Circuit. *See, e.g.*, *Sinnathurai*, 645 F. Supp. 3d at 527-28 (that the business line implicated in fraud was "critical" to company's success "[made] it more plausible that [the individual defendants and other company executives] were aware of the facts underlying the allegedly false statements and material omissions"); *Kiken*, 155 F. Supp. 3d at 606-07 (scienter supported by facts that business line at

issue was a "core operation" and regular subject of defendants' public statements); *Genworth*, 103 F. Supp. 3d at 784 ("core operations" is "certainly relevant to the Court's holistic analysis").

Defendants concede that "core operations allegations may be relevant to a holistic analysis of scienter," Mot. at 31, but argue that such allegations cannot plead scienter standing alone. As detailed above and at length in the Complaint, these allegations do not stand alone. Defendants also argue that their knowledge of widespread problems in the auto-glass and car wash segments would not be "enough for scienter," Mot. at 33, even though those problems directly contradict their statements. But Defendants' case, *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232 (4th Cir. 2023), is inapposite: there, the alleged problems did ***not*** contradict defendants' statements. *Id.* at 243. Here, by contrast: Defendants knew that auto-glass integration was stalled, but stated that Driven was making "significant progress" on it; and they knew that 75% of Driven's car washes needed maintenance that was not being done, but stated that "any deferred maintenance that was there is done, so the equipment is working beautifully." ¶¶47, 123.

### C. The Complaint Adequately Pleads Control Person Liability

Defendants only challenge Plaintiffs' Section 20(a) claim on the ground that Plaintiffs have failed to plead a primary violation. Mot. at 40. As set forth above, that is not correct. Thus, Plaintiffs' Section 20(a) claim should be sustained.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.[12]

---

[12] If the Court grants Defendants' Motion in whole or part, Plaintiffs respectfully request leave to amend. *See Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192-97 (4th Cir. 2009).

Dated: December 13, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

/s/ John Rizio-Hamilton
John Rizio-Hamilton
Abe Alexander
Michael M. Mathai
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
JohnR@blbglaw.com
Abe.Alexander@blbglaw.com
Michael.Mathai@blbglaw.com

-and-

Chloe Jasper
2121 Avenue of the Stars
Suite 2575
Los Angeles, California 90067
Telephone: (310) 819-3481
Chloe.Jasper@blbglaw.com

*Counsel for Lead Plaintiffs Genesee and
Oakland County and Lead Counsel for the
Class*

**TERPENING LAW PLLC**

/s/ William R. Terpening
William R. Terpening
221 West 11th Street
Charlotte, North Carolina 28202
Telephone: (980) 265-1700
Facsimile: (980) 265-1729
terpening@terpeninglaw.com

*Liaison Counsel for Lead Plaintiffs Genesee
and Oakland County*

**VANOVERBEKE MICHAUD
 & TIMMONY, P.C.**
Thomas C. Michaud

-41-

Francis E. Judd
79 Alfred Street
Detroit, Michigan
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com

*Additional Counsel for Lead Plaintiffs*
*Genesee and Oakland County*

-42-

# ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 order in *In re: Use of Artificial Intelligence,* Dkt. No. 3:24-mc-104, the undersigned counsel hereby certifies that:

1.  No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2.  Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

On the 13th day of December, 2024.

/s/ William R. Terpening<br>
William R. Terpening

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will automatically send notification of filing to all

parties receiving electronic service including the following:

ROBINSON, BRADSHAW& HINSON, PA
Adam K. Doerr
Emma W. Perry
101 N. Tryon St., Ste. 1900
Charlotte, NC 28246
Tel.: (704) 377-8114
adoerr@robinsonbradshaw.com
eperry@robinsonbradshaw.com
*Local Counsel for Defendants Driven Brands Holdings Inc. and Jonathan G. Fitzpatrick*

GIBSON, DUNN & CRUTCHER LLP
Christopher D. Belelieu
Nathan C. Strauss
Bethany Saul
200 Park Ave.
New York, NY 10166
Tel.: (212) 351-4000
cbelelieu@gibsondunn.com
nstrauss@gibsondunn.com
bsaul@gibsondunn.com
*Counsel for Defendants Driven Brands Holdings Inc. and Jonathan G. Fitzpatrick*

WINIKER LAW FIRM, PLLC
S. Frederick Winiker, III, Esq.
352 N Caswell Rd.
Charlotte, NC 28204
Tel.: (704) 333-8440
swiniker@winikerlaw.com
*Local Counsel for Defendant Tiffany L. Mason*

ROTTENBERG LIPMAN RICH, P.C.
Steven Kayman (*pro hac vice pending*)
Jennifer A. Kreder (*pro hac vice pending*)
230 Park Ave., 18th Floor
New York, NY 10169
Tel.: (212) 661-3080
skayman@rlrpclaw.com
jkreder@rlrpclaw.com
*Counsel for Defendant Tiffany L. Mason*

-2-

On the 13th day of December, 2024.

/s/ William R. Terpening
William R. Terpening