# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> DRIVEN BRANDS HOLDINGS INC., JONATHAN G. FITZPATRICK, and TIFFANY L. MASON, <br><br> Defendants. | Case No. 3:23-cv-00895-MOC-DCK <br><br> Judge: Honorable Max O. Cogburn, Jr. |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

<u>TABLE OF CONTENTS</u>

<div align="right"><strong><u>Page</u></strong></div>

I.    INTRODUCTION ...................................................................................................... 1

II.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL .......................... 3

    A.    The Standards for Final Approval............................................................... 3

    B.    Application of Rule 23(e)(2) and *Jiffy Lube* Factors ............................................. 5

        1.    Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class.................................................................... 5

        2.    The Settlement Was Reached Through Arm's-Length Negotiations Between Parties with Experienced Counsel After Substantial Discovery ................................................................. 6

            a.    The Posture of the Action at the Time the Settlement Was Reached and the Substantial Discovery Conducted Supports the Fairness of the Settlement.......................................... 6

            b.    The Circumstances Surrounding the Settlement Negotiations Support the Fairness of the Settlement...................... 9

            c.    The Experience of Counsel in Securities Class Action Litigation Supports the Fairness of the Settlement ...................... 10

        3.    The Relief that the Settlement Provides for the Settlement Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors................................................ 12

            a.    The Risks of Establishing Liability and Damages Support Approval of the Settlement ........................................... 13

                i.    Risks to Proving Liability ................................................. 14

                ii.    Risks to Proving Loss Causation and Damages................ 16

                iii.    Risks Related to Class Certification ................................ 17

            b.    The Settlement is Reasonable in Light of the Likely Recoverable Damages.................................................... 18

            c.    The Costs and Delays of Continued Litigation Support Approval of the Settlement ........................................... 19

<div align="center">i</div>

          d.       All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement ............................................................. 20

       4.       The Settlement Treats Class Members Equitably Relative to Each Other ...................................................................................................... 22

       5.       The Reaction of the Settlement Class to Date Supports Approval of the Settlement .......................................................................................... 22

III.      THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ................................ 23

IV.     THE PLAN OF ALLOCATION SHOULD BE APPROVED ........................................ 23

V.      NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS ......................................................................................................................... 24

VI.    CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ..........................................................................................................5

*Boger v. Citrix Sys., Inc.*,
2023 WL 3763974 (D. Md. June 1, 2023) ......................................................................19

*Brown v. Transurban USA, Inc.*,
318 F.R.D. 560 (E.D. Va. 2016) ....................................................................................7, 9

*Chrismon v. Pizza*,
2020 WL 3790866 (E.D.N.C. July 7, 2020) .....................................................................3

*Devine v. City of Hampton*,
2015 WL 10793424 (E.D. Va. Dec. 1, 2015) ...................................................................12

*Dijkstra v. Carenbauer*,
2016 WL 6804980 (N.D.W. Va. July 12, 2016) ................................................................9

*Galloway v. Williams,*
2020 WL 7482191 (E.D. Va. Dec. 18, 2020) ...................................................................18

*In re Genworth Fin. Sec. Litig.*,
210 F. Supp. 3d 837 (E.D. Va. 2016) ..........................................................7, 10, 11, 13, 23

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) .................................................................21

*Henley v. FMC Corp.*,
207 F. Supp. 2d 489 (S.D.W. Va. 2002) ..........................................................................18

*Herrera v. Charlotte School of Law, LLC*,
818 F. App'x 165 (4th Cir. 2020) .....................................................................................9

*In re Jiffy Lube Sec. Litig.*,
927 F.2d 155 (4th Cir. 1991) .................................................................................. *passim*

*Khoja v. Orexigen Therapeutics, Inc.*,
2021 WL 5632673 (S.D. Cal. Nov. 30, 2021) ..................................................................9

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) ........................................................................................... 15

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ...................................................................................13

*In re MicroStrategy, Inc. Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) ...........................................................................11

*Ollila v. Babcock & Wilcox Enters., Inc*,
   No. 3:17-cv-109 (W.D.N.C. Aug. 30, 2019) ..........................................................18, 25

*Phillips v. Triad Guaranty Inc.*,
   2016 WL 1175152 (M.D.N.C. Mar. 23, 2016) ......................................................7, 8, 10, 24

*Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.*,
   2021 WL 1659848 (E.D. Va. April 23, 2021) ...............................................................25

*In re PPDAI Grp. Inc. Sec. Litig.*,
   2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ..............................................................19

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ...............................................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2020 WL 4196468 (S.D.N.Y. July 21, 2020) .........................................................11, 21

*Sims v. BB&T Corp.*,
   2019 WL 1995314 (M.D.N.C. May 6, 2019) ...............................................................3

*Smith v. Res-Care, Inc.*,
   2015 WL 6479658 (S.D. W.Va. Oct. 27, 2015) ...........................................................6

*In re Snap Inc. Sec. Litig.*,
   2021 WL 667590 (C.D. Cal. Feb. 18, 2021)..............................................................19

*Solomon v. American Web Loan, Inc.*,
   2020 WL 3490606 (E.D. Va. June 26, 2020) .........................................................5, 6, 8

*In re The Mills Corp. Sec. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ..........................................................6, 8, 9, 13, 23

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)............................................................19

*In re Valeant Pharms. Int'l, Inc. Third-Party Payor Litig.*,
   2022 WL 525807 (D.N.J. Feb. 22, 2022) ...................................................................9

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)..............................................................12

*In re Wilmington Tr. Sec. Litig.*,
   2018 WL 6046452 (D. Del. Nov. 19, 2018) ...............................................................................11

*Yost v. Elon Prop. Mgmt. Co.-Lexford Pools 1/3, LLC*,
   2023 WL 185178 (D. Md. Jan. 13, 2023)..........................................................................4, 5

**Statutes**

15 U.S.C. § 78u-4(a)(7) .............................................................................................................24

Securities Exchange Act of 1934 Section 10(b) and 20(a) ..........................................................2

**Other Authorities**

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... *passim*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Genesee County Employees' Retirement System ("Genesee"), Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association (collectively, "Oakland County," and together with Genesee, "Lead Plaintiffs"), on behalf of themselves and all other members of the Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement of the above-captioned class action (the "Action") and approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").[1]

## I. INTRODUCTION

As detailed in the Stipulation, Lead Plaintiffs and Defendants[2] have agreed to the Settlement, which provides for the resolution of all claims asserted in the Action and the release of all Released Claims, in exchange for an all-cash payment of $25,000,000. The terms of the Settlement are set forth in the Stipulation, which was filed with the Court. *See* ECF No. 77-1.

The Settlement was reached after Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims. As detailed in the accompanying Uslaner Declaration filed herewith,[3] the decision to settle was informed by extensive litigation

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement dated December 19, 2025 (the "Stipulation") previously filed with the Court (ECF No. 77-1) or in the Declaration of Jonathan D. Uslaner in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Uslaner Declaration"), filed herewith. In this memorandum, citations to "¶ __" refer to paragraphs in the Uslaner Declaration and citations to "Ex. __" refer to exhibits to the Uslaner Declaration.

[2] Defendants are Driven Brands Holdings Inc. ("Driven" or the "Company") and Jonathan G. Fitzpatrick and Tiffany L. Mason (collectively, the "Individual Defendants," and together with Driven, "Defendants," and, together with Lead Plaintiffs, the "Parties").

[3] The Uslaner Declaration is an integral part of this submission. For the sake of brevity in this memorandum, the Court is referred to it for a detailed description of, *inter alia*, the history of the

1

efforts involving a thorough and wide-ranging factual investigation, which included a careful review of publicly available information concerning the Company and identifying, locating, and speaking with 105 former Driven employees, nine of whom provided Lead Plaintiffs with detailed, substantive information that was critical to Lead Plaintiffs' allegations and included in the Complaint (ECF No. 31); successful briefing on Defendants' motion to dismiss the Complaint and Defendants' motion for reconsideration; a review and analysis of tens of thousands of pages of documents from Defendants; and an extensive mediation process overseen by a well-respected and experienced mediator, Jed Melnick of JAMS, including preparing detailed mediation briefs and attending a full-day mediation session.

While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit, they recognize that continuing to litigate the Action presented several substantial risks. Despite Lead Plaintiffs' success at the motion to dismiss stage and their belief that they would be successful in establishing all requisite elements of the claims asserted under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, Defendants would have continued to vigorously challenge the claims if the Action continued into summary judgment, trial, and through appeals. Moreover, the $25 million Settlement is a favorable recovery considering the risks of continued litigation and realistically recoverable damages.

In light of the substantial recovery for the Settlement Class and the risks of continued litigation, as discussed further below and in the Uslaner Declaration, Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court. Additionally, Lead Plaintiffs request that the Court approve the proposed Plan of

---

Action (¶¶ 11-27); the negotiations leading to the Settlement (¶¶ 28-29); the risks and uncertainties of continued litigation (¶¶ 34-47); and the terms of the Plan of Allocation (¶ 58-68).

2

Allocation, which was set forth in full in the Notice to Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims.

## II. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

### A. The Standards for Final Approval

Courts in the Fourth Circuit have long recognized "a strong judicial policy in favor of settlement, in order [to] conserve scarce resources that would otherwise be devoted to protracted litigation." *Chrismon v. Pizza*, 2020 WL 3790866, at \*4 (E.D.N.C. July 7, 2020). "This is particularly true in class actions." *Sims v. BB&T Corp.*, 2019 WL 1995314, at \*3 (M.D.N.C. May 6, 2019).

Pursuant to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

    (i) the costs, risks, and delay of trial and appeal;

    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Traditionally, the Fourth Circuit has instructed courts to analyze the "fairness" and "adequacy" factors set forth in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991) ("*Jiffy*

*Lube*") when evaluating a class action settlement. The *Jiffy Lube* factors are consistent with the Rule 23(e)(2) factors. Under *Jiffy Lube*, to assess the threshold factor of the fairness of a settlement, courts consider, "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant] area of . . . class action litigation." *Jiffy Lube*, 927 F.2d at 159. Analyzing these factors enables the Court to determine that "the settlement was reached as a result of good-faith bargaining at arm's length, without collusion." *Id.*

Under the second *Jiffy Lube* threshold factor of the adequacy of the proposed settlement, courts consider: (1) the relative strength of the plaintiff's case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the expected duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement. *Jiffy Lube,* 927 F.2d at 159.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to displace any factor previously adopted by the court of appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23 (e)(2) Advisory Committee Notes to 2018 Amendments. Courts generally focus on the fairness, reasonableness, and adequacy of the Settlement in relation to the four factors set forth in Rule 23(e)(2), since these factors "almost completely overlap" with the *Jiffy Lube* factors and "the outcome[s] [are] the same under both" sets of factors. *Yost v. Elon Prop. Mgmt. Co.-Lexford Pools 1/3, LLC*, 2023 WL 185178, at *4 (D. Md. Jan. 13, 2023) (quoting *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods.*

*Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020)). As discussed below, each of the Rule 23(e)(2) and *Jiffy Lube* factors readily support approval of the proposed Settlement.

**B.      Application of Rule 23(e)(2) and *Jiffy Lube* Factors**

**1.      Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class**

In determining whether to approve a class action settlement, courts consider whether "the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). The adequacy requirement "involves two inquiries: 1) whether the plaintiff has any interest antagonistic to the rest of the class; and 2) whether plaintiff's counsel is qualified, experienced and generally able to conduct the proposed litigation." *Yost*, 2023 WL 185178, at *7 (quoting *George v. Duke Energy Retirement Cash Balance Plan*, 259 F.R.D. 225, 232 (D.S.C. 2009)); *see also Solomon v. American Web Loan, Inc*., 2020 WL 3490606, at *2 (E.D. Va. June 26, 2020).

Here, there is no antagonism or conflict between Lead Plaintiffs and the Settlement Class. Lead Plaintiffs have claims that are typical of and coextensive with those of other Settlement Class Members and have no interest antagonistic to the interests of other members of the Settlement Class. Lead Plaintiffs and the other Settlement Class Members all purchased shares of Driven common stock during the Class Period, and all were allegedly damaged by the same alleged misleading statements and omissions. If Lead Plaintiffs proved their claims at trial, they would also prove the claims of the other members of the Settlement Class. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because its claims are based on common misrepresentations and omissions).

Moreover, Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action and in the negotiation and achievement of the

Settlement. Lead Counsel BLB&G is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. C to Ex. 5), and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.

### 2. The Settlement Was Reached Through Arm's-Length Negotiations Between Parties with Experienced Counsel After Substantial Discovery

In weighing approval of a class action settlement, courts consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This inquiry is comparable to the Fourth Circuit's traditional examination of a proposed settlement's "fairness," which is used to assess "whether the settlement was reached through good-faith bargaining at arm's length," *Jiffy Lube*, 927 F.2d at 158-59, and involves consideration of four factors: "(1) the posture of the case at the time the settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation." *Id.* Here, all of the factors strongly support a finding that the Settlement was reached through good-faith bargaining at arm's length.

### a. The Posture of the Action at the Time the Settlement Was Reached and the Substantial Discovery Conducted Supports the Fairness of the Settlement

The first and second *Jiffy Lube* fairness factors analyze whether the case progressed far enough to ensure that "the parties did not settle prematurely," and that they were fully informed as to "the strengths and weaknesses of their own and their adversaries' claims and defenses." *Smith v. Res-Care, Inc.*, 2015 WL 6479658, at *5-6 (S.D.W. Va. Oct. 27, 2015); *see Solomon*, 2020 WL 3490606, at *4 (explaining that "in cases where 'several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement'") (citing *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009)).

6

Here, Lead Plaintiffs and Lead Counsel "had more than a sufficient opportunity to appreciate and develop the merits of their case" such that the case was "well-enough developed" to warrant final approval, satisfying the first *Jiffy Lube* factor. *See Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 572 (E.D. Va. 2016) (granting final approval where settlement occurred prior to the completion of formal discovery); *Phillips v. Triad Guaranty Inc.*, 2016 WL 1175152, at *3 (M.D.N.C. Mar. 23, 2016) (granting final approval where settlement occurred prior to formal discovery). At the time the Parties agreed to the Settlement, Lead Plaintiffs had a well-developed understanding of the strengths and weaknesses of their positions. Lead Counsel thoroughly investigated the Complaint, which was filed on August 13, 2024. ECF No. 31. Prior to drafting the Complaint, Lead Counsel identified, located, and spoke with 105 former Driven employees to gather information about the alleged fraud. ¶¶ 15, 75. In addition, Lead Counsel conducted an in-depth review of (i) SEC filings, press releases, and other public statements issued by Driven; (ii) research reports issued by financial analysts discussing and analyzing Driven's business operations and results; and (iii) data reflecting the price of Driven common stock, all in consultation with a damages expert. ¶¶ 14, 75.

After Lead Plaintiffs' filing of the Complaint, the Parties fully briefed Defendants' motion to dismiss the Complaint. ECF Nos. 37-39, 42, 43. On February 20, 2025, the Court issued an Order denying Defendants' motion to dismiss the Complaint. ECF No. 45. The Parties then fully briefed Defendants' motion for reconsideration of the Court's order on Defendants' motion to dismiss (ECF Nos. 48-49, 52, 56), and on October 29, 2025, the Court reconsidered and again denied Defendants' motion to dismiss the Complaint (ECF No. 73).

The second *Jiffy Lube* factor evaluates the extent of discovery that has taken place. *See In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 840 (E.D. Va. 2016). This factor assesses

whether plaintiffs' counsel has had time "to appreciate the full landscape of their case when agreeing to enter into this Settlement." *In re Mills*, 265 F.R.D. at 254. Through their thorough investigation, substantial discovery, and consultations with their damages expert—and as demonstrated in their filings with the Court and submissions to Mr. Melnick—Lead Plaintiffs and Lead Counsel were clearly "well-informed of the strengths and weaknesses of the merits of the case." *Phillips*, 2016 WL 1175152, at *2.

Indeed, even before formal discovery opened, Lead Plaintiffs had amassed a substantial amount of information from their extensive informal discovery efforts, which provided a host of information informing Lead Plaintiffs about the strengths and weaknesses of their case. In addition to thoroughly reviewing all relevant public information—including Defendants' statements to investors and related analyst and market commentary—Lead Plaintiffs interviewed and obtained relevant information concerning the claims and allegations at issue from over 100 percipient witnesses. The accounts of nine of these former employees are described and quoted in the Complaint. *See* Complaint ¶¶ 53-72; 98-101.

Once Lead Plaintiffs defeated Defendants' motion to dismiss, the PSLRA automatic discovery stay was lifted, which allowed Lead Plaintiffs to obtain even more highly probative evidence bearing on their appreciation of "the full landscape of the case." *Solomon*, 2020 WL 3490606, at *4. In response to Lead Plaintiffs' requests for the production of documents, Defendants produced over 70,000 pages of documents to Lead Plaintiffs. In addition, the Parties met and conferred between May 2025 and November 2025 and exchanged numerous letters concerning disputed discovery issues.

Accordingly, this Action progressed materially from its inception, allowing the Parties to thoroughly vet the merits of their claims and defenses through contentious motion practice and

substantial fact discovery, lending significant weight to Lead Plaintiffs' determination that the Settlement is fair and adequate. *See e.g.*, *Herrera v. Charlotte School of Law, LLC*, 818 F. App'x 165, 177 (4th Cir. 2020) (affirming fairness of settlement where the parties had engaged in "a year and a half of litigation involving significant motions practice and discovery"); *Brown,* 318 F.R.D. at 572 ("plaintiffs have conducted sufficient [] discovery and investigation to . . . evaluate [fairly] the merits of Defendants' positions during settlement negotiations").

<blockquote><b>b.  The Circumstances Surrounding the Settlement Negotiations Support the Fairness of the Settlement</b></blockquote>

The third *Jiffy Lube* fairness factor requires the Court to evaluate the conditions and circumstances surrounding the settlement negotiations. *See Mills*, 265 F.R.D. at 255. "The objective of this factor is to ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case." *Id.* (citation omitted). "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Dijkstra v. Carenbauer*, 2016 WL 6804980, at *2 (N.D.W. Va. July 12, 2016) (citing Newberg on Class Actions § 11.28 at 1159 (3d ed. 1992)).

Here, the Settlement negotiations involved an intensive mediation process, including detailed written submissions and presentations addressing contested issues concerning class certification, liability, and damages. Ex. 1, ¶¶ 7-8. These negotiations were overseen by Jed D. Melnick, Esq., of JAMS, an "experienced, neutral mediator" who has mediated over one thousand disputes, with an aggregate value in the billions of dollars. *See Khoja v. Orexigen Therapeutics, Inc.*, 2021 WL 5632673, at *4 (S.D. Cal. Nov. 30, 2021); *In re Valeant Pharms. Int'l, Inc. Third-Party Payor Litig.*, 2022 WL 525807, at *2 (D.N.J. Feb. 22, 2022) (settlement approved where

<div align="center">9</div>

"Plaintiffs and [Defendant] ultimately agreed to mediate their claims before Jed Melnick of JAMS, a 'nationally recognized alternative dispute resolution firm'").[4]

Specifically, on November 13, 2025, the Parties held an in-person, full-day mediation session before Mr. Melnick. Ex. 1, ¶ 9. In advance of this mediation session, the Parties submitted detailed mediation statements with numerous exhibits of evidentiary support addressing all the key disputes in this Action. The mediation session was hard-fought and productive. *Id.*, ¶ 10. At the end of the full day mediation, in an effort to resolve the litigation, Mr. Melnick issued a mediator's proposal for Plaintiffs to resolve the Action in exchange for a payment from Defendants of $25 million. *Id.*, ¶ 11. The Parties accepted Mr. Melnick's mediator's recommendation on a "double-blind" basis and agreed in principle to settle this Action for $25 million. *Id.* The Parties then negotiated and agreed to the final terms of the Settlement, which are set forth in the Stipulation executed on December 19, 2025. ¶ 31. The Parties' participation in this intensive, arm's length mediation process before a highly experienced neutral strongly supports the fairness and reasonableness of resultant Settlement.

      c.      **The Experience of Counsel in Securities Class Action Litigation Supports the Fairness of the Settlement**

The fourth *Jiffy Lube* fairness factor weighs the experience of counsel in the particular field of law. *Genworth*, 210 F. Supp. 3d at 841. Any potential "concerns of collusion" are minimized where both sides' counsel are "nationally recognized members of the securities litigation bar." *Phillips,* 2016 WL 1175152, at *3. Additionally, courts recognize that the opinion of experienced and informed counsel favoring a settlement should be afforded substantial consideration in

---

[4] *See also* Jed D. Melnick, JAMS, https://www.jamsadr.com/neutrals/melnick (last visited Apr. 27, 2026).

determining whether a class settlement is fair and adequate. *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001).

Here, Lead Counsel BLB&G is highly experienced and well-respected in the field of securities class action litigation and has an extensive track record of successfully prosecuting actions on behalf of shareholder classes. *See* Ex. C to Ex. 5 (BLB&G firm resume); *see also, e.g.*, *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) (granting final approval of $210 million and noting BLB&G is comprised of "highly experienced attorneys" and that "[t]he significant amount of recovery in the settlement agreements attests to [its] efficiency"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at **2, 4 (S.D.N.Y. July 21, 2020) (granting final approval of $240 million and noting BLB&G is "qualified and experienced in securities litigation").

Additionally, Lead Plaintiffs and Lead Counsel were able to achieve this Settlement notwithstanding the highly skilled defense mounted by the team of attorneys from Gibson, Dunn & Crutcher LLP; Robinson, Bradshaw & Hinson, P.A.; and Rottenberg Lipman Rich, P.C. *See Genworth*, 210 F. Supp. 3d at 841 ("defendants' law firms are also national firms with deep experience in securities litigation, further demonstrating the fairness of the Settlement").

Moreover, the Court-appointed Lead Plaintiffs, Genesee and Oakland County, are sophisticated institutional investors that are experienced in securities class actions. Lead Plaintiffs retained Lead Counsel specifically because of its expertise and acumen in large complex securities matters like this one. Lead Plaintiffs also closely supervised, carefully monitored, and actively participated in the prosecution of the Action. *See* Ex. 2, at ¶ 4; Ex. 3, at ¶ 4. For example, Lead Plaintiffs regularly participated in discussions with Plaintiffs' Counsel concerning significant developments in the litigation; reviewed drafts and final versions of significant pleadings and

briefs filed in the Action and submitted as part of the mediation, and discussed Court orders; and conducted and supervised the production of discovery by Lead Plaintiffs, including document productions and responses to written document requests and interrogatories. *See* Ex. 2, at ¶ 5; Ex. 3, at ¶ 5. Lead Plaintiffs also consulted with Plaintiffs' Counsel regarding settlement negotiations, and evaluated and ultimately approved the proposed Settlement. *Id.*

Accordingly, the Court may give considerable weight to Lead Plaintiffs' and Lead Counsel's judgment that the Settlement is in the best interests of the Settlement Class. The Court "is entitled to rely on the judgment of experienced counsel for the parties . . . and should hesitate to substitute its own judgment for that of counsel." *Devine v. City of Hampton*, 2015 WL 10793424, at *2 (E.D. Va. Dec. 1, 2015). The fact that Lead Plaintiffs are sophisticated institutional investors, of the type favored by Congress when it passed the PSLRA, strengthens the force of its recommendation that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("[A] settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness . . . .'") (citation omitted).

<p style="padding-left: 2em;">3. <strong>The Relief that the Settlement Provides for the Settlement Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors</strong></p>

In determining whether a settlement is "fair, reasonable, and adequate," courts consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C).[5] Courts have recognized that securities class

---

[5] This factor under Rule 23(e)(2)(C) encompasses four of the five factors of the traditional *Jiffy Lube* adequacy analysis: "(1) The relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, [and] (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment." *Jiffy Lube*, 927 F.2d at 159.

actions are "notably difficult and notoriously uncertain." *Mills*, 265 F.R.D. at 255; *see also Genworth*, 210 F. Supp. 3d at 844 ("[S]ecurities fraud cases require significant showings of fact in order to prevail before a jury, and elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish"). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

As discussed in detail in the Uslaner Declaration and below, continued litigation of the Action presented a number of significant risks to Lead Plaintiffs and the Settlement Class.

### a. The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize the substantial risks they would face in establishing liability and damages at the several remaining stages of litigation, including at class certification, summary judgment, and trial. Throughout the litigation, Defendants argued that their challenged statements about the integration of Driven's auto-glass business and the operational execution and customer retention of Driven's car wash business were immaterial and not false or misleading when made and further that, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors. Defendants also argued that any alleged misstatement was not the cause of the decline in the price of Driven common stock at issue. The risks of continued litigation were significant, and the ultimate potential for recovery for the Settlement Class was always in question.

13

### i. Risks to Proving Liability

**Falsity.** Lead Plaintiffs faced a real risk that the Court or jury might ultimately find that certain of Defendants' alleged misstatements were not false when made and, thus, not actionable under the securities laws. With respect to Lead Plaintiffs' allegations concerning Driven's auto-glass business, Defendants were expected to argue that their statements about the progress of integrating the acquired auto-glass businesses into a single platform were true at the time they were made and were based on the best information Defendants had at the time. ¶ 36.

Lead Plaintiffs also faced challenges in establishing falsity with respect to their allegations concerning Driven's car wash business. Defendants were expected to argue that the same-store sales declines experienced by the car wash segment were attributable to macroeconomic conditions rather than any operational failures or systematic underinvestment by Defendants. ¶ 37. Defendants were also expected to argue that their statements about customer retention in the car wash business were consistent with the information available to them at the time. *Id.*

Thus, to prove falsity, Lead Plaintiffs faced the risk that it might not have been sufficient for Lead Plaintiffs to establish that Driven's auto-glass integration was delayed or that car wash same-store sales were declining: they may needed to have proven that the delays and declines were far more significant than anything Defendants had disclosed and were known by Defendants earlier than disclosed. *Id.* While allegations in the Complaint in this regard, including those from former Driven employees, were found sufficient at the pleading stage, it was uncertain that the same result would be found after a review of all admissible evidence at summary judgment or trial.

Moreover, Lead Plaintiffs anticipate that Defendants would likely use the absence of certain facts—including any SEC investigation or enforcement action—to support their argument against a finding of falsity at later stages of the litigation. ¶ 38.

14

**Materiality.** Even if Defendants' statements concerning the progress of the auto-glass integration or the car wash business were found to be false or misleading, Lead Plaintiffs faced challenges in establishing that these statements were material to investors. The Complaint alleges that the statement that Driven was "committed to having the best stores" is a material misrepresentation. ¶ 39. Defendants were expected to argue that the Fourth Circuit has held that similar statements were non-actionable corporate puffery. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999) (finding inactionable statement that newly acquired "clean and conveniently located stores are especially well suited to the demands of our customers"). Defendants were expected to argue that many of Defendants' statements were susceptible to "puffery" challenges if the Action proceeded to summary judgment or trial. *Id.*

**Scienter.** Lead Plaintiffs also faced risks in proving to a jury that Defendants made their allegedly false or misleading misstatements with scienter—i.e., an intent to defraud or with deliberate recklessness. Defendants vigorously argued throughout the case that they believed their statements to be true and that they had no intent to commit fraud. ¶ 40. Defendants would undoubtedly have reiterated those arguments at summary judgment and trial, when the Complaint's allegations no longer need to be accepted as true.

For example, Defendants were expected to continue to argue that they earnestly believed their statements about the progress of the auto-glass integration and the performance of the car wash business, and that they disclosed material developments to investors as they became aware of them—including on October 26, 2022, when Defendants disclosed significant delays in the auto-glass business, and again on August 2, 2023, when Defendants acknowledged further integration setbacks and same-store car wash sales declines. ¶ 41. Defendants were expected to continue to argue that these disclosures and other cautionary statements were powerful evidence

that Defendants were making their best efforts to keep investors informed. *Id.* There was no certainty that Lead Plaintiffs would succeed in convincing a jury that Defendants knew that the integration delays and car wash operational failures were more significant than what was disclosed to investors—or were known by Defendants earlier than their disclosures. *Id.*

In sum, there was a meaningful risk that the Court or jury could find against Lead Plaintiffs on issues of scienter on a complete record at summary judgment or trial.

### ii.      Risks to Proving Loss Causation and Damages

Even if Lead Plaintiffs were successful in establishing Defendants' liability, they would have still faced significant challenges in establishing loss causation and damages. These were some of the most significant risks remaining in the case.

Specifically, there was a material risk that, at class certification, summary judgment, or trial, the Court might eliminate from recovery one or both of the alleged corrective disclosures. For example, Defendants were expected to argue that the October 26, 2022 corrective disclosure—in which the Company announced significant delays in its ability to generate auto-glass revenue and acknowledged that the glass business was still "a year away" from being in a position to service insurers—was sufficient to warn investors about integration issues in the glass business generally, and that, therefore, the corrective disclosure on August 2, 2023, during which Defendants reiterated many of the same risks, was not fully compensable. ¶ 43. If the Court had agreed with Defendants, maximum recoverable damages would have been reduced dramatically. Lead Plaintiffs' damages expert estimated maximum recoverable damages in this case—aggressively assuming complete success in establishing liability and loss causation for <u>all</u> of the alleged misstatements, throughout <u>the entire</u> Class Period, and for <u>both</u> of the corrective disclosures—of \$268.9 million. *Id.* However, if the Court were to have eliminated the alleged auto-glass misstatements from the case following the first corrective disclosure—which was a risk in this

<div align="center">16</div>

Action—maximum recoverable damages would have been reduced by approximately half, to $134 million. *Id.*

Furthermore, Defendants would likely argue at summary judgment, trial, and subsequent stages of the proceedings, that the declines in the price of Driven common stock were not caused entirely—or at all—by the alleged corrective disclosures. ¶ 44. Defendants would argue that each of the alleged corrective disclosures coincided with the release of other negative information, unrelated to the allegations, which must be disaggregated from any measure of damages. *Id.* In particular, on August 2, 2023—the date of the largest stock price decline at issue in this case— Defendants disclosed, in addition to information concerning the glass and car wash businesses, the negative impact of weather on the car wash segment, mounting rent expenses, and macroeconomic retail traffic softness. *Id.* Defendants would have had colorable arguments that a large portion of the stock price declines on the alleged corrective disclosure dates were due to these non-fraud-related factors. *Id.* The disaggregation analysis was likely to materially lower the amount of potential recovery in this case.

Accordingly, loss causation and damages challenges would have provided Defendants with strong arguments for reducing the ultimate maximum damages that Lead Plaintiffs could obtain, even if they succeeded on all liability issues.

### iii. Risks Related to Class Certification

Lead Plaintiffs and Lead Counsel believe that this Action is suitable for class certification and that it would have been appropriate for the Action to be certified. However, at the class certification stage, Lead Plaintiffs anticipated that Defendants would contend that their misstatements did not impact the price of Driven's stock. ¶ 46. Defendants were expected to argue that many of the alleged misstatements were vulnerable to challenge at class certification because they were purportedly "generic" or aspirational corporate puffery. ¶ 47. These included, for

example, Defendants' statements that "we have built a really nice sort of base platform in the Glass business" and are "implementing our new standard operating procedures." *Id.* An adverse ruling on this "price impact" issue at class certification might have materially impaired the case, including by eliminating or reducing the amount of artificial inflation dissipated by the final corrective disclosure and thereby significantly reducing the amount of maximum recoverable damages.[6]

### b. The Settlement is Reasonable in Light of the Likely Recoverable Damages

The $25 million Settlement is also a favorable result when it is considered in relation to the maximum amount of damages that realistically could be established at trial. As noted above, Lead Plaintiffs' damages expert estimated absolute maximum recoverable damages in the Action—which aggressively assumed complete success in establishing liability and loss causation for <u>all</u> the alleged misstatements, throughout the <u>entire</u> Class Period, and for <u>both</u> of the corrective disclosures—of $268.9 million. However, as noted above, if the Court eliminated the alleged auto-glass misstatements from the case following the first corrective disclosure, maximum recoverable damages would have been reduced by approximately half, to $134 million. The Settlement therefore recovers approximately 9.3% to 18.7% of the absolute maximum estimated damages, before accounting for the need to disaggregate for non-fraud related factors—a favorable recovery in light of the risks of continued litigation. *See, e.g.*, *Ollila v. Babcock & Wilcox Enters., Inc.*, No.

---

[6] In appraising the adequacy of the settlement under *Jiffy Lube*, courts in the Fourth Circuit also consider "the solvency of the defendants and the likelihood of recovery on a litigated judgment" as additional relevant circumstances. *See Jiffy Lube*, 927 F.2d at 159. Here, Driven is a solvent company, and Lead Plaintiffs did not anticipate any significant risks in being able to recover on a litigated judgment. However, in light of the other significant risks in the litigation, this factor is of limited importance. *See Galloway v. Williams,* 2020 WL 7482191, at *9 (E.D. Va. Dec. 18, 2020) (finding, in similar circumstances, "this factor has no bearing on the Court's adequacy analysis"); *Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D.W. Va. 2002) ("The Court has no doubt FMC would be able to satisfy any judgment entered against it. That consideration, however, is largely beside the point given the other factors weighing in favor of a negotiated resolution.").

3:17-CV-00109 (W.D.N.C. 2019) (Cogburn, J.), ECF Nos. 84, 90 (approving settlement representing approximately 4.8-6.9% of estimated damages); *Boger v. Citrix Sys., Inc.*, 2023 WL 3763974, at *11 & n. 7 (D. Md. June 1, 2023) (approving settlement representing 8.8% of maximum potential damages because "it is well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery"); *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *12 (E.D.N.Y. Jan. 21, 2022) (approving securities class action settlement representing "6.4% of the maximum estimated aggregate damages [of] $140,000,000, assuming Plaintiffs can prove all their relevant causation arguments" as "within the range of reasonableness."); *In re Snap Inc. Sec. Litig.*, 2021 WL 667590, at *1 (C.D. Cal. Feb. 18, 2021) (approving settlement "represent[ing] approximately 7.8% of the class's maximum potential aggregate damages" and noting that it is "similar to the percent recovered in other court-approved securities settlements"); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at **3, 10 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of the maximum damages).

<div align="center">

**c.      The Costs and Delays of Continued Litigation Support Approval of the Settlement**

</div>

Achieving a litigated verdict in the Action would have required the Settlement Class to expend substantial additional litigation and costs. In the absence of the Settlement, achieving a recovery for the Settlement Class would have required (i) briefing anticipated motions for class certification and summary judgment; (ii) completing pre-trial motion practice, including motions in limine; (iii) a trial involving substantial fact and expert testimony; and (iv) post-trial motions.

Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict. At each step of the way, the risks in the case could have materialized. For example, Courts of Appeals have vacated plaintiffs' trial verdicts in securities class actions after many years of litigation. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1445-49 (11th Cir.

<div align="center">

19

</div>

1997) (reversing jury verdict on appeal after seven years of litigation). Even assuming success at all these stages, such a protracted process would pose substantial expense to the Settlement Class and delay any recovery for years.

<center>*     *     *</center>

In sum, Lead Plaintiffs respectfully submit that, considering the substantial risks of continued litigation and the additional time and expense to prosecute the Action through a trial and possible appeals, the $25 million Settlement represents an excellent recovery that is in the best interests of the Settlement Class. In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain recovery.

### d.    All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports approval here.

First, the procedures for processing Settlement Class Members' claims and distributing the Settlement's proceeds to eligible claimants in cases of this type are well-established. In sum, the net Settlement proceeds will be distributed to eligible Settlement Class Members who submit required Claim Forms and supporting documentation to the Court-approved Claims Administrator, Strategic Claims Services ("SCS")—a highly experienced claims administration firm. The Claims Administrator will (i) review and process submitted claims under the supervision of Lead Counsel; (ii) provide claimants with an opportunity to cure any deficiencies and bring any unresolved claims disputes to the Court; and (iii) ultimately send claimants their pro rata share of the Net Settlement

<center>20</center>

Fund (following entry of a final "Distribution Order" by the Court).[7] This type of claims processing is standard in securities class actions (as neither Lead Plaintiffs nor Driven possess individual investors' trading data that would otherwise allow the Parties to create a "claims-free" process to distribute Settlement funds). Accordingly, the proposed Settlement satisfies Rule 23(e)(2)(C)(ii).

Second, the relief provided to the Settlement Class under the Settlement is also adequate when the terms of the proposed attorney's fee award is considered. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund, to be paid upon approval by the Court, is fair and reasonable in light of Lead Counsel's work and the results achieved in the face of substantial litigation risk. Moreover, nothing in the Settlement is contingent on the approval of attorneys' fees, which are subject to separate approval by the Court. *See* Stipulation ¶ 16. Accordingly, the proposed Settlement also satisfies Rule 23(e)(2)(C)(iii).

Lastly, Rule 23 asks the Court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). In addition to the Stipulation, Lead Plaintiffs and Defendants entered into a Supplemental Agreement under which Driven may terminate the Settlement if requests for exclusion from the Settlement Class exceed a certain threshold—generally called a "blow provision"—that is standard in securities class actions. *See Signet Jewelers*, 2020 WL 4196468, at *13, ("This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.").[8]

---

[7] The Settlement is not a claims-made settlement. If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or amount of claims submitted. *See* Stipulation ¶ 13.

[8] The Supplemental Agreement is generally maintained as confidential in order to prevent potential opt-outs from threatening to trigger the blow provision and leveraging that threat to obtain additional payment from the settling parties. *See Hefler v. Wells Fargo & Co.*, 2018 WL 4207245,

### 4. The Settlement Treats Class Members Equitably Relative to Each Other

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As discussed in Section IV below, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their pro-rata share of the recovery based on their transactions in Driven common stock. Lead Plaintiffs will receive the same level of pro-rata recovery (based on their Recognized Claims as calculated under the Plan of Allocation) as all other Settlement Class Members. This ensures equitable treatment among the Settlement Class.

### 5. The Reaction of the Settlement Class to Date Supports Approval of the Settlement

The final factor considered by the Fourth Circuit is "the degree of opposition to the settlement." *Jiffy Lube*, 927 F.2d at 159. Under the Preliminary Approval Order, the deadline for Class Members to exclude themselves from the Class or object to the Settlement is May 11, 2026. ¶ 57. To date, no requests for exclusion and no objections to the proposed Settlement have been received. *Id.*; Ex. 4 at ¶ 15. Lead Plaintiffs will file a reply brief by May 25, 2026 that will address any requests for exclusion or objections that may be received.

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

---

at *7 (N.D. Cal. Sept. 4, 2018) ("There are compelling reasons to keep [the opt-out threshold] confidential in order to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts."). The agreement is available for review in camera, if the Court so requests.

## III. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The Court's February 5, 2026 Preliminary Approval Order preliminarily certified the Settlement Class under Rule 23(e)(1)(B)(ii) for purposes of the Settlement. *See* Preliminary Approval Order (ECF No. 79 at 2-3, ¶¶1-2) ("the Court finds that each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met or will likely be met"). Nothing has occurred since then to cast doubt on the propriety of class certification for Settlement purposes, and no objections to certification have been received. For all the reasons stated in the Preliminary Approval Order and in the Memorandum of Law in Support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement (ECF No. 77), Lead Plaintiffs respectfully request that the Court grant final certification to the Settlement Class under Rules 23(a) and (b)(3).

## IV. THE PLAN OF ALLOCATION SHOULD BE APPROVED

The Plan of Allocation, which is set forth in the Notice disseminated to the Settlement Class pursuant to the Preliminary Approval Order, also warrants the Court's approval. Approval of a plan of allocation is governed by the same standards of fairness and reasonableness applicable to the settlement as a whole. *See, e.g.*, *Genworth*, 210 F. Supp. 3d at 842 ("To warrant approval, the plan of allocation must also meet the standards by which the . . . settlement was scrutinized— namely, it must be fair and adequate."). "The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Mills*, 265 F.R.D. at 258.

Here, the Plan of Allocation was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert. ¶ 59. In developing the Plan, Lead Plaintiffs' expert calculated the estimated amount of artificial inflation in the price of Driven common stock during the Class Period by considering how the stock price changed after the announcement of each of the two

alleged corrective disclosures, and adjusting for price changes that were attributable to market or industry forces. *See* Notice (Ex. A to Ex. 4), ¶ 70. Under the Plan of Allocation, a Recognized Loss Amount will be calculated for each purchase or acquisition of Driven common stock by an eligible Settlement Class Member in order to derive the amount of each Authorized Claimant's Recognized Claim, and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their respective Recognized Claims. *See* Notice ¶¶ 73-87.

Courts routinely approve substantially similar methods of distributing recoveries in securities class actions such as this one, and Lead Plaintiffs respectfully submit that this Court should approve the Plan of Allocation submitted here. *See, e.g.*, *Phillips*, 2016 WL 1175152, at *4.

## V. NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS

The Notice approved by the Court to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfies Rule 23(e)(1)(B), which requires a court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement.

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. In addition, the Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, the Claims Administrator began mailing copies of the Notice and Claim Form to potential Settlement Class Members and nominees on March 6, 2026. *See* Ex. 4 at ¶¶ 5-7. Through April 24, 2026, the Claims Administrator disseminated a total of 38,613 Notice Packets to potential Settlement Class

Members and nominees. *See id.* ¶ 11. In addition, the Claims Administrator caused the Summary Notice to be published in *The Wall Street Journal* and over the *PR Newswire* on March 20, 2026. *See id.* ¶ 12. The Notice and Claim Form were also published on a website established for the Settlement and on Lead Counsel's website. *See id.* ¶ 13; Uslaner Decl. ¶ 56. This manner of providing notice, which includes individual notice by first-class mail to all class members who can be reasonably identified, supplemented by additional publication and internet notice, was the best notice practicable under the circumstances and satisfied the requirements of due process and Rule 23. *See, e.g.*, *Ollila,* slip op. at 4-6 (approving similar notice program in securities class action); *Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.,* 2021 WL 1659848, at *3 (E.D. Va. April 23, 2021) (same).

## VI. CONCLUSION

For the reasons discussed above and in the Uslaner Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and the Plan of Allocation.

Dated: April 27, 2026

Respectfully submitted,

**TERPENING LAW PLLC**

*/s/ William R. Terpening*
William R. Terpening
221 West 11th Street
Charlotte, North Carolina 28202
Telephone: (980) 265-1700
Facsimile: (980) 265-1729
terpening@terpeninglaw.com

*Liaison Counsel for Lead Plaintiffs*

25

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner
2121 Avenue of the Stars
Suite 2575
Los Angeles, California 90067
Telephone: (310) 819-3481
JonathanU@blbglaw.com

-and-

Hannah Ross
Alec T. Coquin
Prachi Patel
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
alec.coquin@blbglaw.com
prachi.patel@blbglaw.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Settlement Class*

**VMT LAW, P.C.**
Thomas C. Michaud
Francis E. Judd
Aaron L. Castle
79 Alfred Street
Detroit, Michigan
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
fjudd@vmtlaw.com
acastle@vmtlaw.com

*Additional Counsel for Lead Plaintiffs*

26

# ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order *In re: Use of Artificial Intelligence*, No. 3:24-mc-104 (W.D.N.C. June 18, 2024), the undersigned counsel hereby certifies that:

1.     No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2.     Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: April 27, 2026

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner


# CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notification of filing to all parties receiving electronic service in this Action.

Dated: April 27, 2026

*/s/ William R. Terpening*
William R. Terpening