# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DRIVEN BRANDS HOLDINGS INC., JONATHAN G. FITZPATRICK, and TIFFANY L. MASON,<br><br>Defendants. | Case No. 3:23-cv-00895-MOC-DCK<br><br>Judge: Honorable Max O. Cogburn, Jr. |

**DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF
(I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S
<u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS......................................................................................................................iii

I.      INTRODUCTION ............................................................................................................. 1

II.     PROSECUTION OF THE ACTION ................................................................................. 6

    A.      Appointment of Lead Plaintiffs and Lead Counsel................................................. 6

    B.      Lead Plaintiffs' Investigation and Filing of the Amended Complaint.................... 6

    C.      Defendants' Motion to Dismiss the Consolidated Complaint ................................ 7

    D.      Discovery ............................................................................................................... 9

    E.      Mediation Process and Settlement ....................................................................... 10

III.    RISKS OF CONTINUED LITIGATION ........................................................................ 12

    A.      Risks Concerning Liability ................................................................................... 12

        1.      Falsity......................................................................................................... 12

        2.      Materiality.................................................................................................. 13

        3.      Scienter ...................................................................................................... 14

    B.      Risks Related to Loss Causation and Damages .................................................... 15

    C.      Risks Related to Class Certification ..................................................................... 16

    D.      The Settlement Amount Compared To The Likely Maximum Damages
        That Could Be Proved At Trial.............................................................................. 17

IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
    APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ..................................... 18

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ................................. 20

VI.     THE FEE AND EXPENSE APPLICATION .................................................................. 23

    A.      The Fee Application.............................................................................................. 24

        1.      Lead Plaintiffs Have Authorized and Support the Fee Application ......... 24

        2.      The Time and Labor of Lead Counsel ....................................................... 25

3. The Experience and Standing of Lead Counsel ....................................... 26

4. Standing and Caliber of Defendants' Counsel .......................................... 26

5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ................................ 26

6. The Reaction of the Settlement Class to the Fee Application .................... 28

B. The Expense Application ....................................................................... 28

VII. CONCLUSION ............................................................................................. 31

**TABLE OF EXHIBITS**

Exhibit 1    Declaration of Jed D. Melnick in Support of Final Approval of Settlement

Exhibit 2    Declaration of Karl Kramer, Board Chairperson of Genesee County Employees' Retirement System, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 3    Declaration of Joseph Rozell, Board Chairperson of Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Associations, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 4    Declaration of Josephine Bravata Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of The Summary Notice; and (C) Report on Requests for Exclusion Received to Date

Exhibit 5    Declaration of Jonathan D. Uslaner on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

I, JONATHAN D. USLANER, declare as follows:

I am an attorney admitted *pro hac vice* to this Court. I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"). BLB&G serves as Lead Counsel for Lead Plaintiffs Genesee County Employees' Retirement System ("Genesee"), Oakland County Employees' Retirement System ("Oakland County ERS"), and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA" and, together with Oakland County ERS, "Oakland County," and collectively with Genesee, "Lead Plaintiffs"), and as Lead Counsel for the Settlement Class in the above-captioned Action (the "Action"). I submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion") and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Motion"). I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this Action and could and would testify competently thereto.[1]

## I. INTRODUCTION

1. The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $25 million, plus interest, for the benefit of the Settlement Class. The Settlement Amount has been paid into an escrow account and is earning interest. As detailed below, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and near-term recovery while avoiding the risks of continued

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement dated December 19, 2025 (the "Stipulation") (ECF No. 77-1), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) Driven Brands Holdings Inc. ("Driven" or the "Company"), Jonathan G. Fitzpatrick, and Tiffany L. Mason (collectively, "Defendants").

litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

2. The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel, which included, among other things:

(a) conducting an extensive investigation into the alleged fraud, which included identifying, locating, and speaking with over 100 former Driven employees, and performing a thorough review of all publicly available information about the claims, including Driven's regulatory filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, presentations, and media reports issued by and disseminated by the Company, and analyst and media reports concerning Driven;

(b) drafting a detailed 67-page amended complaint based on Lead Counsel's extensive factual investigation, which included information provided by former Driven employees interviewed by Lead Counsel;

(c) defeating Defendants' motion to dismiss the amended complaint under the heightened pleading standard of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Defendants' motion for reconsideration;

(d) negotiating a case schedule, discovery parameters, and a confidentiality agreement, ESI stipulation, and preparing and responding to discovery requests, including requests for the production of documents and interrogatories;

(e) obtaining more than 70,000 pages of documents from Defendants, conducting substantial review of the documents produced, including holding regular meetings to discuss and analyze these documents, preparing memoranda, chronologies, and other work product concerning the relevant evidence to support the claims alleged, developing a discovery plan to pursue further discovery from Defendants and third parties, and holding numerous conferences with Defendants in an effort to resolve substantial disagreements about the scope of discovery;

(f) consulting with experts on issues of loss causation and damages;

(g) drafting Lead Plaintiffs' motion for class certification and preparing, in consultation with Lead Plaintiffs' loss causation and damages expert, a market efficiency expert report;

(h) submitting a detailed mediation statement before Jed Melnick of JAMS, an experienced mediator in complex litigation, setting forth Lead Plaintiffs' positions on highly disputed issues in the case;

2

(i)      engaging in vigorous arm's-length negotiations before Mr. Melnick, including at an in-person mediation session conducted on November 13, 2025; and

(j)      drafting and negotiating the Stipulation setting out the terms of the Settlement, and related documentation.

3.      As a result of these efforts, Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement, including the risk that there might be no recovery at all. While Lead Plaintiffs were able to overcome Defendants' challenges at the pleading stage, there were numerous other hurdles that Lead Plaintiffs would have had to face in continued litigation. As discussed further below, Lead Plaintiffs faced significant risks in establishing all elements of their claims, including falsity, scienter, loss causation, and damages. Defendants argued that many of the alleged misstatements about the Company's integration of its auto-glass business and the operational capacity of Driven's car wash business were not material to investors and, thus, not actionable under the securities laws. Defendants also argued that their alleged misstatements were not made with "scienter," because Defendants earnestly believed their statements about the progress of the auto-glass integration and the performance of the car wash business, and they disclosed material developments to investors as they became aware of them. In addition, Defendants contested Lead Plaintiffs' loss causation arguments and damages calculations, claiming that the stock price declines on the alleged corrective disclosure dates were due to factors unrelated to the alleged fraud—such as macroeconomic retail softness and Driven's mounting rent expenses—and that, at minimum, non-fraud related information released on the same days would need to be disaggregated from damages calculations, reducing Lead Plaintiffs' total potential recovery on behalf of the Settlement Class. Considering these significant risks of litigation, Lead Plaintiffs and Lead Counsel believe that the proposed $25 million Settlement represents a highly favorable result for the Settlement Class.

3

4.	The Settlement was achieved only after arm's-length negotiations between experienced and well-informed counsel, which included an in-person mediation session with Jed Melnick of JAMS, a well-respected and experienced mediator, and the exchange of detailed mediation statements. At the conclusion of the mediation session, Mr. Melnick made a mediator's recommendation that the Parties settle the Action for $25 million, which the Parties accepted on a "double-blind" basis. Mr. Melnick has submitted a declaration in support of the Settlement, which states that the Settlement "represented the highest settlement amount and the most favorable terms that Lead Plaintiffs could have achieved at that time." Declaration of Jed D. Melnick in Support of Final Approval of Settlement ("Melnick Decl."), attached hereto as Exhibit 1, at 4-5.

5.	Lead Plaintiffs endorse the Settlement. Lead Plaintiffs are institutional investors that participated in the Action and monitored the work of Lead Counsel. Lead Plaintiffs' representatives authorized the settlement negotiations with an understanding of the strengths and weaknesses of the Action informed by counsel and their involvement in the case. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to institutional investors like Lead Plaintiffs and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, 1995 WL 709276, at *34 (Nov. 25, 1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Accordingly, Lead Plaintiffs' approval of the Settlement supports the reasonableness of the Settlement.

6.	In sum, due to their substantial efforts, Lead Plaintiffs and Lead Counsel are well-informed of the strengths and weaknesses of the Action, and they believe that the Settlement is fair and reasonable and represents a favorable outcome for the Settlement Class.

4

7.     Lead Plaintiffs also request that the Court approve the proposed Plan of Allocation for the settlement funds. As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court. The proposed Plan of Allocation provides for distribution to eligible claimants on a pro-rata basis, based on losses attributable to the allegations in the Complaint.

8.     Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of risks. Lead Counsel prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore the risk of an unfavorable result. For its efforts in achieving the Settlement, Lead Counsel is applying for an award of attorneys' fees in the amount of 25% of the Settlement Fund. The requested fee has been approved by Lead Plaintiffs and is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries.

9.     Lead Counsel's Fee and Expense Application also seeks payment of $335,258.43 in Litigation Expenses incurred by Lead Counsel in connection with the institution, prosecution, and settlement of the Action, which includes, among other things, the cost of retaining experts, mediation costs, and the fees and expenses of Liaison Counsel.

10.     For all the reasons discussed in this declaration and in the accompanying motions, including the quality of the result obtained and the meaningful litigation risks discussed below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate," and that the Court should approve them under Federal Rule of Civil Procedure 23(e). For similar reasons, and for the additional reasons discussed below, Lead

5

Plaintiffs respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Appointment of Lead Plaintiffs and Lead Counsel

11.     On December 22, 2023, Genesee filed an initial class action complaint in the United States District Court for the Western District of North Carolina against Driven, Jonathan G. Fitzpatrick, and Tiffany L. Mason alleging securities fraud. ECF No. 1.

12.     On February 20, 2024, Genesee, Oakland County ERS, and Oakland County VEBA filed a motion for appointment as Lead Plaintiffs and approval of their selection of counsel for the putative class (ECF Nos. 16-18). On March 5, 2024, Genesee, Oakland County ERS, and Oakland County VEBA filed a notice that their motion for appointment as Lead Plaintiffs was unopposed, as no competing motions had been filed. ECF No. 19.

13.     On May 31, 2024, the Court appointed Genesee, Oakland County ERS, and Oakland County VEBA as Lead Plaintiffs for the Action, and approved their selection of BLB&G as Lead Counsel for the putative class. ECF No. 20.

### B.     Lead Plaintiffs' Investigation and Filing of the Amended Complaint

14.     Lead Counsel undertook a significant factual investigation into the alleged fraud and a detailed analysis of the potential claims that could be asserted on behalf of investors in Driven common stock. This investigation began prior to the Court's appointment of Lead Plaintiffs and continued through the preparation of the Amended Complaint in August 2024. The investigation included a careful review and analysis of: (a) transcripts, press releases, news articles, and other public statements issued by or concerning Driven; (b) research reports issued by financial analysts concerning the Company; (c) reports and other documents filed publicly by Driven with

6

the SEC; (d) interviews with former Driven employees; (e) analyses of the price movements in Driven's common stock; and (f) other publicly available information.

15. In connection with the investigation, Lead Counsel and its in-house investigators identified, located, and spoke to 105 former employees of Driven and other potential witnesses who may have had relevant information pertaining to the claims asserted in the Action. Lead Plaintiffs included information from nine former Driven employees in the subsequently filed Amended Complaint.

16. Lead Counsel also worked with a financial economist on loss causation and damages issues in connection with its investigation.

17. On August 13, 2024, Lead Plaintiffs filed the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 31) (the "Amended Complaint" or "Complaint"), based on this extensive investigation. The Amended Complaint alleged violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. The Amended Complaint alleged that Driven, Driven's Chief Executive Officer Jonathan G. Fitzpatrick, and its former Chief Financial Officer Tiffany L. Mason (together, Fitzpatrick and Mason are the "Individual Defendants") made statements misrepresenting the progress of Driven's auto-glass integration campaign and the operational performance and competitive position of Driven's car wash business during the Class Period; that the price of Driven's common stock was inflated as a result of the alleged misstatements; and that the price declined when the truth was disclosed through two corrective disclosures, on October 26, 2022 and August 2, 2023.

**C.    Defendants' Motion to Dismiss the Consolidated Complaint**

18. On October 14, 2024, Defendants filed a motion to dismiss the Amended Complaint (the "Motion to Dismiss") and an accompanying declaration attaching 26 exhibits. ECF Nos. 37-39. Defendants' Motion to Dismiss challenged virtually every aspect of the Amended Complaint

7

and previewed many arguments Defendants were expected to continue to make throughout the case. These arguments included, *inter alia*,

(a) that the Amended Complaint failed to allege adequately any false or misleading statement or omission because Lead Plaintiffs could not identify a statement that was false when made, and the Amended Complaint amounted to "fraud by hindsight";

(b) that many of the challenged statements were inactionable under the "bespeaks caution" doctrine because Defendants had warned investors of the specific, relevant risks related to the auto-glass and car wash businesses and, similarly, that Defendants' forward-looking statements were protected by the PSLRA's safe-harbor provision because the Company had accompanied its statements with sufficient cautionary language and because the Amended Complaint did not allege that Defendants had actual knowledge that their statements were false;

(c) that other challenged statements were inactionable statements of corporate optimism or puffery, or were genuinely-held opinions; and

(d) that the Amended Complaint did not allege facts giving rise to a strong inference that Defendants acted with the requisite intent to defraud investors.

19. On December 13, 2024, Lead Plaintiffs filed their opposition to Defendants' Motion to Dismiss. ECF No. 42. Lead Plaintiffs' opposition challenged every argument raised by the Motion to Dismiss, including among other things arguing that Lead Plaintiffs sufficiently alleged the falsity of Defendants' statements concerning Driven's auto-glass integration and car wash business and that the allegations gave rise to a strong inference of scienter.

20. Defendants filed their reply brief in further support of the Motion to Dismiss on January 27, 2025. ECF No. 43.

21. On February 20, 2025, the Court entered an Order denying Defendants' Motion to Dismiss in its entirety. ECF No. 45.

22. On March 6, 2025, Defendants moved for reconsideration of the Court's order on Defendants' Motion to Dismiss and, in the alternative, moved to certify the Court's order for interlocutory appeal (the "Motion for Reconsideration"). ECF Nos. 48-49. On March 17, 2025,

Lead Plaintiffs filed their opposition to the Motion for Reconsideration. ECF No. 52. On March 24, 2025, Defendants filed their reply brief in further support of the Motion for Reconsideration. ECF No. 56.

23. On April 21, 2025, Defendants filed their Answer to the Complaint. ECF No. 57. Defendants' Answer denied Lead Plaintiffs' allegations of wrongdoing and asserted various defenses to the claims pled against Defendants.

24. On October 29, 2025, the Court granted Defendants' Motion for Reconsideration and again denied Defendants' Motion to Dismiss. ECF No. 73.

**D. Discovery**

25. On May 12, 2025, the Parties filed a Certification of Initial Attorney Conference and Discovery Plan pursuant to Fed. R. Civ. P. 26(f). ECF No. 58. On May 13, 2025, the Court entered a Pretrial Order and Case Management Plan. ECF No. 61.

26. The Parties commenced discovery in May 2025. In response to Lead Plaintiffs' requests for production of documents, Defendants produced over 70,000 pages of documents to Lead Plaintiffs. In addition, the Parties met and conferred between May 2025 and November 2025 and exchanged numerous letters concerning disputed discovery issues. In response to Defendants' requests for production of documents, Lead Plaintiffs collected over 250,000 documents and reviewed thousands of documents for responsiveness and privilege.

27. Lead Counsel searched the documents produced by Defendants for what they believed were the most relevant documents and carefully reviewed, analyzed, and coded those documents. In reviewing the documents, attorneys were tasked with making several analytical determinations as to the documents' importance and relevance. Specifically, they determined whether the documents were "hot," "relevant," or "not relevant." They also assessed which specific issues the documents concerned and determined the identities of the Driven employees or

other potential deponents to whom the documents related. Lead Counsel's partners structured the document review to include recurring team meetings to discuss the documents of highest interest and other issues that arose during the document review. Through these meetings, Lead Counsel ensured that all attorneys involved in the review understood the developing nature of the evidence and focused document review on the key issues in the Action. The documents discussed included those that were particularly relevant to Lead Plaintiffs' claims and that offered insight into other important aspects of the case, including Defendants' likeliest defenses. The attorneys working on the document review also prepared chronologies and memoranda on various issues concerning the relevant evidence to support Lead Plaintiffs' claims.

### E. Mediation Process and Settlement

28. The Parties began exploring the possibility of a settlement in the fall of 2025. The Parties agreed to engage in private mediation and retained Jed Melnick of JAMS, an experienced mediator in complex litigation, to act as mediator in the Action. In advance of the mediation, the Parties exchanged and submitted detailed mediation statements to the Mediator setting forth their positions on highly disputed issues in the case, including liability and damages.

29. On November 13, 2025, counsel for the Parties participated in a full-day mediation session before Mr. Melnick. At the conclusion of the mediation session, Mr. Melnick made a mediator's recommendation that the Parties settle the Action for $25,000,000, which the Parties accepted on a "double-blind" basis.

30. On November 14, 2025, the Parties filed a Joint Motion to Hold Case in Abeyance Pending Settlement (ECF No. 74), which the Court granted on November 17, 2025 (ECF No. 75).

31. Following their agreement in principle to settle the Action, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers. On December 19, 2025, the Parties executed the Stipulation which sets

10

forth the terms and conditions of the Settlement. *See* ECF No. 77, Ex. 1. In addition to the Stipulation, Lead Plaintiffs and Defendants have entered into a standard Supplemental Agreement regarding requests for exclusion from the Settlement Class, which provides that Driven has the option to terminate the Settlement if persons who request exclusion from the Settlement Class exceed a certain threshold. *See* Stipulation ¶ 37.

32. On December 19, 2025, Lead Plaintiffs submitted the Stipulation to the Court as part of their Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Settlement Class (the "Preliminary Approval Motion"). ECF Nos. 76, 77.

33. On February 5, 2026, the Court entered an Order granting Lead Plaintiffs' Preliminary Approval Motion (ECF No. 79) (the "Preliminary Approval Order"), which, among other things: (a) preliminarily approved the Settlement; (b) preliminarily certified the Settlement Class for Settlement purposes; (c) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice of the Settlement to be given to potential Settlement Class Members through dissemination of the Notice and Claim Form, posting the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over *PR Newswire*; (d) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application; and (e) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also scheduled the Settlement Hearing for June 1, 2026, at 9:45 a.m., to determine, among other things, whether the Settlement should be finally approved.

## III. RISKS OF CONTINUED LITIGATION

34. Lead Plaintiffs and Lead Counsel believe the claims asserted against Defendants in the Action are meritorious. They recognize, however, that the Action presented risks to establishing liability. As discussed further below, Defendants had vigorously contended that their challenged statements about the integration of Driven's auto-glass business and the operational execution and customer retention of Driven's car wash business were not material or false or misleading when made and further that, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors. Defendants would also argue that any alleged misstatements were not the cause of the declines in the price of Driven common stock at issue and that factors unrelated to Defendants' alleged misrepresentations caused Driven's stock price to decline. Therefore, the risks of continued litigation were significant, and the class's ultimate potential for recovery was always in question.

### A. Risks Concerning Liability

#### 1. Falsity

35. While Lead Plaintiffs ultimately prevailed in sustaining all of their claims at the Motion to Dismiss stage—including by defeating Defendants' motion for reconsideration of the Court's order denying the Motion to Dismiss—Lead Plaintiffs recognize that they would face challenges in proving that Defendants' statements were materially false and misleading when made at summary judgment and trial.

36. With respect to Lead Plaintiffs' allegations concerning Driven's auto-glass business, Defendants were expected to argue that their statements about the progress of integrating the acquired auto-glass businesses into a single platform were true at the time they were made and were based on the best information Defendants had at the time.

37. Lead Plaintiffs also faced challenges in establishing falsity with respect to their allegations concerning Driven's car wash business. Defendants were expected to argue that the same-store sales declines experienced by the car wash segment were attributable to macroeconomic conditions rather than any operational failures or systematic underinvestment. Defendants were also expected to argue that their statements about customer retention in the car wash business were consistent with the information available to them at the time. Thus, to prove falsity, Lead Plaintiffs faced the risk that it might not have been sufficient for Lead Plaintiffs to simply establish that Driven's auto-glass integration was delayed or that car wash same-store sales were declining: they may need to have proven that the delays and declines were far more significant than anything Defendants had disclosed and further were known by Defendants earlier than disclosed. While allegations in the Complaint in this regard, including those from former Driven employees, were found sufficient at the pleading stage, it was uncertain that the same result would be found after a review of all admissible evidence at summary judgment or trial.

38. Additionally, Lead Plaintiffs anticipate that Defendants would likely use the absence of certain facts—including any SEC investigation or enforcement action—to support their argument against a finding of falsity at later stages of the litigation.

### 2. Materiality

39. Defendants were also expected to argue that—even if any of the statements concerning the progress of the auto-glass integration or the car wash business were found to be false or misleading—these statements were not material to investors. The Complaint alleges that the statement that Driven was "committed to having the best stores" is a material misrepresentation. Defendants were expected to argue that the Fourth Circuit has held that similar statements were non-actionable corporate puffery. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999) (finding inactionable statement that newly acquired "clean and conveniently

13

located stores are especially well suited to the demands of our customers"). Defendants were expected to assert that many of Defendants' statements were susceptible to puffery attacks if the Action proceeded to summary judgment or trial.

### 3. Scienter

40. Even if Lead Plaintiffs succeeded in establishing that Defendants' statements were materially false or misleading, Lead Plaintiffs would still need to prove to a jury that Defendants made the misstatements with scienter—i.e., an intent to defraud or with deliberate recklessness. Throughout this litigation, Defendants have vigorously argued that they believed their statements to be true and that they had no intent to commit fraud. They would certainly have continued to press those arguments at summary judgment and trial, when Lead Plaintiffs' allegations no longer need to be accepted as true.

41. Defendants were expected to continue to argue that they earnestly believed their statements about the progress of the auto-glass integration and the performance of the car wash business, and that they disclosed material developments to investors as they became aware of them—including on October 26, 2022, when Defendants disclosed significant delays in the auto-glass business, and again on August 2, 2023, when Defendants acknowledged further integration setbacks and same-store car wash sales declines. Defendants were expected to continue to argue that these disclosures and other cautionary statements were powerful evidence that Defendants were making their best efforts to keep investors informed. There was no certainty that Lead Plaintiffs would succeed in convincing a jury that Defendants knew that the integration delays and car wash operational failures were more significant than what was disclosed to investors—or were known by Defendants earlier than their disclosures.

14

## B. Risks Related to Loss Causation and Damages

42. Assuming that Lead Plaintiffs and Lead Counsel overcame Defendants' arguments and established liability at trial, Lead Plaintiffs would have still needed to confront additional challenges in establishing loss causation and damages. These were some of the most significant risks remaining in the case.

43. Specifically, there was a material risk that the Court might eliminate from recovery one or both of the two alleged corrective disclosures at class certification, summary judgment, or trial. For example, Defendants were expected to argue that the October 26, 2022 corrective disclosure—in which Driven announced significant delays in its ability to generate auto-glass revenue and acknowledged that the glass business was still "a year away" from being in a position to service insurers—was sufficient to warn investors about integration issues in the glass business generally, and that, therefore, the corrective disclosure on August 2, 2023, during which Defendants reiterated many of the same risks, was not fully compensable. If the Court had agreed with Defendants, maximum recoverable damages would have been reduced dramatically. Lead Plaintiffs' damages expert estimated maximum recoverable damages in this case—aggressively assuming complete success in establishing liability and loss causation for all of the alleged misstatements, throughout the entire Class Period, and for both of the corrective disclosures—of $268.9 million. However, if the Court were to have eliminated the alleged auto-glass misstatements from the case following the first corrective disclosure—which was a risk in this Action—maximum recoverable damages would have been reduced by approximately half, to $134 million.

44. In addition, Lead Plaintiffs anticipate that Defendants would argue at summary judgment, trial, and subsequent stages of the proceedings, that the declines in the price of Driven common stock were not caused entirely—or at all—by the alleged corrective disclosures.

Defendants would argue that each of the alleged corrective disclosures coincided with the release of other negative information, unrelated to the allegations, which must be disaggregated from any measure of damages. In particular, on August 2, 2023—the date of the largest stock price decline in this case—Defendants disclosed, in addition to information concerning the glass and car wash businesses, the negative impact of weather on the car wash segment, mounting rent expenses, and macroeconomic retail traffic softness. Defendants would have had colorable arguments that a large portion of the stock price declines on the alleged corrective disclosure dates were due to these non-fraud-related factors. The disaggregation analysis was likely to materially lower the amount of potential recovery in this case.

45. Accordingly, loss causation and damages challenges would have provided Defendants with strong arguments for reducing the ultimate maximum damages that Lead Plaintiffs could obtain, even if they succeeded on all liability issues.

## C. Risks Related to Class Certification

46. Lead Plaintiffs and Lead Counsel believe that this Action is suitable for class certification and that it would have been appropriate for the Action to be certified. However, at the class certification stage, Lead Plaintiffs anticipated that Defendants would contend that their misstatements did not impact the price of Driven's stock.

47. Defendants were expected to argue that many of the alleged misstatements, and in particular those following the first corrective disclosure in this Action, were vulnerable to challenge at class certification because they were purportedly "generic" or aspirational corporate puffery. These included, for example, Defendants' statements that "we have built a really nice sort of base platform in the Glass business" and are "implementing our new standard operating procedures." An adverse ruling on this "price impact" issue at class certification might have

16

materially impaired the case, including by eliminating the final corrective disclosure and significantly reducing the amount of maximum recoverable damages.

**D.     The Settlement Amount Compared To The Likely Maximum Damages That Could Be Proved At Trial**

48.     The $25 million Settlement is a favorable result when compared to the maximum amount of damages that could be recovered for the Settlement Class. As noted above, Lead Plaintiffs' damages expert estimated absolute maximum recoverable damages in the Action—which aggressively assumed complete success in establishing liability and loss causation for all the alleged misstatements, throughout the entire Class Period, and for both of the corrective disclosures—of $268.9 million. However, as noted above, if the Court eliminated the alleged auto-glass misstatements from the case following the first corrective disclosure, maximum recoverable damages would have been reduced by approximately half, to $134 million.

49.     The Settlement therefore recovers approximately 9.3% to 18.7% of the absolute maximum estimated damages, before accounting for the need to disaggregate for non-fraud related factors—a favorable recovery in light of the risks of continued litigation. *See, e.g.*, *Ollila v. Babcock & Wilcox Enters., Inc. et al.*, No. 3:17-CV-00109 (W.D.N.C. 2019) (Cogburn, J.), ECF No. 84 at 13 and ECF No. 90 at 4 (approving settlement representing approximately 4.8-6.9% of estimated damages); *Boger v. Citrix Sys., Inc.*, No. 19-cv-01234-LKG, 2023 WL 3763974, at *11 & n. 7 (D. Md. June 1, 2023) (approving settlement representing 8.8% of maximum potential damages because "it is 'well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery'"); *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *12 (E.D.N.Y. Jan. 21, 2022) (approving securities class action settlement representing "6.4% of the maximum estimated aggregate damages [of] $140,000,000, assuming Plaintiffs can prove all their relevant causation arguments" as "within the range of

reasonableness."); *In re Snap Inc. Sec. Litig.*, 2021 WL 667590, at *1 (C.D. Cal. Feb. 18, 2021) (approving settlement "represent[ing] approximately 7.8% of the class's maximum potential aggregate damages" and noting that it is "similar to the percent recovered in other court-approved securities settlements"); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at **3, 10 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of the maximum damages).

50.     Given the meaningful litigation risks, and the immediacy and amount of the $25,000,000 recovery for the Settlement Class, Lead Plaintiffs and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

51.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to potential members of the Settlement Class. The Preliminary Approval Order also set May 11, 2026 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class.

52.     In accordance with the Preliminary Approval Order, Lead Counsel instructed Strategic Claims Services ("SCS"), the Claims Administrator approved by the Court, to begin disseminating copies of the Notice and the Claim Form and to publish the Summary Notice. The Notice contained, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informed Settlement Class Members of

Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $500,000.

53. In order to disseminate the Notice and Claim Form (together, the "Notice Packet"), SCS obtained information from the Company and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. The accompanying Declaration of Josephine Bravata of SCS, attached hereto as Exhibit 4, provides additional information about the Claims Administrator's distribution of the Notice Packet. *See* Bravata Decl. ¶¶ 3-11.

54. SCS began mailing copies of the Notice Packet to potential Settlement Class Members and nominee owners on March 6, 2026. *Id*. ¶¶ 5-7. Through April 24, 2026, SCS disseminated a total of 38,613 Notice Packets to potential Settlement Class Members and nominees. *Id*. ¶ 11.

55. On March 20, 2026, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*. *Id*. ¶ 12.

56. SCS also established a dedicated settlement website, www.DrivenBrandsSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, Complaint, and other relevant documents. *Id* ¶ 13. That website became operational on March 4, 2026. *Id*. Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com. Lead Counsel and SCS will continue to monitor and to update the website as needed as the settlement process continues. For example, Lead Plaintiffs' papers in support of their

motion for final approval of the Settlement and Lead Counsel's papers in support of its motion for attorneys' fees and litigation expenses will be made available on the website after they are filed, and any orders entered by the Court in connection with the motions will also be posted.

57.	As noted above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, or Fee and Expense Application, or to request exclusion from the Settlement Class is May 11, 2026. To date, no requests for exclusion have been received, *see* Bravata Decl. ¶ 15, and no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before May 25, 2026, that will address all requests for exclusion and any objections that may be received.

## V.	ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

58.	Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than July 6, 2026. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to a plan of allocation approved by the Court.

59.	Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation" or "Plan"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered economic losses as result of the conduct alleged in the Action.

60.	The Plan of Allocation is set forth at pages 14 to 18 of the Notice. *See* Bravata Decl., Ex. A at pp. 14-18. As described in the Notice, the calculations under the Plan of Allocation

are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable pro-rata allocation of the Net Settlement Fund. Notice ¶ 69.

61.     In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share price of Driven common stock which allegedly was proximately caused by Defendants' alleged false and misleading statements during the Class Period. *See* Notice ¶ 70. In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered price changes in Driven common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations, adjusting for price changes that were attributable to market or industry forces. *Id*.

62.     In this case, Lead Plaintiffs allege that Defendants made false statements and omitted material facts that rendered their statements misleading during the Class Period (from October 27, 2021 through August 1, 2023, inclusive), which had the effect of artificially inflating the price of Driven common stock, and that corrective information was released to the market on October 26, 2022 and August 2, 2023, which removed artificial inflation from the price of Driven common stock on those days. Notice ¶ 71. In order to be eligible under the Plan of Allocation, a Settlement Class Member that purchased or acquired Driven common stock during the Class Period must have held those shares through at least one of the dates where new corrective information was released to the market and partially removed the artificial inflation from the price of Driven common stock. *See* Notice ¶ 72.

63.     Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Driven common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided. In general, Recognized Loss Amounts are calculated as the lesser of: (a) the difference between the amount of alleged

artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. *See* Notice ¶ 72. For shares sold prior to the close of trading on October 25, 2022, the Recognized Loss Amount is zero, because those shares were sold before first alleged corrective disclosure and thus were not damaged by the alleged fraud. *Id.* ¶ 74.A.

64. In addition, as stated in the Notice, and in accordance with the PSLRA, Recognized Loss Amounts for shares of Driven common stock sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale. Notice ¶ 74.C(ii). Recognized Loss Amounts for shares of Driven common stock still held as of the close of trading on October 30, 2023, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $13.28, the average closing price for the stock during that 90-day period. *Id.* ¶ 74.D.

65. The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Driven common stock during the Class Period is the Claimant's "Recognized Claim." Notice ¶ 75. The Plan of Allocation also limits a Claimants' Recognized Claims based on whether they had an overall market loss in their transactions in Driven common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in Driven common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id.* ¶¶ 82-83.

66. The Net Settlement Fund will be allocated to Authorized Claimants on a pro-rata basis based on the relative size of their Recognized Claims. Notice ¶ 84. If an Authorized Claimant's pro-rata distribution amount calculates to less than ten dollars, no payment will be

made to that Authorized Claimant. Notice ¶ 85. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

67. One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial pro-rata distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 86. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), the remaining balance will be contributed to one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be proposed by Lead Counsel and approved by the Court. *Id.*

68. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on losses they suffered on purchases of Driven common stock that were attributable to the conduct alleged. To date, no objections to the proposed Plan of Allocation have been received.

## VI. THE FEE AND EXPENSE APPLICATION

69. Lead Counsel is applying to the Court for an award of attorneys' fees of 25% of the Settlement Fund, including any interest earned (the "Fee Application"). Lead Counsel also requests payment for Litigation Expenses that it incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $335,258.43 (the "Expense Application"). The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum, filed herewith. The primary factual bases for the requested fee and expenses are summarized below.

23

### A. The Fee Application

70. Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. The percentage method is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. Use of the percentage method has been recognized as appropriate by the Supreme Court and Fourth Circuit in comparable cases.

71. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in the Fee Memorandum, a 25% fee award is within the range of percentage fees typically awarded in securities class actions in this Circuit in comparable cases, and is fair and reasonable in light of all the circumstances in this case.

#### 1. Lead Plaintiffs Have Authorized and Support the Fee Application

72. Lead Plaintiffs Genesee and Oakland County are institutional investors that closely supervised and monitored the prosecution and settlement of the Action. *See* Declaration of Karl Kramer on behalf of Genesee, attached hereto as Exhibit 2 ("Kramer Decl."), at ¶¶ 4-6; Declaration of Joseph Rozell, on behalf of Oakland County, attached hereto as Exhibit 3 ( "Rozell Decl."), at ¶¶ 4-6. Lead Plaintiffs fully support Lead Counsel's requested fee of 25% of the Settlement Fund. Lead Plaintiffs have evaluated the Fee Application and believe that it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Lead Counsel. *See* Kramer Decl., ¶ 10; Rozell Decl., ¶ 10. Lead Plaintiffs' endorsement of Lead Counsel's Fee Application further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Time and Labor of Lead Counsel

73. The time and labor expended by Lead Counsel in pursuing this Action and achieving the Settlement also support the reasonableness of the requested fee. Attached hereto as Exhibit 5 in support of the motion for attorneys' fees and litigation expenses is my fee and expense declaration on behalf of BLB&G (the "Fee and Expense Declaration"). The Fee and Expense Declaration indicates the amount of time spent by each BLB&G attorney and professional support staff employee who devoted ten or more hours to the Action from its inception through and including April 17, 2026, and the lodestar calculation for those individuals based on their current hourly rates. The Fee and Expense Declaration also includes a schedule of expenses incurred by BLB&G, delineated by category. Lead Counsel notes that it already has and will continue to invest additional time and effort in this case after the April 17, 2026 cut-off imposed for its lodestar submission on this application.

74. As set forth in the Fee and Expense Declaration, Lead Counsel has expended 3,959.00 hours in the prosecution and resolution of this Action, with a total lodestar of $2,826,691.25. Accordingly, the requested fee represents a 2.21 multiplier on Lead Counsel's lodestar. As discussed in the Fee Memorandum, this multiplier is well within the range of multipliers awarded in comparable cases and thus supports the reasonableness of the requested fee.

75. As described above in greater detail, the work that Lead Counsel performed in this Action included, among other things: (a) conducting a thorough investigation into the claims asserted, which included identifying, locating, and speaking with 105 former Driven employees, performing a detailed review of public documents, and consulting with experts; (b) drafting the detailed Amended Complaint based on this extensive investigation; (c) preparing Lead Plaintiffs' opposition to Defendants' motion to dismiss the Amended Complaint and Defendants' motion for reconsideration; (d) undertaking substantial fact discovery, including preparing and responding to

requests for the production of documents and interrogatories, obtaining over 70,000 pages of documents, and identifying and reviewing the most relevant documents produced; (e) consulting with damages experts; and (f) engaging in arm's-length settlement negotiations to achieve the Settlement.

### 3. The Experience and Standing of Lead Counsel

76. The skill and expertise of Lead Counsel also support the requested fee. A copy of Lead Counsel BLB&G's firm resume, which includes information about the standing of the firm and brief biographical summaries for each attorney who worked on the matter, including information about their position, education, and relevant experience, is attached as Exhibit C to BLB&G's Fee and Expense Declaration. As demonstrated by the firm resume, BLB&G is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.

### 4. Standing and Caliber of Defendants' Counsel

77. Defendants were represented in the Action by a team of attorneys from Gibson, Dunn & Crutcher LLP; Robinson, Bradshaw & Hinson, P.A.; and Rottenberg Lipman Rich, P.C., who vigorously litigated the Action. In the face of this skillful and well-financed opposition, Lead Counsel was able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that will benefit the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

78. The prosecution of these claims was undertaken on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. The risks assumed by Lead Counsel here, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

26

79.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of being compensated for the substantial investment of time and the outlay of money that the prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation often proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet it has devoted nearly 4,000 hours and incurred more than $335,000 in expenses in connection with the prosecution and resolution of this Action.

80.     Lead Counsel also bore the risk that no recovery would be achieved in the Action. As discussed above, this case presented a number of significant trial risks and uncertainties, including challenges in proving the materiality and falsity of Defendants' statements, establishing scienter, and establishing loss causation and damages.

81.     As noted above, the Settlement was reached only after Lead Counsel had conducted a thorough investigation and drafted a detailed Complaint that survived Defendants' motion to dismiss and motion for reconsideration. However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to conduct substantial fact and expert discovery; brief a motion for class certification; oppose Defendants' expected motions for summary judgment; and prepare and take the case to trial. Moreover, even if the jury

27

returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions and appeals.

82. Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class. In light of this recovery and Lead Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 6. The Reaction of the Settlement Class to the Fee Application

83. As noted above, through April 24, 2026, over 38,600 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Bravata Decl. ¶ 11 and Ex. A (Notice ¶¶ 5, 49). In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire* on March 20, 2026. *See* Bravata Decl. ¶ 12. To date, no objections to the request for attorneys' fees have been received.

84. In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it diligently without any compensation or guarantee of success. Based on the highly favorable result obtained, the quality of the work performed, the substantial risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

### B. The Expense Application

85. Lead Counsel also respectfully seeks payment from the Settlement Fund of $335,258.43 for Litigation Expenses that it reasonably incurred in connection with the prosecution and resolution of the Action (the "Expense Application").

86. From the outset of the Action, Lead Counsel has been aware that that it might not recover any of its expenses (if the litigation was unsuccessful), and, further, if there were to be

reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even assuming that the case were ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

87. As set forth in the BLB&G's Fee and Expense Declaration attached hereto as Exhibit 5, Lead Counsel has incurred a total of $335,258.43 in unreimbursed litigation expenses in connection with the prosecution and resolution of the Action. The expenses are summarized in Exhibit B to the BLB&G Fee and Expense Declaration, which identifies each category of expense, *e.g.*, experts, mediation, and online legal and factual research) and the amount incurred for each category.

88. Of the total amount of expenses, $196,352.50, or approximately 59%, was expended for the retention of Lead Plaintiffs' damages experts. Lead Counsel consulted with well-qualified experts in market efficiency, loss causation, and damages during its investigation, and the preparation of the Amended Complaint; during discovery; in connection with Lead Plaintiffs' anticipated motion for class certification; in connection with settlement negotiations with Defendants; and, in the development of the proposed Plan of Allocation.

89. Lead Counsel also seeks $58,304.00, or approximately 17% of the total amount of expenses, for reimbursement of the legal fees and expenses for Liaison Counsel who worked for the benefit of the Settlement Class on an hourly basis in this matter. Liaison Counsel provided substantial assistance throughout the litigation in formulating strategy, reviewing and submitting

court filings in the Western District of North Carolina, and providing advice with respect to practices and procedures in the District and the Charlotte Division.

90. Another large component of the litigation expenses was for online legal and factual research, which was necessary to prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss and motion for reconsideration, and to support Lead Plaintiffs' anticipated motion for class certification. The charges for on-line research amounted to $51,477.08, or approximately 15% of the total amount of expenses.

91. Lead Plaintiffs' share of the mediation costs paid to JAMS for the services of Mr. Melnick was $20,000, or approximately 6% of the total expenses.

92. The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, service of process fees, local transportation, and express mail expenses. All of the litigation expenses incurred were reasonable and necessary to the successful litigation of the Action.

93. In addition, Lead Plaintiffs seek reimbursement of a total of $5,105.21 for the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class. Specifically, Genesee seeks $2,100.30 in compensation for 36.75 hours that its employees dedicated to the Action. *See* Kramer Decl. ¶¶ 12-15. Oakland County requests $3,004.91 in compensation for 29.90 hours dedicated by its employees. *See* Rozell Decl. ¶¶ 12-15. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 17-18.

94. The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $500,000, which

might include PSLRA awards for Lead Plaintiffs. Notice ¶¶ 5, 49. The total amount requested, $340,363.64, which includes $335,258.43 for Lead Counsel's expenses and a total of $5,105.21 for Lead Plaintiffs' PSLRA Awards, is well below the $500,000 that Settlement Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

95.     The expenses incurred by Lead Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

## VII.    CONCLUSION

96.     For all the foregoing reasons, Lead Plaintiffs respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the request for payment of Lead Counsel's expenses in the amount of $335,258.43 should also be approved, as well as Lead Plaintiffs' request for reimbursement of a total of $5,105.21 in reasonable costs that were directly related to their representation of the Settlement Class, as authorized by the PSLRA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of April, 2026.

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner
